FILED
OFFICE OF ADMINISTRATIVE HEARINGS
05/28/2021 9:00 AM

| STATE OF NORTH CAROLINA | IN THE OFFICE OF ADMINISTRATIVE HEARINGS |
| --- | --- |
| COUNTY OF WAKE | 20 EDC 02645, 20 EDC 03551 |

| | |
| --- | --- |
| GM by and through her parents DM and JM<br>Petitioner,<br><br>v.<br><br>Wake County Board of Education<br>Respondent. | **FINAL DECISION** |

**THIS MATTER** was heard before the undersigned Honorable Stacey B. Bawtinhimer, Administrative Law Judge presiding, on the following dates: November 16-20 and 23, at the Office of Administrative Hearings in Raleigh, North Carolina. Additional evidence was taken on March 4, 2021.

In this contested case, D.M. and J.M. ("Parents") on behalf of their daughter G.M. ("Petitioners") assert that Wake County Board of Education ("WCPSS" or "Respondent" or "Wake County Schools") violated the Individuals with Disabilities Education Act ("IDEA") and its implementing regulations, thus significantly impeding G.M.'s parents' right to participate in the decision-making process regarding the provision of a free appropriate public education to G.M., denying G.M. a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"), failing to conduct appropriate evaluations to make informed decisions regarding G.M.'s needs, and failing to provide services in accordance with her Individualized Education Program ("IEP").

While Petitioners asserted numerous procedural and substantive violations of the IDEA, the primary issue was whether G.M., a student with Cortical Visual Impairment ("CVI") who, except for reading fluency, was on grade level in all academic subjects should be given Braille instruction.

After hearing the evidence presented and considering the written and oral arguments of counsel, the Undersigned is of the opinion that Respondent has denied Petitioner G.M. a FAPE on this primary issue as well as the other issues.

## INTRODUCTION

### A Case of First Impression

This is a case of first impression —as there have been no other cases in the North Carolina Office of Administrative Hearings in which a district demanded the inclusion of instruction in Braille

in the IEP of a student with grade-level visual reading proficiency, without a degenerative ocular condition, and over the vehement objections of her parents. Based on the Undersigned's research, this also appears to be a case of first impression nationally, so the Undersigned was unable to find law on point for guidance.

Even without precedent, the Supreme Court requires that the hearing officer to determine whether Braille instruction is appropriate based on the "unique circumstances of G.M." not anyone else. Respondent, on the other hand, asserts that the IDEA "presumes" that Braille instruction will be taught to a student with visual impairment and that this Tribunal is bound by that presumption. Even assuming, *arguendo* as Respondent asserts, that there is a "presumption for Braille instruction," both the IDEA and the Supreme Court require that the IEP team determine if such instruction is appropriate for a visually disabled student based on that student's unique needs. In this case, at this time, the Undersigned finds that Braille instruction is not appropriate for G.M.

**Primary Issue: Braille Instruction for Student with CVI**

1. The primary issue in this case is whether the school-based members of the IEP Team denied G.M. a FAPE by deciding to incorporate Braille instruction into her IEP in September 2020 (the "September 2020 IEP Team").

2. At that time, G.M. was a third-grader, visually impaired student whose primary diagnosis was Cortical Visual Impairment ("CVI"). CVI is a neurological rather than ocular diagnosis that, unlike many ocular conditions, can and does improve over time with appropriate interventions.

3. Respondent does not dispute that G.M. is on grade level and her vision has improved. In fact, Respondent concedes that:

> [b]oth Petitioners and Respondent agree that G.M. needs CVI-specific supports and strategies and that G.M. has realized improvements in her functional vision in recent years while using CVI-based strategies and accommodations. … Both Petitioners and Respondent agree that G.M. can and does use her vision to engage in instruction and that she is academically on grade level in almost all areas.

Resp't Pro. FD, Intro. p. 1.

4. Reading fluency is G.M.'s major academic difficulty. According to Respondent, G.M.'s visual impairment caused G.M.'s fluency deficit and G.M.'s inability to "keep up" with her nondisabled peers in the regular curriculum. Because of this "single academic"[1] area of disagreement, the school-based IEP Team members concluded that G.M. must have instruction in Braille. The school-based IEP Team members acknowledged that assistive technology typically used for reading fluency deficits such as read aloud, books on tape, etc. (auditory media) accommodated G.M.'s fluency deficit while her vision continued to improve.

---

[1] Respondent concedes that: "[t]he disagreement over Braille arises from [this] single academic issue…". Resp't Pro. FD, Intro. p. 1.

5. Respondent asserts that Braille is required because there is a “Braille presumption” in the IDEA and that the school staff should be given deference in this decision. This “presumption” purportedly “exists to ensure that student with visual impairments have the opportunity to engage the written word.” *Id.* p. 2. The Undersigned declines to adopt the “Braille presumption” proposed by Respondent. G.M. “engages” the written word by vision and her fluency can be addressed through auditory means. Moreover, no deference is owed to the school staff who have no expertise in CVI or to the VI teacher who was insufficiently trained in CVI techniques which could have addressed G.M.’s fluency deficits.

6. The unique circumstances of G.M., a student who is becoming more “sighted” and less virtually impaired, dictate what is appropriate instruction for her. According to Dr. Christine Roman, the only expert witness qualified in CVI, Braille is not appropriate for G.M.

7. In response to her expert opinion, Respondent offered no opposing expert testimony[2] or offered a cogent and responsive explanation for their decisions. Therefore, based on a preponderance of evidence, this “primary issue” about the incorporation of Braille instruction in G.M.’s September 2020 IEP is decided in Petitioner’s favor.

**APPEARANCES**

For Petitioners: Stacey M. Gahagan
K. Alice Tolin
Gahagan Paradis, P.L.L.C.
Suite 210-C
3326 Durham Chapel Hill Blvd.
Durham, North Carolina 27707

For Respondent: David Noland
Steve Rawson
Tharrington Smith, L.L.P.
150 Fayetteville Street, Suite 1800
Raleigh, North Carolina 27602

**WITNESSES**

For Petitioners: Christine Roman, Ph.D., Expert Witness
Judith Endicott, Expert Witness
Petitioner J.M., Mother of G.M.
Emily Jackson, Virtual Learning Helper and Sitter
Stephanie Hall, Private Occupational Therapist

[2] In concluding such, the Undersigned is not shifting the burden of proof to Respondent. Although the school-based IEP Team members, without the Parents, regularly communicated with their CVI consultant, Alisha Waugh, for unknown reasons, Respondent chose not to proffer her an opposing expert witness.

For Respondent: Katherine Kalmbach, Second Grade Teacher
Sherrill Miller, Principal and Expert Witness
Andrea Rutherford, Expert Witness and Lead VI Teacher
Claire Scarborough-Hakin, Orientation and Mobility teacher
Roxanne Wyss, Teacher of the Visually Impaired (TVI)

## EXHIBITS

The following exhibits were received into evidence during the course of the hearing. The page numbers referenced are the "Bates stamped" numbers.

**Stipulated Exhibits ("Stip. Ex.")**: 3, 5, 7-15, 17-29, 31-34, 36, 40, 42, 46-58, 60 (pp. 459, 460-63), 61, 64-70.

**Petitioners' Exhibits ("Pet. Ex.)** : 2-5, 6 3, 4, 6, 7, 9, 10, 20, 29, 31, 38 (pp. 298-299, 308-309, 376-377), 40, 41, 47, 49, 60, 80 (pp. 460, 465-466) 81-82, 87, 97 (pp. 721-722, 740-744, 752-753, 766-767, 772, 774, 783-784, 790-792, 797-798, 813-814, 839). Official Notice was taken, without objection from Respondent on Petitioners' exhibits 84, 86, and 98.

**Respondent's Exhibits ("Resp. Ex."):** 9, 10 (for illustrative purposes only), 11 (pp. 137-148) (for illustrative purposes only), 12, 14, 16, 17, 22, 24-26, 30 (pp. 42-46 and pp. 49-57), 31, 33 (for illustrative purposes only), 36-38, 39 (pp. 891-95, 899-903), 40 (pp. 904, 906, 908, 917, 955-56, 958, 960), 41 (p 999).

The exhibits have been retained as part of the official record of this contested case.

## Other Documents

**Transcript volumes 1 through 7** were received and have been retained in the official record of this case cited as Tr. vol. __, p. __: [line].

## ISSUES

As stated above, the primary issue is the appropriateness of Braille instruction. Other issues identified below are all intertwined with this fundamental question related to providing G.M.'s specially designed instruction to address her unique circumstances, primarily her functional visions and reading fluency.

In the original and amended Prehearing Orders, the Parties identified the issues as:

**Issue with Respect to the September 12, 2019 IEP:**

1. Did the IEP fail to offer FAPE for lack of appropriate reading goals?

**Issues with Respect to the February 10, 2020 IEP:**

2. Did the IEP fail to offer FAPE for lack of appropriate reading goals?
3. Whether Respondent failed to implement G.M.'s IEP during school closures from March 16, 2020 through June 15, 2020?

**Issues with Respect to the September 8, 2020 IEP:**

4. Did the IEP offer G.M. a FAPE in the least restrictive environment ("LRE") as it relates to appropriate IEP goals, service delivery, and Extended School Year services?

**Parental Participation Issue**

5. Did Respondent deny the parents meaningful participation in the IEP process during the statutory period?

**Evaluations Issue**

6. Did Respondent appropriately evaluate G.M. during the statutory period?

**Compensatory Education and Related Services Remedies**

7. If there were any violations of G.M.'s right to a FAPE, what compensatory education and related services should be awarded?

## Burden of Proof

Petitioners bear the burden of proof in North Carolina. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The standard of proof is by a preponderance of the evidence. *See Schaffer v. Weast*, 546 U.S. 49, 62 (2005); N.C. Gen. Stat. §150B-34(a). "Courts give educators "deference…based on the application of expertise and the exercise of judgment by school authorities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). "By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement," and a "reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of [her] circumstances." *Id.*

Due regard in administrative cases is given "to the demonstrated knowledge and expertise of the agency with respect to facts and inferences within the specialized knowledge of the agency." N.C.G.S. § 150B-34(a). Deference was afforded to Claire Scarborough-Hakin, Respondent's Orientation and Mobility teacher ("O&M" teacher) as she demonstrated specialized knowledge in O&M services.

Both of Respondent's expert witnesses, Principal Sherrill Miller and Lead VI teacher Andrea Rutherford had expertise in reading remediation, but neither of them demonstrated any specialized knowledge or expertise with the unique fluency deficits of G.M., a student with CVI. While Ms. Wyss, Respondent's Teacher for the Visually Impaired, did have specialized knowledge about CVI,

her motivation for advocating Braille instruction in lieu of continuation of her instruction to G.M. with CVI overlay was questionable as discussed in detail below.

In short, none of Respondent's expert or factual witnesses had any specialized knowledge about the appropriateness of Braille instruction for a student with CVI. Although the school-based IEP team members purportedly communicated and relied on the recommendation of a CVI consultant retained by WCPSS, their CIV consultant did not testify at the hearing. Such hearsay communications are inadmissible in this proceeding[3] and any reliance thereon cannot be, and was not, afforded any deference by this Tribunal.

## Procedural Background

1. On July 6, 2020, Petitioners D.M. and J.M. on behalf of themselves and G.M. filed a Petition for a Contested Case Hearing in the Office of Administrative Hearings ("OAH") alleging violations of the Individuals with Disabilities Education Act over which the Office of Administrative Hearings has jurisdiction against the Wake County Public Schools ("WCPSS").

a. WCPSS failed to employ proper identification, evaluation, and placement procedures;

b. WCPSS failed to make decisions with respect to G.M. based on her unique needs;

c. WCPSS failed to develop substantively and procedurally appropriate IEPs that were reasonably calculated to enable G.M. to make progress appropriate in light of her circumstances;

d. WCPSS failed to develop appropriately ambitious IEP goals;

e. WCPSS failed to implement G.M.'s IEP; and

f. The WCPSS significantly impeded G.M.'s parents' ability to meaningfully participate in the development of G.M.'s IEPs and significantly impeded G.M.'s parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to G.M.

2. On July 20, 2020, Respondent filed a Motion for Immediate Determination of Stay-Put Placement. On the same day, this Tribunal issued a Request for Response to Respondent's Motion. On August 3, 2020, Petitioners filed their Response to Respondent's Motion for Immediate Determination of Stay Put Placement.

3. On August 21, 2020, this Tribunal issued an Order Denying Respondent's Motion for Immediate Determination of Stay Put Placement for ESY services as the Parties had previously agreed that the ESY services would be reduced from 42 hours to 37 hours.

---

3 N.C. Gen. Stat § 8C-1, Rule 802.

4. On September 9, 2020, Petitioners D.M. and J.M. filed a second Petition for a Contested Case Hearing in OAH alleging the following:

a. WCPSS failed to employ proper evaluation and placement procedures;

b. WCPSS failed to make decisions with respect to G.M. based on her unique needs;

c. WCPSS failed to develop a substantively and procedurally appropriate IEP that was reasonably calculated to enable G.M. to make progress appropriate in light of her circumstances;

d. WCPSS predetermined G.M.'s placement in a Braille program;

e. WCPSS changed G.M.'s service delivery, increasing her removal from her nondisabled peers by one hundred percent (100%) and providing instruction in Braille over parental objection and without conducting any evaluations;

f. WCPSS failed to develop appropriately ambitious IEP goals designed to meet G.M.'s unique needs based on measurable and valid baseline data;

g. WCPSS failed to implement G.M.'s IEP; and

h. The WCPSS significantly impeded G.M.'s parents' ability to meaningfully participate in the development of G.M.'s IEPs and significantly impeded G.M.'s parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to G.M.

5. On September 23, 2020, the Parties filed a Joint Motion to Consolidate the two cases. The next day, this Tribunal issued an order consolidating cases 20 EDC 02645 and 20 EDC 03551.

6. On October 28, 2020, Petitioners filed their Motion for Partial Summary Judgment. This motion was taken under advisement and later denied. On November 9, 2020, Respondent filed its response to Petitioners' Motion for Partial Summary Judgement. Because the contested case hearing was scheduled to begin on November 16, 2021, the Undersigned took the dispositive motion under advisement.

7. Prior to the hearing, on November 13, 2020, Petitioners filed a Motion to Sequester Witnesses which was granted. The Parties filed a Final Proposed Pre-Trial Order the first day of the hearing.

8. The Parties presented evidence in the due process evidentiary hearing from November 16-20, and 23, 2020.

9. On November 24, 2020, this Tribunal issued a Post Hearing Order. The same day this Tribunal issued an Order Denying Petitioners' Partial Motion for Summary Judgment.

10. The Parties filed their exhibits admitted into the record with verifications on December 3 and 4, 2020.

11. The Proposed Final Decisions and Final Decision deadlines were extended by consent on January 26, 2021.

12. The transcripts for the initial hearing dates were received on January 22, 2021.

13. On January 29, 2021, Petitioners filed a Motion for Additional Evidence. On February 12, 2021, Respondent filed its Response objecting to the Motion for Additional Evidence. This Tribunal granted Petitioners Motion for Additional Evidence on February 16, 2021.

14. Additional evidence was heard on March 4, 2021, about the CVI Range and Sensory Balance Approach evaluation which according to Petitioners should have been conducted prior to the IEP Team's decision to include Braille instruction.

15. On March 5, 2021, the Parties filed an Amended Order of the Final Pre-Trial Conference.

16. Also on March 5, 2021, a Post Hearing Order with Amended Deadlines allowed the Parties to incorporate the additional evidence in their Proposed Final Decisions.

17. Stipulated Exhibits 66-70 were received into the record on March 10, 2021.

18. On April 12, 2021, both Parties forwarded their Proposed Final Decisions.

19. Upon review of the exhibits filed in the record while drafting the Final Decision, the Undersigned discovered discrepancies in the record. Some of the Stipulated Exhibits had not been filed and other exhibits were not correctly marked with exhibit numbers. After a conference call with the Parties on May 19, 2021, and discussing options about repairing the record, the Parties entered a Consent Order on May 20, 2021, in which they agreed to refile their exhibits and the stipulated exhibits and seek removal or distinguishment of the original exhibits in the docket entries. The Parties also agreed to extend the Final Decision deadline to May 28, 2021, to allow all the exhibits to be properly entered before the record was closed.

20. On May 21, 2021, the Parties refiled their respective exhibits along with the stipulated exhibits. Pursuant to an Order of Removal, the exhibits originally filed on December 3 and 4, 2020 were removed from the record.

21. In response to an inquiry from the Undersigned inviting the Parties to submit alternative proposals for compensatory education, Petitioners filed a Compensatory Education Proposal. Respondent declined.

22. On May 28, 2021, the Final Decision was issued and the record closed.

## FINDINGS OF FACT

### *Stipulations of Fact*

At the start of the hearing in this matter, the parties agreed to Jurisdictional, Party, Legal, and Factual Stipulations in a proposed Pre-Trial Order, which was approved and filed in the Office of Administrative Hearings on November 16, 2020. To the extent that the Stipulations are not specifically stated herein, the Stipulations of Fact in the Order and Amended Order on the Pre-Trial Conference are incorporated fully herein by reference as Stipulations are referenced as "Stip. 1," "Stip. 2," Stip. 3," through "Stip. 49". On May 21, 2021, by Consent Order, three additional stipulations were filed by the Parties. Starting from the last stipulation of fact number 49 in the Amended Pre-Trial Order, these stipulations are number Stip. 50, 51, and 52.

### *Prior Orders*

Unless specifically contradicted herein, this Order incorporates and reaffirms all Findings of Fact and Conclusions of Law contained in previous Orders entered in this litigation.

**BASED UPON** careful consideration of the sworn testimony of the witnesses presented at the hearing, the documents, exhibits received and admitted into evidence, and the entire record in this proceeding, the undersigned ALJ makes the following Findings of Fact. In making these Findings of Fact, the ALJ has weighed the evidence presented and has assessed the credibility of the witnesses by taking into account the appropriate factors for judging credibility, including, but not limited to the demeanor of the witnesses, any interests, biases, or prejudices the witnesses may have, the opportunity of the witness to see, hear, know, and remember the facts or occurrences about which the witness testified, whether the testimony of the witness is reasonable and whether the testimony is consistent with all other believable evidence in the case including, but not limited to, verbal statements at IEP meetings, IEP meeting minutes, IEP documents, affidavits, and all other competent and admissible evidence.

Based upon the stipulations of record and the preponderance of the admissible evidence, with due deference were applicable, the Undersigned finds as follows:

### Comment Regarding Exemplary Prior Educational Services

1. For the past 3 years, G.M.'s teachers have done a remarkable job teaching her at Lacy Elementary School. Thanks to their combined efforts and the support of G.M.'s Parents, except for reading fluency G.M. is on grade level and her functional vision has improved moving towards near typical vision.

2. Roxanne Wyss, G.M.'s VI teacher during this time, has personally made extraordinary efforts in coordinating CVI strategies and modifications within the regular education classrooms.

3. Whether this trend in G.M.'s functional vision will continue remains to be seen. What is known is that the CVI overlay and VI supports provided thus far have been instrumental in making this progress happen and need to continue with the same intensity.

4. At this time, with too many unanswered questions about its impact on G.M.'s functional vision and G.M.'s academic progress in the general education curriculum, the introduction of Braille instruction for G.M. is not appropriate.

**Credibility of Witnesses**

5. The Undersigned determined the credibility of the witnesses in this case based on any inconsistencies in the record and the witnesses' testimony as well as the Undersigned's observations of each witness' demeanor, voice inflection, tone, hesitation in responding to questions, facial features, body language, as well as any leading nature in the question and the witnesses' interactions with legal counsel. The transcript of the hearing cannot record these mannerisms of witnesses.

6. In this case, as in most others, the Undersigned has not indicated in the record to legal counsel how she intended to rule on the credibility of the witnesses. Occasionally in hearings, the Undersigned has noted on the record when a witness significantly and routinely delays answering a question. There is no legal authority requiring that an administrative law judge, or any judge, make any credibility determinations on the record or advise legal counsel on how the administrative law judge intends to rule on the credibility of witnesses.[4]

7. Because resolution of the Braille issue relies primarily on the testimonies of the expert witnesses, the credibility and weight given the testimony of each Parties' expert witnesses will be addressed in this subsection.

8. The credibility and weight given to the fact witnesses will be addressed throughout the Final Decision were applicable and if necessary. Otherwise, the fact witnesses were deemed credible.

**Petitioners' Witnesses**

9. Petitioners called two expert witnesses, Christine Roman, Ph.D., and Judith Endicott.

10. Petitioners also called J.M., G.M.'s mother; Emily Jackson, Virtual Learning Helper and Sitter; and Stephanie Hall, Private Occupational Therapist, as fact witnesses.

**Respondent's Witnesses**

11. Respondent called two expert witnesses, Sherrill Miller, Principal at Lacey Elementary School, and Andrea Rutherford, WCPSS' Lead Teacher of the Visually Impaired ("VIT") students.

[4] Even though this Final Decision may incorporate language from the Parties' respective Proposed Final Decisions, credibility determinations are made independently from any proposals by the Parties. The Undersigned notes that legal counsel of both Parties also heard and/or observed each witness testify.

12. Respondents also presented testimony from the following fact witnesses: Roxanne Wyss, G.M.'s VI Teacher; Katherine Kalmbach, G.M.'s Second Grade Regular Teacher; and Claire Scarborough-Hakin, Orientation and Mobility ("O&M") Teacher.

**Expert Witness Qualifications**

13. Expert witnesses are necessary in almost all special education cases but were particularly important in this case because of G.M.'s unique circumstances. As explained below, Respondent's expert witnesses had no expertise in CVI or literacy instruction for students like G.M. diagnosed with CVI. While Andrea Rutherford does have extensive experience as a Braille instructor for students with ocular visual impairments, she does not have similar experience with cortical visually impaired students. From October 2019 through January 2020, Respondent did consult with Alisha Waugh, a CVI Range Endorsed and CVI trained consultant. *See* Stip. Exs. 54-58. However, Respondent did not proffer Ms. Waugh as an expert or as a fact witness in this case.

14. Also of note, Roxanne Wyss, G.M.'s VI Teacher is also CVI Range Endorsed but was not offered as an expert witness. Deference was however given to Ms. Wyss' testimony and actions as G.M.'s VI teacher except when Ms. Wyss' testimony or recommendations at IEP meetings contrasted with expert opinion or the documentary evidence.

**Petitioners' Expert Witnesses**

***Christin Roman, Ph.D.: Expert in CVI, CVI Range, O&M, and Other Areas***

15. Christine Roman, Ph.D. was qualified as an expert in the following areas: Cortical Visual Impairment ("CVI"), Orientation and Mobility ("O&M"), CVI Range as an assessment of functional vision, accommodations for children with CVI, CVI, and social development and special education for visually impaired students, and as a neurodevelopmental specialist. Tr. vol. 3, pp. 394:11-16; 398:22-23.

16. Dr. Roman was further qualified as an expert in the Sensory Balance Approach, Learning Media Assessment ("LMA") specific for children with cortical visual impairment as she coauthored the book titled *Sensory Balance: An Approach to Learning Media Planning for Students with CVI*. Tr. vol. 7, pp. 1076: 20-25; 1077: 1-8. The LMA is one of the assessments, the IEP team considered in determining the appropriate Braille instruction for a VI student. should have

17. Dr. Roman has published over fourteen (14) books, chapters, and peer reviewed journal articles, all of which focus on Cortical Visual Impairment, evaluations of individuals with CVI, or orientation and mobility. Pet. Ex. 81, pp. 470-472. In 2007, Dr. Roman published the first textbook on CVI with an "educational point of view." Tr. vol. 3, p. 390: 14-17. Since 2000, Dr. Roman has presented nationally and internationally at over four hundred (400) conferences and workshops focusing primarily on CVI. Pet. Ex. 81, p. 472.

18. Dr. Roman currently serves as a neurodevelopmental specialist and the Director of the Pediatric VIEW Program at the Western Pennsylvania Hospital in Pittsburgh, Pennsylvania, and has served in this capacity since 1990. Tr. vol. 3, p. 390: 2-11, Tr. vol. 3, p. 396:13-14, Pet. Ex. 81, p. 467. Dr. Roman's research has focused on CVI including the reliability and validity of the CVI Range, the effectiveness of augmentative alternative communication for students with CVI, infant screening to identify infants at risk for CVI. *See* Pet. Ex. 81, p. 472, Tr. vol. 3, p. 394:24-395:3.

19. Not only does Dr. Roman have expertise in areas relevant to this case, but she has also had direct contact with G.M. and her family and reviewed G.M.'s educational record as part of gathering information to form the basis of her opinions about G.M.'s educational programming and her preparation to testify on G.M.'s behalf. Tr. vol. 3, pp. 446:11-19; 452:15-453:3 Dr. Roman also reviewed videos of G.M. reading and being tested by Ms. Wyss. Tr. vol. 3, pp. 429:9-10; 430:23-25.

20. Dr. Roman was credible and knowledgeable about G.M.'s unique circumstances based on her review of G.M.'s educational records; her independent evaluations of G.M.; meeting with G.M. and her parents; extensive history with G.M. and her parents; and observations of G.M. in the videos Respondent provided.

21. As Dr. Roman was the only expert qualified in CVI, which is the particular disability for which G.M. requires specially designed instruction and relevant to the primary issue in this case, and Respondent offered no opposing expert testimony, her testimony will be given significant weight throughout the Final Decision.

***Judith Endicott: Expert in CVI Literacy Instruction***

22. Ms. Judith Endicott was qualified as an expert in the following areas: special education related to literacy instruction, reading and literacy, and literacy instruction related to CVI along with the adaptations and modifications necessary for that instruction. Tr. vol. 2, pp. 235: 5-9; 243: 21-24.

23. Ms. Endicott received her Bachelor of Arts from Wittenberg University School of Education in Elementary and Special Education in 1974. Pet. Ex. 82, p. 474. Ms. Endicott received her Master of Education from Temple University School of Education with a specialization in the Psychology of Reading in 1978. Pet. Ex. 82, p. 474. Ms. Endicott has received the following certifications through the Wilson Reading System Program: Multisensory Language Training, Level I Certification, and Level II Group Mastery Seminar Certification. Pet. Ex. 82, p. 474.

24. Ms. Endicott has presented a two-part e-learning webinar series entitled "Our CVI Literacy Journey into Phase III" parts I and II through the Perkins School for the Blind[5] series titled *CVI for the TVI*. Pet. Ex. 82, p. 474. Ms. Endicott has developed and is teaching the course "Literacy and CVI: Phases II and III" for Fitchburg State University. Pet. Ex. 82, p. 474. In addition

[5] The Perkins School for the Blind has international programs and is a leader in understanding and educating people about CVI. Tr. vol. 2, p. 241: 17-25. Further, the Perkins School for the Blind is a leader in CVI research and instruction. Tr. vol. 2, p. 242: 3-10.

to her other training and certifications, Ms. Endicott has attended numerous seminars on CVI through the Perkins School for the Blind and additional reading seminars. Pet. Ex. 82, p. 477-78.

25. Ms. Endicott has had direct contact with G.M. and her family as part of gathering information to form the basis of her opinions about G.M.'s educational programming and in preparation to testify on G.M.'s behalf. Tr. vol. 2, pp. 230:24-231:22. Ms. Endicott reviewed G.M.'s educational record and all the videos of G.M. that Respondent provided. Tr. vol. 2, p. 231: 12-22. Ms. Endicott also met with G.M. virtually and talked with her about strategies for improving G.M.'s print work. Tr. vol. 2, p. 231: 6-9.

26. Ms. Endicott's credibility is also bolstered by her history with G.M. and her Parents. Ms. Endicott first met them at a CVI conference. Tr. vol. 2, pp. 230:1-231:1. Ms. Endicott has talked with G.M.'s Parents by telephone to discuss ways to meet G.M.'s needs. Tr. vol. 2, p. 231:1-2. Further, Ms. Endicott offered her knowledge to G.M.'s VI teacher during G.M.'s second grade year "exploring ways to move her skills along as a reader." Tr. vol. 2, p. 231:3-6.

27. Ms. Endicott was credible and knowledgeable about G.M.'s unique circumstances and based on her review of G.M.'s educational records, evaluations; meeting with G.M. and her Parents; history with G.M. and her Parents; observations of G.M. in the videos Respondent provided; her interactions with G.M. and Ms. Endicoff's online observation of G.M. during virtual instruction.

28. The Respondent did not offer any expert testimony on literacy instruction related to CVI and the adaptations and modifications necessary for that instruction. As Ms. Endicott was the only expert qualified in the area of literacy instruction related to CVI and the adaptations and modifications necessary for that instruction, her testimony will be given substantial weight in this critical area throughout the Final Decision.

**Respondent's Expert Witnesses**

***Principal Sherrill Miller: Expert in, General Literacy Instruction and Reading Interventions Not Specific to CVI Students***

29. Ms. Sherrill Miller is the Principal at Lacy Elementary School. She was qualified as an expert in the following areas: literacy skills and instruction, not specific to students with CVI; and reading interventions, not specific to students with CVI. Tr. vol. 6, p. 952: 3-6. Because Ms. Miller had no expertise specific to G.M.'s unique reading instructional needs as a student with CVI in literacy, Ms. Miller's expert opinion on that particular issue was given less weight.

30. Ms. Miller has a Bachelor of Science in Elementary Education from Juniata College. A Master of Arts in Special Education from the University of North Colorado, and a Masters in School Administration from East Carolina University. Res. Ex. 36, p. 884.

31. In the third quarter of the 2020-2021 school year, Ms. Miller was hired to be the Principal at Lacy Elementary School. She started in this position on February 3, 2020. Tr. vol. 6, p. 950:7-10. Ms. Miller is still the current principal at Lacy Elementary and has provided no instruction to G.M. or any other students with CVI. Tr. vol. 6, p. 950: 5-18.

32. Based on the first and only time Ms. Miller saw G.M. reading days before the February 10, 2020 IEP meeting, her immediate reaction was "why isn't she reading Braille." Tr. vol. 6, pp. 1040:2-11; 950:16-18.

33. Before meeting G.M., Ms. Miller had never heard of CVI. Tr. vol. 6, p. 947: 9-10. Ms. Miller acted as the LEA Representative at three of the four IEP meetings at issue in this case which were the February 2020, June 2020, and September 2020 IEP meetings. *See* Stip. Exs. 14, 17, & 19.

34. Ms. Miller's commitment to Braille instruction for G.M. continued even after reviewing WCPSS' own evaluations which contraindicated the appropriateness of that instruction. Prior to developing any Braille goals at the September 20, 2020 IEP meeting, because the Parents disagreed with the IEP teams' inclusion of Braille in G.M.'s IEP, Ms. Miller as the LEA Representative, made the final decision to add Braille to G.M.'s IEP. Tr. vol. 6, p. 1035:2-16.

35. At times during her testimony, her recollection of events did not align with the documentary evidence in the case. *Compare, e.g.,* Tr. vol. 6, pp. 1008: 18-25, 1009: 1-10 (explaining she was unaware the Parents did not want G.M. to be instructed in braille), *with* Stip. Ex. 19. (minutes from the September 8, 2020 IEP meeting reporting the Parents objected to G.M. being taught braille).

36. Furthermore, although Ms. Miller served as the LEA for the IEP meetings and made the final decision concerning Braille instruction for G.M., Ms. Miller was unaware of whether G.M.'s vision will improve or whether G.M. has a degenerative eye condition, important information to have knowledge of when assessing a student's potential future needs for Braille. Tr. vol. 6, pp. 1046:18-25 – 1047:1 (T of Miller).

37. For these reasons, the Undersigned found Ms. Miller to be an uninformed witness about G.M.'s primary disability, CVI. Further, the Undersigned found her factual testimony to be of little use due to her limited knowledge of G.M. and G.M.'s primary disability as well as her misinterpretation of the Parents' wishes concerning Braille. With respect to the areas, she was qualified as an expert witness, the Undersigned did find Ms. Miller's testimony regarding literacy skills and instruction and reading interventions to students without CVI to be credible, albeit unrelated to the issues in this case.

***Andrea Rutherford: Expert in General Visual Impairment and IEPs for VI Students, Not CVI Students***

38. Andrea Rutherford is the Lead Teacher for the Visually Impaired ("VI") Program at WCPSS. Res. Ex. 37, p. 887. She was qualified as an expert in the following areas: general visual impairment, not CVI; and developing IEPs for students with visual impairments, but not CVI. Tr. vol. 3, pp. 557:25-558: 1-4. Ms. Rutherford has not worked with any students with CVI, like G.M., who were reading print on grade level. Tr. vol. 3, p. 551: 9-13.

39. Ms. Rutherford attended all the IEP meetings at issue in this case as the Lead VI Teacher for WCPSS. She supported Braille instruction.

40. Ms. Rutherford has a Bachelor of Science in Athletic Training from Springfield College. She has a Master's in Teacher Certification and Special Education from Cambridge College as well as a Master's in Teaching Students with Visual Impairments from the University of Massachusetts-Boston. Res. Ex., 37, p. 887. Ms. Rutherford holds a Master's in School Administration from East Carolina University. Res. Ex., 37, p. 887.

41. Ms. Rutherford is self-taught in Braille and has extensive experience as a Braille instructor. Tr. p. 540:9-25; 541:1-542:4. She is has received National Board Certification and three Master's degrees. Resp. Ex. 37. The Undersigned gives significant weight to her opinions and testimony regarding the teaching of Braille and the factors that go into that decision for ocular visually impaired students.

42. Ms. Rutherford was a credible witness, except as noted, however, her expertise was of limited value relating to G.M.'s unique needs and circumstances. Ms. Rutherford does not have expertise in the particularized and individualized instruction necessary for G.M.'s unique learning needs as a student whose primary disability is CVI. Her testimony in that regard was given little weight.

***Respondent Proffered No Opposing Expert Testimony in CVI or CVI Literacy Instruction***

43. Respondent did not offer any expert witness qualified to give expert opinions on either: CVI in general; Orientation and Mobility, for a student with CVI; the CVI Range as an assessment of functional vision; academic accommodations for children with CVI; social development for children with CVI; special education for visually impaired students with CVI; or Braille instruction for a student with CVI.

44. Nor did Respondent offer any responsive expert witness qualified to give expert opinions on literacy instruction related to CVI and the adaptations and modifications necessary for that instruction.

45. Neither Party proffered any medical expert witness to give an expert opinion on Braille instruction for G.M.'s ocular vision impairments.

46. During the hearing and in its Proposed Final Decision, Respondent did refer to comments in various documents from Dr. Grace, Dr. Brockert as well as information from the "American Printing House for the Blind". *See* Stip. Ex. 25$ 25, *see also* Resp't Pro FD ##22-29, pp. 12-13. Petitioner was also guilty of citing hearsay and included a selection from a journal article and the federal register in its Proposed Final Decision of which neither official notice was taken nor live testimony.

47. Of note, Alisha Waugh, WCPSS' CVI Range Endorsed Consultant, did not testify at the hearing. At times, Respondent's witnesses suggested that she "brought up" Braille to consider and the team asked her about the appropriateness of Braille instruction for G.M. *See* Tr. vol. 4, p. 662:18-665:20 (T of Rutherford).

48. This inadmissible hearsay, along with any other hearsay with no applicable exception, was not considered by the Undersigned.

49. Respondent raised the concern that the burden of proof may be improperly shifted to them. Even though Respondent does not have the burden of proof, Respondent still has to make some showing to tip the Petitioners' case to below the preponderance of the evidence. Where Petitioners met their burden of proof in their case in chief, the weight of Respondent's response must at least even the scale to 50/50. It did not.

**G.M.'s Unique Circumstances and Needs**

50. G.M. was 8 years old[6] at the time the first petition was filed, she loves to ride her bike, her favorite color is pink, and, except for reading fluency, she is on grade level academically.

51. She is a "child with a disability" and became eligible for services under the IDEA as a visually impaired ("VI") student on October 13, 2014. Stips. 9 & 10.

52. G.M. began attending school in WCPSS on August 28, 2017, and currently attends Lacy Elementary School based on her domicile in Wake County. Stips. 10, 12 & 14.

***G.M.'s Cortical Visual Impairment ("CVI")***

53. G.M.'s primary diagnosis is Cortical Visual Impairment ("CVI"), and she has also been diagnosed with optic nerve anomaly and myopia. Stip. 15. She was diagnosed with CVI before one year of age. Stip. Ex. 24, p. 73.

54. Prior to her transfer to Lacy Elementary School as a kindergartener, G.M. attended the Governor Morehead School for the Blind. The IEP team there did not discuss any information about CVI with G.M.'s parents. Tr. vol. 1, p.30:18-21. G.M.'s parents first learned about the importance of early intervention for children with CVI and the expectation that G.M.'s functional vision would improve with the provision of appropriate services by attending the American Conference on Pediatric Cortical Visual Impairment and by reading Dr. Roman's book. Tr. vol. 1, 30:22-31:18.

55. There are two broad categories of visual impairments: ocular and cortical impairments. An ocular visual impairment impacts the anterior or front part of the visual system and will not improve. A cortical visual impairment is a brain-based visual impairment and may improve. Tr. vol 3, 400:3-7, 13-15.

56. More specifically, CVI is a condition in which there is damage or injury that occurs to the visual pathways and processing centers in the brain, and which disrupts the function of the message being received by the brain. Tr. vol. 3, p. 399:2-25 (T of Roman).

---

6 G.M.'s date of birth is November 1, 2011. Stip. 6.

57. This means a child can see, but does not, at first, have the functional vision to process or interpret what they are seeing. "[c]hildren with CVI cannot turn their vision off. It's not possible. So they are constantly bombarded with visual information that we have to help them sort out." Tr. vol 3, 400:3-401:14; 448:19-21 (T of Roman).

58. One of the key distinctions between the two areas of impairment is that while the expectation for a child with CVI is that their functional vision may improve over time, there is not a similar expectation of improvement for optic nerve issues. Tr. vol. 3, pp. 424:23-425:11 (T of Roman).

59. Based on WCPSS' own evaluations of G.M.'s CVI, her vision has improved since 2017 and has continued to improve during the course of this proceeding. *See* Stips 18-20; Stip. Exs. 66&67.

***G.M.'s Academic Strengths and Challenges***

60. G.M. is an excellent student on grade level academically except for reading fluency.

61. Katherine Kalmbach, G.M.'s second grade teacher (Stip. 26), a 30-year veteran teaching mostly second graders, described G.M. as: "very popular with the other boys and girls [in her regular education second grade class]. She was an inspiration to all of us because she was full of life, and she was an excellent student, and I truly enjoyed having her in my room, [a]nd she did well. She was a good student. Very loving." Tr. vol. 4, p. 476:31-17 (T of Kalmbach).

62. Also, according to Ms. Kalmbach, G.M.'s major academic strengths were reading comprehension and math. Tr. vol. 4, p. 747:14-25. G.M. "was quick to understand whatever skill [the class] was working on and eager to share her paper and to participate in whatever the [class] were doing." Tr. vol. 4, p. 474:23-25 (T of Kalmbach).

63. G.M.'s "biggest academic challenge was being able to read faster. That was something that slowed her down. But she kept on trying and she didn't give up and she didn't complain, but that didn't slow her down. Tr. vol. 4, p. 748:1-5 (T of Kalmbach).

64. G.M.'s other challenge was writing. "It was hard for her to write a paragraph without taking a lot of time. It was difficult for her, but she did it and wanted to share it. But it did take her more time." Tr. vol. 4, p. 748:5-9 (T of Kalmbach).

65. "[G.M] did everything that the rest of the students were doing in every subject, but her assignment or her text had to be modified. So there was a lot of planning involved in what G. did. And whatever the other children were doing, she did., so she was going right along with what we were doing in every subject." Tr. vol. 4, p. 748:5-9 (T of Kalmbach).

66. G.M. "wasn't a low student, so she didn't qualify … for the Tier 1 and Tier 2 [intervention groups.]" Tr. vol. 4, 757:12-20 (T of Kalmbach).

67. Respondent's reading expert Ms. Rutherford, admitted "G.[7] was not struggling to access her grade level curriculum in second grade." Tr. vol. 4, p. 644:3-6 (T of Rutherford).

68. In contrast to Ms. Kalmbach's representations that, with CVI accommodations, G.M. could keep pace with her nondisabled peers in the regular classroom, Principal Miller and Ms. Wyss both testified that G.M's reading rate was so laborious that, despite her hard work, she could not even approach the pace of the classroom. Tr. vol. 6, pp. 969:22-970:7 (T of Miller); Tr. vol. 4, pp.794:22-795:8 (T of Wyss).

69. Principal Miller and Ms. Wyss' testimonies were also inconsistent with WCPSS' own documentation of Weekly Meetings with G.M.'s teachers, including Ms. Wyss, from August 29, 2019 through March 3, 2020. *See* Stip. Exs. 46-59 ("Weekly Meetings Notes").

70. Likewise, the Weekly Meeting Notes prepared by WCPSS teaching staff, including Roxanne Wyss, from August 29, 2019 to January 23, 2020, reported each week that G.M. was "completing all assignment, engages with her classmates, and has had a good week." Stip. Exs. 46-58 ("Weekly Meeting Notes").

71. Similarly, the testimonies of Ms. Miller and Ms. Wyss are inconsistent with G.M.'s IEP Progress Monitoring Reports. As of January 2020, G.M. was making adequate progress towards mastery of all her academic IEPs goals in reading and writing. *See* Stip. Ex. 42: Progress Report for First and Second Quarters.

72. The Undersigned found Ms. Kalmbach[8] to be credible. Her description of G.M.'s unique academic characteristics and G.M.'s ability to access, without Braille, the regular education curriculum with CVI modifications and assistive technology was given significant weight.

**Cortical Visual Impairment Primer**

73. The differences between a student with ocular visual impairments and a student like G.M. with a cortical visual impairment, a relatively new diagnosis, are central to this case and must be understood before turning to the underlying facts and decisions at the various IEP team meetings.

74. Knowing the differences between the two vision impairments is information is critical which the IEP team, including the ultimate decision maker Principal Miller. The IEP team should have had a thorough understanding of CVI [9] before making the educational decision to add Braille instruction which ultimately may prove harmful to G.M.'s functional vision.

---

[7] The minor Petitioner G.M. is referred as "G." in some of the records and in some of the testimonies. For purposes of this decision "G." or "G.M" refers to the Petitioner G.M.

[8] Of note, neither party asked Ms. Kalmbach about whether she supported Braille instruction for G.M. nor did Ms. Kalmbach mention Braille instruction at any point during her testimony or in any of her documentation.

[9] While Ms. Wyss, the CVI Range Endorsed VI teacher, arguably had a better understanding of CVI, WCPSS contracted an outside CVI consultant, Alisha Waugh, when instructional questions about CVI arose.

75. While CVI is "the leading cause of visual impairment in children today," it is not well known and frequently goes undiagnosed. Tr. vol. 3, p. 399:12-19 (T of Roman).

76. CVI is identified by three diagnostic criteria: (i) the child has an eye exam that does not explain their functional use of vision, (ii) the child has a history of some neurologic condition or event, and (iii) there is the presence of certain unique visual and behavioral characteristics. Tr. vol. 3, pp. 400:20-401:6.

77. While the expectation for a child with CVI is that their functional vision may improve with appropriate interventions and supports, there is no way to predict the degree or amount of progress that any particular individual will be able to make. Tr. vol. 3, pp. 461:19-462:16 (T of Roman).

78. G.M. does have a co-existing ocular condition, and it is particularly difficult to predict the outcome for any improvement in functional vision for a child with a co-existing ocular condition. Tr. vol. 3, pp. 462:23-463:1 (T of Roman). However, it is undisputed in this case that G.M.'s functional vision has improved and continued to improve as evidenced by assessments of her functional vision in December 2020. See Stip. 18-20, 22, 24, Stip. Ex. 67.

79. There are ten characteristics that define children with CVI: (i) response to color, (ii) response to movement, (iii) latency, (iv) visual field differences, (v) complexity, (vi) relationship with light, (vii) relationship with distance, (viii) reflexes, (ix) novelty, and (x) visual motor. Tr. vol. 3, pp. 401:15-407:14.

80. The CVI Range, which was developed by Dr. Roman in 2007, is a functional vision assessment used to aid in determining the extent of the impact of CVI and to guide interventions. Tr. vol. 3, pp. 413:24-415:22.

81. The CVI Range is used to determine the degree of effect of CVI on a scale of 0 to 10, where zero (0) represents little or no visual functioning and ten (10) represents near typical visual functioning. Stip. 16.

82. According to the 2016 CVI Range, "[t]his "assessment protocol is intended for multiple evaluations over a period of time. Suggested scoring (no less than three times per school year)." Pet. Ex. 29, p. 232 (08/15/16). More recent CVI Range Protocols state that "[t]his assessment protocol is intended for multiple evaluations over a period of time." Stip. Ex. 23, p. 311.

83. The CVI Range has three phases: Phase I (Ranges 0-3), where the student is building visual behaviors; Phase II (Ranges 4-7), where the student is integrating vision with function; and Phase III (Ranges 8-10), where there is resolution of the remaining CVI characteristics. Stip. 17.

84. The Perkins School for the Blind issues a CVI Range endorsement to professionals who meet certain criteria. The endorsement means that the individual is able to properly conduct the CVI Range. In order to receive the endorsement, the individual must have given the CVI Range before, pass a test involving knowledge of CVI, gather letters of recommendations, and

watch videos of children with CVI and score them on the CVI Range according to the standard. Tr. vol. 3, pp. 477:20-478:18.

85. Ms. Wyss is the only CVI Range Endorsed teacher at Wake County Schools. Tr. vol. 4, pp. 634:13-635:9 (T of Rutherford).

86. Dr. Roman conducted a CVI Range assessment of G.M. on August 15, 2016 when she was 4 years, 10 months old. G.M.'s score fell at the 4.5 range in Phase II. Pet. Ex. 29, p. 232. This means that G.M. was starting to use vision for functional tasks. Pet. Ex. 29, p. 234.

87. The Parties stipulated that G.M.'s CVI Ranges have improved since June 26, 2017 to June 28, 2019 after she began receiving two (2) hours of specially designed instruction using CVI strategies and interventions each day from her CVI Range Endorsed teacher. Stips. 18 &22.

88. The CVI Range conducted before the September 2020 IEP meeting was conducted by Dr. Roman on June 28, 2019, over a year ago. Stip. Ex. 24.

89. WCPSS did not conduct any CVI Range assessments of G.M. during the 2019-2020 school year or prior to their decision to add Braille instruction to G.M.'s IEP. Stip. 42.

90. The most recent CVI Range conducted on December 16, 2020, documented that G.M.'s functional vision was continuing to improve and G.M. was on the verge of entering Phase III. Stip. Exs. 66&67.

91. Phase III is the "refinement of ventral stream visual function" to the end result of typical or near typical visual functioning. Stip. Ex. 66, p. 482. G.M. scored at CVI Range 7. Students at CVI Range 9-10 spontaneously use vision for most functional activities at a level approaching near typical. Stip. Ex. 66, p. 485.

92. WCPSS proffered no credible evidence that typical or near typical visual functioning was unrealistic for G.M. or why the IEP should not have continued to have CVI strategies to address G.M.'s functional vision.

***G.M is the only CVI student in WCPSS on grade level and has CVI Range Assessments***

93. In Wake County Schools, there are "90 to 100" students[10] served by Respondent's Visually Impaired department with VI. Tr. vol. 3, p. 545:10-20 (T of Rutherford) Ms. Wyss, the only person in Respondent's district who is CVI Range Endorsed has never administered the CVI Range to anyone except G.M. Tr. vol. 4, pp. 634:13-635:9 (T of Rutherford).

94. According to WCPSS' Lead VI Teacher, prior to G.M.'s arrival WCPSS has had little or no experience working with students with CVI. None of the ninety (90) to one hundred (100) students with a CVI diagnosis, served by Respondent's VI department, have had CVI Ranges

[10] According to Respondent's discovery responses, there were 67 students total with VI as the primary eligibility category and G.M. was the only student with CVI. Tr. vol. 3, p. 409: 4-12 ; Pet. Ex. 80, p. 462. (Petitioners' Exhibit 80 referenced in that exchange was missing page 462).

administered, except for G.M. It is unknown how many students, if any, that WCPSS has provided CVI services who were in Phase II and approaching Phase III, like G.M. Tr. vol. 4, p. 634:22-24 (T of Rutherford).

95. That alone suggests that WCPSS' lead VI teacher and other VI teaching staff are not sufficiently knowledgeable about CVI to be making decisions about fluency or Braille instruction for a child with CVI.

96. G.M. is the only student of the 20,050[11] special education students, in Wake County Schools, that the Lead VI Teacher is aware of who receives two (2) hours of VI services daily. Tr. vol. 4, p. 635:6-9 (T of Rutherford).

97. Fortunately, a couple of WCPSS' VI teachers (G.M.'s kindergarten and Ms. Wyss) have been trained in CVI which bodes well for future students with CVI and Braille instruction. But as it stands now, G.M. is the test case.

**Intensive CVI Instruction**

98. During kindergarten in the 2017-18 school year, G.M.'s Teacher of the Visually Impaired (TVI), participated in the training to become CVI Range Endorsed and certified to administer the CVI Range. Stip. 19

99. During the 2017-18 school year, G.M. received two (2) hours of specially designed instruction each day from her TVI. Stip. 20

100. G.M.'s score on the CVI Range improved during the 2017-18 school year and continued to improve during the 2018-19 school year. Stip. 22

101. G.M.'s TVI during the 2018-19 and 2019-20 school years was Roxanne Wyss. Due to G.M. being on her case load, Ms. Wyss became CVI Range Endorsed and certified to administer the CVI Range. Stip. 23

102. Except during the 2020 pandemic period, during both the 2018-19 and 2019-2020 school years, Ms. Wyss provided G.M. two (2) hours of specially designed instruction each day - 75 minutes in General Education and 45 minutes in Special Education. Stip. 24. G.M. received O&M Services for 45 minutes per week and occupational therapy services. She also received 42 hours of ESY services in the summer of 2019 and 37 hours[12] of ESY in the summer of 2020. Stip. Ex. 9, Stip. 24, 25, 30-31.

---

[11] Wake County School's average daily enrollment for the 2019-2020 school year was 161,907.00 Of that number 20,050 was identified as student with special needs in Wake County Schools' special education program. Pet. Ex. 98, pp. 843-844 (officially noticed).

[12] The stay put ESY number of hours was 42 hours, but by agreement of the Parties it was reduced to 37 hours.

**CVI Strategies and Modifications Have Been Effective**

103. CVI Strategies are used throughout G.M.'s educational day and are imbedded as "CVI Modifications" in her IEP goals. *See* Stip. Exs. 5, 9, &13.

104. CVI Strategies are "what is most important for G.M.'s visual access and access in general to what we are teaching. She needs . . . very specific modifications and accommodations for accessing classroom materials." Tr. vol. 4, pp. 772:21-773:2. (T of Wyss).

105. Examples of the effective CVI strategies Ms. Wyss provided to G.M. are: "modifications to the work, we would put less on a page. We would highlight important information. We would decrease the complexity. . . I would teach novel ideas and concepts, vocabulary, reteaching, reviewing, repetition was very important, reading things before G. was asked to read so that she had an idea of what she was going to be reading about, using her iPad as a backlighting device for easier visual access, you know, giving her breaks." Tr. vol. 4, 773:3-11.

106. Part of the specially designed instruction G.M. received from her VI teacher included "figuring out what was – with the end in mind, so what do we want G. to come out of this lesson knowing. Does she need to do everything that everybody else is doing? Can we just kind of skip some steps and get to – get to the end knowing that G. has given us the information needed for an assessment or an assignment without having to work so hard to get – what could we tease out?" Tr. vol. 4 773:14-20.

**CVI Range Improvement**

107. As shown by her functional vision growth, this intensive instruction has been worthwhile because G.M.'s CVI ranges improved as documented in her educational records as follows:

| Date | Rating I | Rating II | Level of Function |
|---|---|---|---|
| June 26, 2017 | 4.75 | 5.0 | Phase II |
| September 17, 2017 | 4.75 | 5.0 | Phase II |
| January 12, 2018 | 5+ | 5.50 | Phase II |
| March 21, 2018 | 5+ | 5.50 | Phase II |
| May 31, 2018 | 5+ | 5.50 | Phase II |
| June 28, 2019 | 6+ | 5.75 | Phase II |
| Dec. 16, 2020 | 7 | 6.25 | Phase II |

Stips. 18-20, 22, 24; Stip. Ex. 67.

108. On December 16, 2020, G.M. was approaching closer towards a Phrase III rating 8-10. Stip. Ex. 67.

**Smaller Font Size**

109. Not only did G.M.'s performance on the CVI Range improve during this time, but her ability to read a smaller font size also improved. The VI teacher and staff: "were working at a font size between 72 and 100 when she was – when I [Ms. Wyss] first started working with her. And she now has most of her work modified in a 48-point font." Tr. vol. 4, p. 769:13-21. (T of Wyss) More recently as of November 7, 2019, G.M. could read at a 28-point font. Stip. Ex. 54.

**Braille Instruction Was Considered in Kindergarten**

110. G.M. has never received any Braille instruction. It was initially considered by WCPSS during G.M.'s transition to kindergarten in 2017. A Learning Media Assessment Braille Skills Inventory ("LMA") was conducted by WCPSS on March 7, 2017. Stip. Ex. 22, At the reevaluation IEP meeting held on March 8, 2017, the VI teacher shared that G.M. is a dual media student with vision being the primary medium but Braille was still recommended. Pet. Ex. 6, p. 21. At G.M.'s Parents' request, Braille services were removed from G.M.'s IEP and the team agreed to focus on strategies specific to CVI in an attempt to improve G.M.'s functional vision. Pet. Ex. 9, pp. 49-50.

111. In retrospect, based on the improvement in G.M. functional vision rating in the CVI Ranges from 2017 to 2020 (Stips. 18-20, 22, 24; Stip. Ex. 67), the 2017 IEP team made the right decision in 2017.

**Reading Fluency**

112. Although reading fluency was G.M.'s greatest academic obstacle, her reading fluency also improved from 2017 to 2019.

113. G.M.'s performance on the general education DIBELS reading assessment improved between 2017-19 while she was receiving specially designed instruction using CVI strategies and interventions for two (2) hours each day. *See* Stip. 32.

114. On a standardized reading measure used by Respondent (DIBELS), (Stip. 32) G.M. has demonstrated significant progress in certain areas of reading. Her composite score, which is an overall score based on subtests that identify specific needs, ended Kindergarten in the "strategic intervention" category at 106, increased to 127 by the end of first grade (still strategic), and after ESY instruction between 1st and 2nd grade, jumped to a score of 227, which is proficient. Stip. Ex. 31; Tr. vol. 2, p. 249:6-22 (T of Endicott).

115. Similarly, G.M.'s TRC score was a Level D after kindergarten, a Level I after 1st grade, and a Level J to start 2nd grade, which is above proficiency. Her reading accuracy, which began to be measured in mid-1st grade, was consistently well above average. Stip. Ex. 31.

116. Progress monitoring data from her IEP services based on the DIBELS confirmed that G.M. was on grade level with the exception of her reading fluency. Across all of the data taken by Ms. Wyss, G.M.'s comprehension was consistently strong, and her reading accuracy was consistently strong. But her reading fluency was consistently well below grade-level expectations. *See* Stip. Ex. 27-33; Tr. vol. 4, pp. 747:14-25, 748:1-9 (T of Kalmbach).

117. G.M.'s reading fluency, and specifically her reading rate, did not keep up with her other scores. At the end of first grade, her Nonsense Word Fluency scores were both well below the norm: 36 against a norm of 58 in Correct Letter Sounds ("CLS"), 3 against a norm of 13 in Whole Word Reading ("WWR"). Her Oral Reading Fluency score measured at 16 wpm at the end of 1st grade against a norm of 47 wpm, and 28 wpm at the start of 2nd grade against a norm of 52 wpm. Stip. Ex. 31.

118. Based on G.M.'s fluency deficits at this time, the IEP team should have developed a fluency goal. However, the Parent's repeated requests for a fluency goal went unheeded for over eighteen (18) months.

**Assistive Technology**

119. Throughout the school years, assistive technology has also played a vital role in supporting G.M. in the regular classroom.

120. The May 2019 IEP included the following assistive technology devices: iPad or Tablet, Smart Board or mimeo-board, JoinMe App, screen sharing application, large print books with simple pictures, 20/20 pens, bold lead pencils, bold lined notebooks and paper, slant board, trifold board, mini-felt board, all-in-one board, work/play tray and dividers, line guide, and occluder. Stip. Ex. 5, pp. 85-97. The implementation of these devices and accommodations is extensively explained in the May 2019 IEP. *See* Stip. Ex. 5, pp. 85-97

121. Audiobooks were added in the September 2019 IEP. Stip. Ex. 8, p. 138.

122. All of the aforementioned assistive technology devices continued to be included in G.M.'s and a "Voice to Text" program was added as an accommodation for G.M.'s writing in the February 2020 IEP. Stip. Ex. 13, p. 180. Although the June 2020 IEP was not included in the evidence, the meeting minutes and Prior Written Notice do not indicate that any assistive technology were deleted or added at that meeting. *See* Stip. Exs. 17&18.

123. The September 2020 IEP also listed the following: iPad, screen sharing app, audiobooks, large print books, laptop with screen reader and voice typing program/applications, a typing program, slant board, reading guide, as the assistive technology devices. Stip. Ex. 20, pp. 293-297. A "Voice to Text" program was added for writing assignments longer than 2 paragraphs. Stip. Ex. 20, p. 297.

**CVI Strategies**

124. It is undisputed that the CVI strategies and modifications in the regular classroom have been essential to G.M.'s academic success. CVI has strategies for fluency issues.

***The "Bubbling" Technique***

125. After first grade, on July 10, 2019, Dr. Roman had recommended to WCPSS the use of a color, word "bubbling" technique to aid G.M.'s word fluency and help avoid fatigue. According to Dr. Roman, G.M.'s "ability to look at a word shape while also using context and reading fluency will, in the long run, make her reading more efficient." Stip. Ex. 24, p. 74.

126. In second grade, her teachers reported in the October 3, 2019 Weekly Meeting note that G.M. continued to make progress in reading fluency. They stated:

> We are continuing to progress in reading fluency. We continue to work with G.M. and use a variety of strategies to help her with reading. Her stamina for reading has increased this year. She is reading longer and longer passages.

Stip. Ex. 50

127. Although Ms. Wyss and the second grade teachers reported some success in improving G.M.'s fluency, Ms. Wyss and Ms. Miller discounted that progress. One data point on the Nonsense Word Fluency in 2nd grade showed a substantial jump, but that score came from an untimed administration of the test, which is supposed to be confined to one minute. Tr. vol. 4, p. 796:16-24 (T of Wyss). According to Ms. Miller, untimed scores would not be something that would show a true measure of G.M.'s performance, compared with other data points that were administered timed. Tr. vol. 6, pp. 977:13-978:1 (T of Miller).

128. In the second grade, G.M. did continue to improve in her reading fluency and as of November 7, 2019, the staff reported that G.M. could read "12 more words in a minute." Stip. Ex. 54 ("Weekly Meeting Note")

**Vision - Primary Learning Media and Auditory- Secondary Learning Media**

129. Petitioners claim and WCPSS VI teacher admits that vision is G.M.'s primary learning medium and auditory is her secondary learning medium. WCPSS' lead VI teacher admitted that G.M. is a dual media learner with visual as her primary and auditory as her secondary. Tr. vol. 4, 644:12-13 (T of Rutherford); *see also* Stip. Ex. 68.

130. The Sensory Balance Learning Media Assessment conducted by Ms. Wyss in December 2020 and January 2021 supports that G.M. is not a tactile learner rather that auditory learning is G.M.'s secondary learning medium and that Braille which is a tactile medium would not be appropriate.

131. G.M.'s primary and secondary learning media are the crux of this case.

**FIRST GRADE: 2018-2019 SCHOOL YEAR**

**March 2019 IEP - Parents' *First* Request for a Fluency Goal**

132. G.M.'s Parents first requested the IEP team add a fluency goal beginning in March 2019. *See* Stip. Ex. 3; Stip. Ex. 10, p. 66 (Sept 2019); Stip. Ex. 14 (February 2020 IEP meeting); *see also* Tr. vol. 2, pp. 254:16-255:16 (T of Ms. Endicott confirming the need for a goal for G.M. in text fluency by the March 21, 2019 IEP meeting). The Parents asked at each subsequent IEP meeting, but a fluency goal was not added until September 2020, eighteen (18) months later. Stip. Ex. 20, p. 290.

133. As of March 2019, the IEP team knew that G.M. needed a fluency goal. The IEP meeting minutes reflect that Senior WCPSS Administrator Jones-Langston[13] admitted that G.M. is making gains "but still below grade level in the areas of fluency and comprehension." Stip. Ex. 3, p. 34

134. In the IEP meeting minutes, Ms. Wyss acknowledged that "repetition and practice is what [G.M.] needs to build her fluency." Stip. Ex. 3, p. 35

135. The issue about a fluency goal was tabled until additional data was available, and Respondent offered to bring another literacy expert to observe G.M. and determine the specific area of need to address her learning issues. A decision was to be made at the "next meeting." Stip. Ex. 3, p. 35. This did not happen.

136. Because D.M. objected to a WCPSS staff member's evaluation and wanted someone from "his side to be there during the observation", the team agreed to work with the Parent on that. Stip. Ex. 3, p. 36. The decision was tabled until the next meeting which was May 10, 2019.

**May 10, 2019 IEP Parents' *Second* Request for a Fluency Goal**

137. G.M.'s Parents asked for a fluency goal again at the May 10, 2019 IEP meeting. They also asked for a systematic auditory reading program as another medium to use when G.M. was visually fatigued. Stip. 5, p. 74.

138. During the May 10, 2019 IEP meeting, the IEP team noted "[G.M.] has issues with fluency . . . but shared that it is more important that [G.M.] is able to read and identify the words and that speed is not a focus for [G.M.]" Stip. Ex. 7, p. 114. Yet, later in September 2020 speed was the exact reason the IEP team gave for why G.M. needed instruction in Braille. *See* Stip. Ex. 19.

139. The IEP Team developed a number of goals, but only the reading goals in this IEP are relevant to this case at that meeting are the reading goals which were virtually the same as the subsequent September 2019 IEP reading goals.

140. Grace's reading goals in the May 2019 IEP were:

> Given high frequency word from curriculum, G.M. will use CVI modifications and pre-reading strategies In order to increase her high word frequency word recognition with 80% accuracy in 4 out [of] 5 opportunities.
>
> Log of teacher observation, Data sheets.
> ESY: Yes

---

[13] Audrey Jones-Langston is a Senior Administrator for WCPSS.

G.M. will use CVI modification and pre-reading strategies in order to comprehend a given text of no more than 300 words with 80% accuracy in 4 out of 5 opportunities.

Monitored by: Log of teacher observation, Data sheets.
ESY: Yes

Stip. Ex. 5, p. 84

141. According to Principal Miller, Tr. vol. 6, pp. 978:6-979:9, and in its Proposed Final Decision, Respondent asserts that the writing goals in the May 2019 IEP and the September 12, 2019 IEP, were also reading goals because G.M. had to reread her own sentences. This writing goal is found on page 78 preceding the O&M goals and Adaptive PE goals on pages 79-84. The reading goals are on page 84.

142. The purported reading goal states:

G.M. will write 3 sentences (5-7 words each), using CVI modification and with no more than 3 spelling and punctuation errors, will correctly read back her own writing in two consecutive sessions with 100% accuracy.

Monitored by: Work samples, Data sheets
ESY: No

Resp. Pro Final Dec. p. 19, FoF 77 citing Stip. 9, p. 132 (September 12, 2019 IEP) same goal as in Stip. Ex. 5, p. 78

143. Although Respondent now claims this is a reading goal, Ms. Wyss clarified at the September 2019 IEP meeting that this is actually a "writing" goal, not a reading goal. Stip. Ex. 11, p. 64 (September 2019 IEP Meeting Minutes where it states Ms. Wyss began reviewing the "writing goal" of 3 sentences).

144. Principal Miller did not attend this IEP meeting and her mischaracterization, of this writing goal as a reading goal during her expert testimony, diminished her credibility.

145. Once again at the September 2019 IEP meeting, even though G.M. still had fluency deficits, the IEP team determined that G.M. did not need Braille instruction. Stip. Ex. 5, p. 75.

146. G.M. continued to be served by the VI teacher 75 minutes a day in regular education and 45 minutes a day in special education. Stip. Ex. 5, pp. 97-98.

147. Her VI teacher provided teacher support to all her regular education teachers in the modifications and delivery of G.M.'s academics with CVI strategies. Stip. Ex. 5, p. 97-98. All G.M.'s classes had accommodations adapted based on CVI characteristics throughout the school day. Stip. Ex. 5, p. 86-97.

148. G.M received 42 hours of ESY services the summer of 2019 per her May 2019 IEP. Stip. 25.

## SECOND GRADE: 2019-2020 SCHOOL YEAR

### September 12, 2019 IEP Meeting Parents' *Third* Request for Fluency Goal

149. G.M.'s IEP team met on September 12, 2019, for a reevaluation meeting and to review and revise her IEP. Stip. 27. This is the first contested IEP within the relevant time period but the reading goals are also identical to the May 2019 IEP and the fluency goal was an ongoing issue.

150. G.M.'s Parents again, for the third time, requested a fluency goal be added to G.M.'s IEP. Tr. vol. 1, p. 111:19-21.

151. The IEP Team reviewed the VI Eligibility Worksheet and copied it on the IEP as follows:

> G.M. would benefit from a **systematic auditory reading program**, to build on her listening strength and give her **another medium** to rely on when she is visually fatigued, when the test is lengthy or when it suits the goal of a lesson.
>
> Stip. Ex.9, p. 126 (emphasis added)

152. The IEP also incorporated the following in the Present Levels of Academic and Functional Performance ("Present Level"):

> Grace's second grade teacher recently administered the MClass reading assessment. Grace passed Level J which is considered above proficient. While she successfully read the text and demonstrated a solid understanding of the content, she continues to read at a very slow, laborious rate. Data shows that text that typically takes a student to read in an average of 3-5 minutes (300 words) takes Grace an average of 45 minutes. Data also shows this time decreases if she reads the passage more than once and if she is familiar with the vocabulary words. Previewing the pictures and taking a picture walk through the book supports comprehension. **Grace does not, at this time, read with fluidity and fluency.** This can be frustrating and visually fatiguing. **Grace will benefit from listening to text when appropriate using audiobooks. This medium will allow Grace to access grade level text and keep up with the curriculum.** Grace has the skills appropriate to decode words containing blends, digraphs, short vowels, r-controlled vowels, and vowel teams. The DORF (Dibels Oral Reading Fluency) indicated a score of 97 (goal is 90) at the beginning of second grade. Observation data indicates that Grace is able to learn new words but does not have automaticity with word retrieval. **She needs additional practice and exposure to text and sight words in order to maintain skills in reading. Grace consistently uses CVI strategies when presented with new words and images as well as text reading strategies. This instruction has helped Grace progress to her current reading level of J. The more time Grace spends reading the expectation is that the faster her reading rate will become. Grace benefits from pre-reading strategies in a separate setting that include identifying salient features, comparative thought, direct teaching of novel**

**words and objects, repetition and frequent exposure to words learned previously. Grace also benefits from regular classroom instruction and small group reading strategies which include using context clues, rereading after struggling with a word, and skipping and reading ahead. Grace will benefit from direct instruction in phonics-based reading instruction and a whole-word approach for longer, more complex words. Identifying the shape of a word is one instructional method for students with CVI used to teach new words. Bubbling the word in a bright color, learning the salient features of the shape of the word, and then fading the bubbling once Grace has demonstrated consistency in reading the word is a strategy used in conjunction with classroom-based instruction**. Grace does experience visual fatigue when expected to read passages longer than 300 words at this time and will show signs of latency. She primarily uses her left eye for reading tasks and leans in within inches to see the text. Text and arrays of images are modified to control complexity and are presented on a backlit device. Novelty of text, images, and objects profoundly impacts Grace's ability to learn incidentally. **She benefits from ongoing language that supports comparative thought...how things are the same, how they are different. Comparative thought is the responsibility of the adult working with her. Grace currently uses screen sharing with her teachers on a tablet and also uses the tablet for viewing concepts related to the curriculum (text, pictures, images, scenes, maps, etc.).** Grace continues to make progress on the Reading Comprehension goal. She is meeting this goal with 81% accuracy. High Frequency Words goal--she is meeting this goal with 100%. Grace's writing continues to improve. She averages 5-6 errors on the current writing goal. Because she does not have the opportunity to see words incidentally and naturally in the environment she needs practice with writing high frequency words and reading her writing back. Reading and writing these words often will help solidify them in her long term memory.

Stip. Ex. 9, pp. 127-128 (emphasis added)

153. Although noting, once again in the Present Level, G.M.'s significant fluency deficits, the IEP team did not develop a fluency goal.

154. The Present Level references auditory media which have benefited G.M. and "systematic auditory reading program" which could be beneficial. This reading program was not added to the IEP. G.M.'s success with auditory media is inconsistent with Respondent's position that G.M. needs Braille instruction.

155. The IEP team did not include Braille instruction in the September 2019 IEP. Stip. Ex. 9, p. 130.

156. G.M.'s September 2019 IEP continued to include two (2) hours of VI services daily from her VI teacher—75 minutes in general education and 45 minutes in special education. Stip. 31.

157. The September 12, 2019 IEP included the same three reading goals from the May 2019 IEP, except the percentages for accuracy were increased from 80% to 90% and the number of words increased from 300 to 400. *Compare* Stip. 5, p. 84 *with* Stip. Ex. 9, pp. 132-33.

158. The first reading goal was purportedly:

> G.M. will write 3 sentences (5-7 words each) using CVI modifications and with no more than 3 spelling and punctuation errors, and will correctly read back her own writing in two consecutive sessions with 100% accuracy.

Stip. Ex. 9, p. 132.

159. Although this goal was moved on the page before the reading goals, this was a "writing" not "reading" goal as explained *supra.*

160. In reality, the first reading goal was:

> Given high frequency words from the curriculum, G.M. will use CVI modifications and pre-reading strategies in order to increase her high frequency word recognition with 90% accuracy in 4 out of 5 opportunities.

Stip. Ex. 9, p. 133.

161. The first reading goal focused on increasing high frequency work recognition.

162. The second reading goal was:

> G.M. will use CVI modifications and pre-reading strategies in order to comprehend a given text of no more than 400 words with 80% accuracy in 4 out of 5 opportunities.

Stip. Ex. 9, p. 133.

163. The second goal was a reading comprehension goal.

164. Ms. Endicott opined the September 12, 2019 IEP did not meet G.M.'s identified needs, did not include appropriately ambitious goals, and did not offer G.M. a FAPE. Tr. vol. 2, p. 274:9-22.

165. Ms. Endicott opined "the team needed to put in place a goal specific to that text level fluency and work with interventions with a CVI overlay, collect the data, and see if those interventions were improving G.'s text fluency." Tr. vol. 2, p. 280:13-16.

166. The data collected prior to the IEP meeting documented G.M. had met the reading goals from the September 2019 IEP and that these goals were not appropriately ambitious. Stip. Ex. 42.

167. The IEP team did not add a fluency goal because, according to WCPSS Senior

Administrator Audrey Jones-Langston, a fluency goal was not necessary since the 3 reading goals "supported" her fluency. Stip. Ex. 11, p. 57.

168. Although G.M.'s IEP team assured G.M.'s parents that her goals did "support fluency," Ms. Endicott opined the goals, as written for the February 2020 IEP, do *not* address G.M.'s fluency needs. Tr. vol. 2, pp. 281:23-282:8.; *see* Stip. Ex. 14, p. 189.

169. Yet, while these goals may have "supported" G.M.'s fluency they did nothing to improve it. During the same meeting despite this "support", Ms. Jones-Langston wanted to "address the issue with [G.M.'s] reading speed." Stip. Ex. 11, p. 66.

170. D.M. recommended that they contact. Dr. Roman as a resource and consider using the "bubble" technique to help her speed and fluency." Stip. Ex. 11, p. 67.

171. According to Ms. Wyss, G.M. struggled with the "bubble technique". Stip. Ex. 11, p. 64. In response, J.M asked them to consult with Alisha Waugh about this and Ms. Wyss said she would. Stip. Ex. 11, p. 64.

172. It is questionable whether Ms. Wyss had been adequately trained in the use of the "bubbling" technique because to use the bubbling technique a person needs a lot of expertise because it is more complex than it seems. Tr. vol. 3, pp. 490:7-22 (T of Roman).

173. Ms. Wyss did not contact Dr. Roman, but according to the October and November 2019 Weekly Meeting notes, she complained to Alisha Waugh that the "bubbling" technique was not working with G.M. *See* Stip. Exs. 53-56.

174. G.M.'s Parents continually attempted to connect G.M.'s service providers with CVI experts to assist them in developing appropriate programming for G.M. J.M. emailed Ms. Wyss notes from a meeting J.M. had with Dr. Roman including Judy Endicott's contact information and ideas about improving G.M.'s literacy skills. *See, e.g.,* Pet. Ex. 97, p.745.

175. Yet, Respondent repeatedly refused to accept such assistance. *Compare, e.g.,* Pet. Ex. 97, p. 745 (Ms. Wyss passing along information to Andrea Rutherford regarding the assistance available from Ms. Endicott) *with* Tr. vol. 2, p. 255:22-25 (Ms. Endicott testifying Ms. Rutherford never contacted her to discuss ideas pertaining to G.M.'s unique needs surrounding CVI and literacy).

176. Ms. Rutherford admitted she was aware of Ms. Endicott but has never contacted her directly to get advice, guidance, or information about ways in which Respondent could improve G.M.'s fluency with print literacy. Tr. vol. 4, p. 661:4-10. Respondent's refusal to contact Ms. Endicott shows it was not genuinely committed to using CVI strategies with G.M. fluency remediation. Instead, this lack of follow through suggests that Respondent was predetermined to change G.M.'s instruction to Braille.

177. Respondent admitted "G.M.'s parents have offered to pay for the services of Dr. Roman to support G.M.'s service providers in the CVI instruction" and "D.M. has offered Dr. Roman to assist the IEP team and attend IEP meetings." Pet. Ex. 80, BS 466.

178. Yet, Dr. Roman testified, and the Undersigned finds as fact, Respondent has *not* contacted Dr. Roman to assist them in providing appropriate instruction to G.M. Tr. vol. 3, pp. 455:22-456:3. The Undersigned is extremely troubled Respondent has had access to an expert in the field of CVI, orientation and mobility, and the Sensory Balance Learning Media Assessment and has elected over and over again not to reach out to Dr. Roman for any consultation.

179. Respondent's failure to contact a free expert in a child's disability when offered by the Parents, suggests that Respondent was not committed to continuing the use of CVI strategies.

**Reading Goals Not Appropriately Ambitious for G.M.**

180. Ms. Endicott further opined these reading goals were not appropriately ambitious for G.M. as "we know that she can accomplish this goal already…." Tr. vol. 2, p. 273: 12-17 and 271:6-8. She also opined the IEP "continues to keep a goal in place that she has already demonstrated proficiency with." Tr. vol. 2, p. 274:6-8.

181. Based on Ms. Kalmbach's report at the IEP meeting, G.M. was above proficient in her mClass assessment data in the blue range, "slightly above proficient in the area for TRC and she was proficient or green in DIEBELS [sic]." Stip. Ex. 11, p. 62.

182. Ms. Endicott's expert opinion is also corroborated by WCPSS' reevaluation report. Based on the reevaluation dated September 12, 2019, G.M. made progress on all of her IEP goals except for the typing goal. She scored a 3 in reading and a 3 in math on her end of grade testing. Her reading comprehension goal was met with 80% accuracy and her high frequency word goal was meeting with 100% accuracy. Stip. Ex. 12, p. 158.

183. The service delivery did not change in the September 2019 IEP. G.M. continued to be served by the VI teacher for 75 minutes a day in regular education and 45 minutes a day in special education. Stip. Ex. 8, p. 137.

184. G.M.'s VI teacher continued to provide teacher support to all her regular education teachers in the modifications and delivery of G.M.'s academics with CVI strategies. Stip. Ex. 8, p. 144 All G.M.'s classes had accommodations adapted based on CVI characteristics throughout the school day. Stip. Ex. 8, pp. 138-143.

185. The IEP team deferred determining ESY eligibility until the next IEP meeting on February 4, 2020. Stip. Ex. 10, p. 66.

186. The IEP Team decided that no additional formal evaluations were needed because G.M. made progress on her IEP goals and was achieving in the second grade curriculum. Stip. Ex. 12, p. 159.

**WCPSS Contract with Alisha Waugh, CVI Consultant**

187. Sometime in October 2019, WCPSS contracted with Alisha Waugh, a CVI Range Endorsed Consultant. Stip. Ex. 51. Ms. Waugh attended "Weekly Meetings" with WCPSS school staff including Ms. Wyss from October 24, 2019 to December 19, 2019. Stip. Exs. 52-56. The Parents were not invited to those meetings.

188. During these meetings, Ms. Waugh also recommended the "bubbling" technique, a CVI strategy to help with G.M.'s fluency, but Ms. Wyss indicated to Ms. Waugh that it was not working for G.M. Stip. Exs. 52-56.

189. Braille instruction was mentioned by school staff at the December 19, 2019 Weekly Meeting. WCPSS documented Ms. Waugh's comment that "most students with CVI didn't have the ability to learn braille." Stip. Ex. 56. This was the last meeting, Ms. Waugh attended. No one told G.M.'s Parents that G.M. might be wasting time on a learning strategy, which she might not even be able to master.

190. Ms. Rutherford started attending the Weekly Meetings on January 9, 2020, and Ms. Waugh stopping attending. Stip. Ex. 57.

**Discussions about Braille Without Parents' Participation**

191. At the February IEP 2020 meeting, WCPSS staff indicated that Braille was necessary because of G.M.'s fluency deficits even though their IEP Progress Monitoring indicated that G.M. was progressing in her "fluency supported" IEP goals.

192. Based on the "Weekly Meeting Notes" provided by WCPSS, there were team discussions outside the IEP meetings without the Parents about Braille as early as January 23, 2020. Stip. Ex. 60, p. 462, 463, 468.

193. While the IEP team has to consider Braille as a potential option for a visually impaired child, the Parents need to be included in those discussions.

194. Throughout the 2019-20 school year, the documentary evidence shows the school-based members of the IEP team repeatedly discussed providing G.M. instruction in Braille outside of any IEP meetings and what language that they would be used to justify this to her parents. *See, e.g.,* Stip. Ex. 60, pp. 460-1 (notes taken by Ms. Rutherford from the January 23, 2020 meeting that did *not* include G.M.'s parents, indicating "concern w/fluency and automaticity. When do we consider braille?").

195. The school based IEP team members then in fact used the same language at later IEP meetings. *Compare* Stip. Ex. 60 at 462 ("We want her to use her vision as much as possible, still use print but supplement w/ braille. Still keep CVI overlay in place.") *and* 463 ("assure that braille instruction does not take away from classroom work") *with* Stip. Ex. 14 at 188 ("Mrs. Wyss stated instruction in braille would be in addition to what is being addressed now, using CVI strategies").

196. Notably, the school based members of the IEP team used the exact same language to describe Braille for G.M. in the IEP meeting minutes. Stip. Ex. 19, p. 240 ("Mrs. Scarborough-Hakin shared her thoughts regarding Braille…. *Braille is just another tool in [G.M.]'s tool box*.")(emphasis added); Stip. Ex. 14, p. 189 (Ms. Rutherford stating, "this could be just another tool in [G.M.]'s tool box…." after Ms. Wyss proposed adding braille goals to G.M.'s IEP); Stip. Ex. 19, p. 240 (Even Ms. Miller when making the determination as to the LEA during the September 8, 2020 IEP meeting noted "*Braille would be another tool*….").

197. Both Ms. Rutherford and Ms. Wyss testified that the school's CVI consultant. Alisha Waugh, recommended Braille instruction for G.M. *See* Tr. vol. 4, 664:10-13 (T of Rutherford); Tr. vol. 4, 664:10-22 (T of Wyss). Yet, in Ms. Rutherford's own notes from January 23, 2020, Ms. Rutherford documents her interpretation of Ms. Waugh's *response* to the school team's idea of introducing braille "Alisha—not opposed, sounds reasonable. 'Seems like she has the skills to learn braille.'" Stip. Ex. 60, pp. 461-462.

198. Despite notes reflecting many school-based IEP team members' conversations with Ms. Alisha Waugh about including Braille as part of G.M.'s educational programming, during the meeting with Ms. Waugh where G.M.'s mother *was* present, no one discussed Braille. Tr. vol. 5, p. 895:2-13 (T of Wyss) and Exs. 46-60.

199. Even if Ms. Waugh had independently advised the school-based members of G.M.'s IEP team that G.M. needed instruction in Braille during the January 23, 2020 call, this would be inappropriate. Ms. Waugh is not an educator and does not have the skills needed to make a determination about Braille. Tr. vol. 3, pp. 454:7-455:21 (T of Roman)

**February 10, 2020 IEP Meeting: Parents' *Fourth* Request for a Fluency Goal**

200. Another IEP meeting was held on February 10, 2020.

201. G.M.'s reading Present Levels of Academic and Functional Performance ("Present Level") in the February 10, 2020 IEP ("February 2020 IEP"), summarized the educational data from February 7, 2020 as:

> G.M. had made progress on the CVI range from 2018 to 2019; she was above proficient on the Mclass reading assessment recently administered by her second grade teacher; that she continues to read at a very slow laborious rate but that data shows this time decreases if she read the passage more than once and is familiar with the vocabulary words; the instruction of CVI strategies, which G.M. consistently uses, when presented with new words and images as well as test reading strategies; G.M. would benefit from direct instruction in phonics-based reading instruction and a whole word approach for longer, more complex words; bubbling is strategy used in conjunction with classroom-based instruction; G.M. benefits from modification of the text presentation with assistive technology and comparative thought techniques; she is meeting her goal in reading comprehension and her frequency goal with 100%; "**repetition is identified as being one of the biggest factors in G.M.'s success as a reader"**; teaching G.M. the phonics patterns through **Letterland program has been beneficial and should continue**;

> activities working with word shapes has been consistent over the past two; , the **frequent exposure and repetition of words has been the best way for Grace to have more fluidity and automaticity with reading**; .she can decode using Letterland units with 93% accuracy….

Stip. Ex. 13, pp. 163-164(emphasis added)

202. The IEP team also stated in the Present Level that G.M. benefits from listening to text and when appropriate "using audiobooks. This [auditory] medium will allow G.M. to access grade level text and keep up with the curriculum." Stip. Ex. 13, p. 163. Another statement by the IEP team which is inconsistent with Braille instruction.

203. Under Special Factor considerations, the IEP team again answered "No" that G.M. did not require instruction in or use of Braille. Stip. Ex. 13, p. 167.

204. The reading goals remained the same as the previous IEP. Stip. Ex. 13, pp. 169-170.

205. The O&M service delivery was the same as the prior IEP at 8 times per reporting period, 45-minute sessions in the general education setting. Stip. Ex. 13, p. 174.

206. When asked by D.M. at the IEP meeting how WCPSS could improve fluency, despite all the information in the Present Level about what has been working to improve G.M.'s fluency, Ms. Wyss responded that:

> she [Ms. Wyss] isn't sure how to get G.M. to be more fluent when accessing the print on the page and this is difficult for G.M.

Stip. Ex. 14, p. 187.

207. Instead of exploring CVI strategies or contacting the CVI experts recommended by the Parents, Ms. Wyss insisted that instruction in Braille should be another mode of reading. Stip. Ex. 14, p. 188. This was the first time, since kindergarten, that Braille had been mentioned by the IEP team at an IEP team meeting with G.M.'s Parents.

208. According to Ms. Wyss, Braille was another option to help make G.M. a fluent reading and Ms. Rutherford stated that this could be "just another tool in G.M.'s tool box…" with the implication that it was would be done in addition to the continuation of CVI strategies which had been instrumental to the improvement of G.M.'s functional vision. Stip. Ex. 14, p. 189.

209. Ms. Rutherford did not tell the Parents that VI services would be significantly reduced if Braille instruction was added.

210. Principal Miller stressed that although G.M. was becoming more automatic with word retrieval, she was not automatic at the sentence level. Principal Miller emphasized how difficult it would be for G.M. to keep up with her peers as up to "10,000 new words" are encountered a year and that "[w]e don't want to see G.M. not gain knowledge because she is limited with the words she can see." Stip. Ex. 14, p. 189.

211. The Parents objected and the Braille discussion was tabled for another day. Stip. Ex. 14, p. 189.

212. When D.M. asked why fluency was not bought up before as the reason for Braille instruction and why a fluency goal was not being developed, "the team clarified that the present goals do support fluency." Stip. Ex. 14, p. 189.

213. While the present goals might "support" fluency, the IEP teams did not explain, in response to D.M.'s fourth request for a fluency goal, why such a goal could not be added to the February 2020 IEP. Stip. Ex. 14, p. 189.

214. The February 2020 IEP reading goals were inappropriate for the same reasons as the September 2019 IEP reading goals were. It is unclear how inappropriate reading goals can "support" G.M.'s fluency.

215. D.M. even argued with the team on this point saying "from what he has heard, fluency is a concern and is not incorporated into the IEP. He feels that Fluency is an emerging skill, however, Principal Miller responded that reading multi-syllabic words & syllable types are not emerging skills, because they are grade level standards." Stip. Ex. 14, p. 192. Yet, these deficits in G.M.'s fluency levels are exactly why the school-based IEP members suggested to the Parents that they needed to introduce Braille to G.M. Stip. Ex. 14.

216. In the Prior Written Notice ("PWN") for February 2020 IEP meeting, WCPSS did not include D.M.'s request for a fluency goal or why that request was refused. *See* Stip. Ex. 15.

217. However, the PWN did note that the "team agreed to explore strategies to improve G.M.'s fluency rate" and indicated that the "team will discuss strategies in the consultation meetings with the contracted CVI Range Endorsed professional [Alison Waugh]." Stip. Ex. 15, p. 196.

218. At this point based on the Weekly Minutes, Ms. Waugh was no longer attending the Weekly Meetings and it is unclear whether the team discussed any additional fluency strategies with her. No evidence indicated that they had. Another example of the many false promises made by WCPSS.

219. To the extent that they actually had these discussions with Ms. Waugh, the school-based IEP team did not include G.M.'s parents in these discussions nor was Ms. Waugh invited to the subsequent September 8, 2020 IEP meeting.

220. At the February 2020 IEP meeting, the IEP team, over the objection of G.M.'s Parents, determined G.M. did "not qualify for ESY services due to the consistent progress made on all goals. [G.M.] is currently on grade level." Stip. Ex. 15, p. 196.

**June 15, 2020 IEP Meeting: Parent's *Fifth* Request for Fluency Goal**

221. After the Parent's fifth request for a fluency goal, at the June 15, 2020 IEP meeting ("June 2020 IEP"), the IEP team finally "agreed to add a fluency goal, but to defer to developing that goal until after the data collection to update the baseline data." Stip. Ex. 18, p. 233.

222. The June 2020 IEP meeting was conveyed to correct a clerical error because the VI service delivery had inadvertently been deleted from the IEP at the prior IEP meeting. Stip. 18, p. 233.

223. The VI service delivery was added back to the IEP as: VI: ECC at 15 minutes per day in the special education classroom; VI: ECC Compensatory access 75 minutes per day in the general education classroom and VI: ECC compensatory access 30 minutes per day in the special education classroom. A total of 2 hours of VI instruction. Stip. Ex. 18, p. 233.

224. The IEP also included that the CVI Range, conducted by a CVI Range Endorsed professional, would be used as a progress monitoring tool. Stip. Ex. 17, p. 225.

225. Although this was the fifth time, the Parents asked the IEP team to develop a fluency goal, Principal Miller did not feel "comfortable setting a fluency goal at this time" because a baseline would be needed to establish a goal. Stip. Ex. 17, pp. 230-232. Moreover, according to Principal Miller, a fluency goal could not be developed because "G.M.'s vision is preventing G.M. from reading." Stip. Ex. 17, p. 230. Again, at this meeting, Ms. Wyss admitted that she did not know how to increase G.M.'s reading fluency. Stip. Ex. 17, p. 227.

226. When asked how fluency would be addressed in the meanwhile, Principal Miller shared that "repeated readings are given, practice with other reading passages, putting together phrases of words, and working on accuracy." Stip. Ex. 17, p. 230.

227. So while the school-based IEP team members finally agreed with G.M.'s Parents that she needed a fluency goal, they still did not develop one. Their excuse was that additional baseline data was needed. Some additional data was eventually collected based on 2 informal assessments. But this same data could have been collected after the March 2019 IEP meeting.

## Failure to implement G.M.'s IEP from March 16 – June 15, 2020.

### *Failure to provide specially designed instruction in accordance with G.M.'s IEP*

228. Due to the COVID-19 pandemic, the last day of in-person educational services at WCPSS was March 13, 2020. Thereafter, the Governor ordered all brick and mortar schools closed to students throughout the remainder of the 2019-2020 school year. Stip. 36.

229. Beginning March 16, 2020, Respondent provided only virtual instruction from March 16, 2020 to June 15, 2020 due to the COVID-19 pandemic. Stip. 36.

230. During the remainder of the school year, all WCPSS students received instruction remotely. Based on guidance from WCPSS every student, including students with special needs, received the same amount of instruction time. G.M.'s second grade class received two hours of live or recorded instruction four days a week, and one day of support. Tr. vol. 6, p. 990:17-991:15 (T of Miller).

231. After schools closed in March 2020, G.M.'s mother J.M. documented the virtual instruction G.M. received. Pet. Ex. 47.

232. When schools initially closed, Respondent provided asynchronous activities to its students. Tr. vol. 3, p. 611:17-25.

233. "G.'s class met asynchronously Monday through Thursday, and there was like a class meet on Fridays. So the instruction was primarily Monday through Thursday, again asynchronously, though – I forget what platform right now." Tr. vol. 3, pp. 612:24-613:4 (T of Rutherford)

234. G.M.'s IEP mandated two (2) hours per day of specially designed instruction each day, but during this period G.M. received VI services two days a week and some assistance from an instructional assistant on the other two days. Tr. vol. 3, p. 613:5-9 ((T of Rutherford)

235. Ms. Wyss documented her contacts with G.M. and her family during virtual instruction. She documented only 22 hours of instructional time for G.M., despite G.M.'s IEP requiring two (2) hours of daily VI instruction. Stip. Ex. 36 (Ms. Wyss's service delivery log); Stip. Exs. 13 & 18.

236. The amount of special education and O&M services Respondent failed to implement during the period of March 16, 2020 until June 15, 2020 was 101.5 hours of VI special education and 3.5 hours of O&M services. Stip. Ex. 61 (school calendar); Pet. Ex. 47 (J.M.'s log of all services); and Stip. Ex. 36 (Ms. Wyss' documentation).

237. Prior to schools closing for in-person instruction, Ms. Kalmbach, G.M.'s second grade teacher, testified she provided over an hour of ELA instruction in her classroom daily. Tr. vol. 4, p. 757:1-6. However, after schools transitioned to virtual instruction, the students were provided with only two (2) forty-five (45) minute blocks of ELA time weekly. Tr. vol. 4, p. 757:7-11.

238. While this instruction was not part of G.M.'s IEP, the impact of G.M. not receiving the requisite specially designed instruction and needed modifications was even more profound. J.M. explained the profound impact this virtual learning had on G.M.

239. J.M. stated that:

> G.'s motivation really flagged during that time period. It was difficult for her to participate in the lessons as they were presented. As I mentioned, they were videos, and those were being put together by any number of people on the second grade team. They weren't all visually accessible to her, which required a parent or a babysitter to sit next to her and recreate what was happening say on the – on the board or the math video on a whiteboard for her to be able to see it.
>
> And, you know, she saw her younger sister being able to kind of zip through her lessons on this app, and I think it really -- it kind of dampened her spirits. Her motivation kind of flagged, and she experienced a lot of frustration with the technology piece and not always having the modified materials directly available to her in a way that she could access them and do her work.

> And she takes great pride in being able to do her work, so that was tough. I can think of one example when they were working on cursive toward the end of the year with the rest of the classroom. There no modifications made, and G. – G. lost it. She was embarrassed that she couldn't keep up, frustrated that that wasn't something that she could do, you know, to look up at the screen and also try to copy the cursive letters onto the page at the same time. And she just – she shut down and ran off.
>
> So there were a lot of episodes like that. I think that just dredged up a lot of emotion, frustration, and kind of caused her motivation to lag.
>
> Tr. vol. 1, pp. 127:8-128:11.

***Failure to provide accommodations and modifications to allow G.M. to access the general education curriculum***

240. Throughout virtual instruction, J.M. noted many "lessons [were] inappropriate and not visually accessible for [G.M.]" Tr. vol. 1, p. 123:20-24.

241. After J.M. observed unmodified virtual instruction that was inappropriate for G.M. and inaccessible for G.M., she contacted Ms. Wyss via email. Pet. Ex. 97, pp. 783-784.

242. J.M. observed Ms. Falih, G.M.'s instructional assistant, working with G.M. in a visually inappropriate and inaccessible manner during virtual learning. As G.M.'s primary diagnosis is CVI, she is unable to interpret clip art or cartoon illustrations. Yet, Ms. Falih was attempting to instruct G.M. utilizing these inappropriate materials. Tr. vol. 1, pp. 83:5-21; 82:5-9.

243. J.M. gave one example of how G.M.'s second grade class had lessons in cursive writing. These lessons were not modified to provide G.M. access to the lessons. Tr. vol. 1, p. 123:16-19 (T of J.M.)

244. Emily Jackson provided before and after school care and virtual learning assistance for G.M. and her sister. Tr. vol. 2, pp. 345: 19-24; 347: 4-8 (T of Jackson).

245. Ms. Jackson graduated from Iowa University with Bachelor's degrees in the following three (3) areas: psychology, studio arts, and human backgrounds. Tr. vol. 2, p. 344: 23-25. At the time she testified, Ms. Jackson was in her final year of a doctoral program at North Carolina State University where she was working toward a degree in human factors and applied cognition. Tr. vol. 2, p. 344: 17-18 (T of Jackson).

246. Ms. Jackson was familiar with G.M.'s unique circumstances and disability. Ms. Jackson spoke at length about G.M. her needs, the adaptations she made for G.M.'s visual needs during virtual learning, and the interactions between G.M. and her teachers during virtual school. *See, e.g.,* Tr. vol. 2, p. 348: 6-23 (explaining enlargements and modifications she made to enable G.M. to access her virtual education, which the school did not make); Tr. vol. 2, pp. 350:11-351:22 (explaining the Dreambox application for math assignments that G.M. could not access and the math assignments she created for G.M. to continue learning and practicing math skills); Tr. vol. 2,

p. 354:19-25 (explaining the special setup she created for G.M. with the extra technology necessary); Tr. vol. 2, p. 355:5-13 (explaining the trial and error for determining what was accessible to G.M.); Tr. vol. 2, p. 356: 18-25 (explaining the lack of modifications necessitating continually reaching out to teachers); Tr. vol. 2, pp. 359:24-361:7 (explaining the technology modifications she continued providing for G.M. to access her education); Tr. vol. 2, p. 361:8-17 (explaining G.M. cannot access her education without the modifications Ms. Jackson provided); Tr. vol. 2, p. 362: 13-19 (explaining no one from the school provided instruction specific to G.M. on accessing the virtual platforms); Tr. vol. 2, p. 368:1-5 (explaining how Ms. Jackson would modify plays for G.M. to read); Tr. vol. 2, p. 373: 6-20 (explaining the videos the school provided were not modified and G.M. could rarely see them).

247. Ms. Jackson was credible and knowledgeable about G.M.'s unique needs, circumstances, and disability, especially as it relates to the implementation of G.M.'s IEP during online learning. When weighing Ms. Jackson's testimony, the Undersigned factored in that Ms. Jackson was working toward a graduate degree in human factors and applied cognition, an area particularly useful to making appropriate adaptations to G.M.'s assignments and work environment. G.M. was fortunate to have Ms. Jackson's assistance during this difficult period.

248. Incredulously, even without appropriate CVI modifications and special education instruction, Ms. Wyss stated that G.M. continued to make progress on her IEP goals during the COVID-19 closure. Tr. vol. 4, p. 804:10-14. (T of Wyss). No collaborating documentation was provided to support Ms. Wyss' contention and the fact that G.M. had already mastered her reading goals. Based on the intensity of Ms. Jackson's personal involvement with G.M.'s virtual education, Ms. Wyss' testimony appears disingenuous on this point.

## Third Grade: 2020-2021 School Year

### September 8, 2020 IEP Meeting: Fluency Goal Developed and Braille Added

249. Despite being required to evaluate G.M.'s learning media and functional vision, prior to their decision to include Braille instruction, WCPSS did not reevaluate G.M.'s reading and writing skills, vision needs, evaluate appropriate reading and writing media; or evaluate G.M.'s future needs for instruction in Braille or the use of Braille. 34 C.F.R. 300. 324(a)(2)(iii).

250. Principal Miller had not followed through with her promise to collect data and "said that the team does not have data regarding fluency rates for students specifically with CVI." Stip. Ex. 19, p. 238.

251. Ms. Wyss recommended Braille because it gave G.M. another option of accessing print through Braille and Mrs. Scarborough-Hakin, the O&M teacher, agreed that "Braille is a clear way to attack reading and writing [for] students with low vision." Stip. Ex. 19, p. 240

252. However, no one on the Team including Ms. Rutherford was able to answer J.M.'s question about how long it would take to teach G.M. Braille. Stip. Ex. 19, p. 240.

253. Ms. Wyss forewarned that if Braille was not introduced, G.M. would need to start working with more technology in order to keep up with grade level demands. Stip. Ex. 19, p. 240.

254. Because G.M.'s Parents did not agree with the addition of Braille, as LEA Representative Principal Miller cast the deciding vote that "yes" Braille would be added. Stip. Ex. 19, p. 240.

255. A Braille goal was added to G.M.'s IEP that targeted pre-Braille skills. *See* Stip. Ex. 20.

256. The goal provided that: "When given two-dimensional shapes/symbols, and/or a line of Braille symbols, G.M. will demonstrate Braille reading readiness skills with 80% accuracy in 3 out of 5 teacher selected tasks," and included four benchmark objectives. Stip. Ex. 20, pp. 286-87.

257. According to Ms. Rutherford, these skills were appropriate targets for G.M., as she had not received Braille instruction for several years. Tr. vol. 3, p. 615:2-22 (T of Rutherford).

258. Dr. Roman opined. Otherwise, that the inclusion of Braille instruction was inappropriate and the Braille goal and objectives were also inappropriate. Tr. vol. 3, pp. 438:1-441:17; 443:22-444:18. The Undersigned agrees with Dr. Roman's expert opinion.

259. Regardless of the appropriateness of Braille goals, Braille instruction should not have been added to G.M.'s IEP without first conducting a new LMA and a new functional vision assessment. Because WCPSS did not conduct the requisite evaluations to determine if the instruction in Braille was appropriate, both the inclusion of Braille instruction and the Braille goals are inappropriate.

**Fluency Goal**

260. Finally, eighteen months after the Parents' first request, the following fluency goal, with 4 objectives, was added:

> [G.M.] will use pre-reading strategies to read grade level text increasing her reading to 33 words correct per minute 4 out of 5 times.
>
> > [G.M.] will use decoding skills and strategies to identify unknown words with 90% accuracy in 3 out of 4 trials.
> >
> > [G.M.] will pre-read core text with auditory support used in ELA to increase her familiarity with the vocabulary with 90% accuracy in 3 out of 4 trials.
> >
> > [G.M.] will read known words at a more automatic level, less than 3-5 seconds per word in 4 out of 5 opportunities.

> [G.M.] will practice reading and reading portions of text from word to phrase to sentence level with 90% accuracy in 4 out of 5 opportunities.

Stip. Ex. 20, p. 290

261. The data used to develop the fluency goal and objectives included data collected before the June 2020 IEP meeting. The Acadience Reading Assessment was completed at the end of January 2020. The Oral Reading Fluency ("ORF") Assessment and the Letterland Placement Assessment were the only 2 assessments conducted after the June 2020 IEP meeting and they were completed in August 2020. Stip. 20, pp. 259-260. WCPSS did not explain why these assessments could not have been conducted previously since G.M.'s fluency deficits were well known in March 2019.

262. Moreover, according to Principal Miller, prior to the September 2020 IEP meeting, the reason that WCPSS could not develop a fluency goal for G.M. because they had no "normed data to indicate what a reasonable rate of growth would be." Tr. vol. 6, p. 1013:24-1014:14. At the September 2020 IEP meeting, they still had no data to indicate a rate of growth for a student with CVI.

263. At the hearing, Principal Miller contradicted her previous statements and admitted that WCPSS had "plenty of data looking at what G. was able to do" fluently before the February 2020 IEP meeting. Tr. vol. 6, p. 1014:11-13.

264. Ms. Miller also admitted that the DIBELS and Acadience data she claimed as justification for developing a fluency goal at the September 2020 IEP meeting was the same data available at the February 2020 IEP meeting when WCPSS refused to develop a fluency goal. Tr. vol. 6, pp. 1014:15-1015:3.

**Change in VI and O&M Service Delivery**

265. Because of the inclusion of Braille instruction, the IEP's service delivery was changed from 75 minutes in the general education setting and 45 minutes in the special education setting (a "Regular" education placement) to 30 minutes in the general education setting and 90 minutes in the special education setting (a "Resource" placement). *Compare* Stip. Ex. 18, p. 233 *with* Stip. Ex. 20, pp. 290-291.

266. None of the academic or functional goals in the IEP included in the goal "with CVI modifications". However, the IEP still contained CVI accommodations based in the supplemental aids and accommodation section as well as VI teacher support with CVI strategies for the regular education teachers and CVI training if necessary. Stip. Ex. 20, pp. 280-282; 298.

267. Improvement of G.M.'s functional vision was not addressed by the September 2020 IEP team. No functional vision goals were proposed in the September 2020 IEP because WCPSS's goal was not to improve G.M.'s vision" but "to improve G.M.'s ability to read." Tr. vol. 6, p. 1036:2-8 (T of Miller).

268. G.M.'s two hours of VI instruction for developing print literacy using CVI instruction in the special education and 45 minutes of CVI instruction in the general education classroom were removed from her IEP in September 2020. Tr. vol. 6, pp. 1036:20-1037:12; c*ompare* Stip. Exs. 9&13 *with* Stip. Ex. 20.

269. The CVI literacy instruction was replaced with Braille instruction as another way to enable G.M. to access print. Tr. vol. 6, p. 1037:15-24.

270. Although the IEP team agreed that G.M. would benefit from a "systematic auditory reading program" at the September 2019 IEP meeting, this was not included in the September 2020 even though the auditory medium is G.M.'s secondary learning medium.

271. G.M.'s placement was changed from a Regular education setting with more than 80% of the time with her nondisabled peers to a Resource setting with 40-79% removal from her nondisabled peers.

272. Despite Ms. Scarborough-Hakin testifying G.M. was making "limited progress" on her orientation and mobility goals, the IEP team reduced her time working on those goals by half in the September 8, 2020 IEP. *Compare* Tr. vol. 4, pp. 738:18-739: 1 *and* Stip. Ex. 20. Even though G.M. had not made progress on all her O&M goals, her O&M Instruction was reduced from 8 times a reporting period to 4 times a reporting period. Stip. Ex. 21, p. 304.

273. Additional assistive technology was added which included a screen reader and voice to text features on a touch screen laptop. Stip. Ex. 21, p. 304.

274. The removal of the CVI Overlays and modifications from G.M.'s academic goals was inappropriate because these strategies are instrumental in G.M.'s academic and functional visual success. Tr. vol. 2, p. 290:15-22 (T of Endicott); Tr. vol. 3, p. 445:1-6 (T of Roman).

275. Ms. Endicott opined that the goals included in the September 8, 2020 IEP were not appropriate for G.M.'s unique needs and circumstances as the goals do not include CVI strategies or CVI overlay necessary for G.M. to accomplish the goals. Tr. vol. 2, p. 290:15-22. Dr. Roman further opined of the fluency goal: "what I'm not seeing are specific CVI accommodations to help her get there. So the key is if we think about CVI, very different concept than ocular visual impairment, special strategies and supports are *necessary*." Tr. vol. 3, p. 445:1-6 (emphasis added).

276. Ms. Endicott explained that the CVI overlay and specially designed instruction were not the same. She opined, "I consider CVI [overlay] necessary, a necessary component of specially designed instruction. Specially designed instruction targets specific needs. The CVI overlay is necessary in order for that learner to interpret and participate with those visual experiences." Tr. vol. 2, p. 247:5-12.

277. Dr. Roman went on to say, "These goals could exist for *any* child who is having difficulty reading. I just don't see these goals being wrapped around or designed specifically with CVI at the center." Tr. vol. 3, 446:4-7 (emphasis added).

278. On cross examination, Ms. Rutherford acknowledged the fluency goal on the September 2020 IEP as written does *not* include CVI specific strategies and accommodations necessary for G.M. to access print. Furthermore, Ms. Rutherford admitted that the fluency goal was not written to be implemented by someone with training in CVI. Tr. vol. 4, pp. 696:5-697:3.

279. The Undersigned agrees with the expert opinions of Dr. Roman and Ms. Endicott that the CVI overlay and CVI strategies are necessary and the exclusion of these strategies from the IEP goals is inappropriate.

280. ESY was not decided at that meeting and the team agreed to reconvene to discuss ESY by February 5, 2021. Stip. Ex. 19, pp. 242-243; Stip. 21, p. 305.

**Evaluations Required to Determine Appropriateness of Braille Instruction**

281. The September 2020 Prior Written Notice indicated that Roxanne Wyss was the "Interpreter of Instructional Implications of Evaluation Results." Stip. Ex. 21, p. 306.

282. In order to determine the appropriateness of Braille instruction, the IEP team must first conduct and then review certain evaluations. These evaluations are 1. reading and writing skills and needs evaluation(s); 2. reading and writing media evaluation; and 3. Braille "current need" or "future need" evaluation. *See* 34 C.F.R. 300.324(a)(2)(iii).

283. The team had previously agreed to conduct another CVI Range before the September 2020 IEP Meeting. Stip. Ex. 19, p. 238. However, the team later refused to conduct it because of COVID-19 health issues. Stip. Ex. 19, p. 239. The team did not consider conducting the CVI Range remotely. The most recent CVI Range used by the team was dated July 10, 2019, over one year old. Stip. Ex. 21, p. 305.

284. The Parents also asked that the Sensory Balance: An Approach to Learning Media Assessment ("LMA") be completed prior to the Braille determination. The IEP team declined but, inexplicably, agreed to revisit this assessment *after* the decision to add Braille was made. Stip. Ex. 21, p. 303. Neither of these essential assessments were completed before the Braille decision.

285. Respondent intentionally did not conduct these evaluations. Ms. Wyss was adamant in her position that she did not need to conduct a separate Learning Media Assessment to determine G.M. needed instruction in Braille. Tr. vol. 7, p. 1146:3-10.

286. Prior to the Braille determination, the IEP team had formally and informally assessed G.M.'s reading and writing skills. Although an assistive technology ("AT") evaluation had not been conducted, based on observations and information from the VI, O&M, and Occupational Therapist, sufficient information was available to determine the technology G.M. needed to access the general curriculum. At the September 2020 IEP meeting, additional technology was added with assistive technology goals. Although Petitioners dispute the reading goals, they proffered no evidence that the AT goals were inappropriate.

***Functional Vision Skills Assessment***

287. The IEP team did not, however, have an updated CVI Range. As a result, the September 2020 IEP team did not have information about G.M.'s current functional vision skills. After the fact, on December 16, 2020, Ms. Wyss conducted a CVI Range assessment. Stip. 50, *see also* Stip. Exs. 66 & 67.

288. The CVI Range was provided to J.M. and D.M. via email on January 14, 2021, after the conclusion of the due process hearing. Stip. 50.

289. Prior to the IEP team's decision to provide G.M. with Braille instruction, the team failed to properly re-evaluate G.M.'s functional vision using the CVI Range or conduct a new Learning Media Assessment in order to determine the appropriateness of such instruction. The 2019 CVI was used when deciding Braille instruction for G.M. in September 2020.Tr. vol. 4, p. 648:7-15 (T of Rutherford). This was inappropriate.

***Reading and Writing Media Evaluation***

290. The September 2020 IEP Team also did not conduct a Sensory Balance Assessment Learning Media Assessment ("LMA") of G.M.'s primary and secondary sensory learning media.

291. A Learning Media Assessment ("LMA") is used to determine a student's primary and secondary learning media. Prior to the 2020 LMA, the last LMA that WCPSS conducted of G.M. was in 2017. Stip. 45.

292. Dr. Roman opined the Learning Media Assessment from 2017 was not appropriate for the IEP team to change G.M.'s educational programming to Braille. Moreover, even a 2019 CVI Range over a year earlier is not an appropriate assessment for changing G.M.'s educational programming to Braille. Tr. vol. 3, pp. 524:22-525:15.

293. At the September 8, 2020 IEP meeting, after the IEP team decided to include instruction in Braille in G.M.'s IEP, the IEP team agreed the Sensory Balance Approach would be completed and agreed to reconvene for a re-evaluation meeting. Stip. 49.

294. Three months after the IEP meeting in December 2020 and January 2021, Ms. Wyss, with input from other educational team members Lesley Wade, Megan Busick, and Claire Scarborough-Hakin, conducted the Sensory Balance Assessment. Stip. 51, *see also*, Stip. Exs. 68 & 69.

295. The extent of J.M. and D.M.'s involvement in the completion of the Sensory Balance is disputed, but it seems unlikely that they were aware that they were answering questions for the Sensory Balance. Stip. 51, *see* Tr. vol. 7, pp. 1118:17-1119:18 (T of J.M.), *and* Tr. vol. 7, pp. 1127:20-1128:15, 1137:17-1139:3 (T of Wyss).

296. The Sensory Balance Approach ("SBA") does not require face-to-face interaction to complete, yet the IEP team waited until December to conduct it and January 2021 to share the results with G.M.'s parents. Stip. Exs. 68&69.

297. The SBA does not mention G.M.'s need for instruction in Braille even once. To the contrary, the SBA documents G.M.'s strength as a visual learner and need for auditory support. Stip. Exs. 68&69.

298. The new updated evaluations "reinforce[] the fact that G. shows absolutely no indication of needing Braille, that she is, you know, really continuing to show improvement as a visual learner." Tr. vol. 7, pp. 1099:19-1100:3 (T of Roman). The new evaluations did not support Braille instruction for G.M. Tr. vol. 7, pp. 1102:20-1103:1 (T of Roman).

299. The IEP team did not conduct an updated Learning Media Assessment prior to changing G.M.'s educational programming to Braille nor does it appear that they even carefully reviewed the outdated 2017 LMA before changing G.M.'s programming to Braille. *See e.g.,* Tr. vol. 4, p. 658:4-8; Stip. Exs. 20 & 21.

300. Ms. Wyss testified that the "Sensory Balance is the piece that supports the CVI-specific areas that a Learning Media Assessment may not cover. So when we come to decisions through the Learning Media Assessment, it may not consider that vision is expected to improve in a student with cortical visual impairment." Tr. vol. 5, p. 1124:12-19.

301. Knowing this, even when confronted with the new evaluations, which further documented G.M. did not need, much less require, instruction in Braille, Ms. Wyss[14] was still convinced that believed G.M. needed Braille instruction. Tr. vol. 7, pp. 1145:24-1146:2. Yet, when pressed to describe G.M.'s primary and secondary ways of collecting information, learning media, and literacy media, Ms. Wyss admitted those media were visual and auditory. Tr. vol. 7, pp. 1146:15-1147:9.

**No Evaluation for "Current Need" or "Future Need" of Braille**

302. A Braille Skills Inventory is part of the LMA and is used to determine a student's current need and future need for Braille. The document is actually entitled: "Braille Skills Inventory Learning Media Assessment/Initial." Stip. Ex. 22, p. 307. The Braille Skills Inventory ("2017 Braille Inventory") used by the Team was completed when G.M. was in preschool on March 7, 2017 after 3 observations held on January 30, 2017, February 21, 2017, and March 2, 2017. Stip. Ex. 22, p. 307. The evaluator's name is not listed on the report.

303. The 2017 Braille Inventory was not only an outdated assessment but incomplete as well. *See* Stip. Ex. 22, pp. 309-310. Many of the informative sections were not even filled in.

304. The 2017 evaluator only answered the first question in this section about G.M.'s print reading skills, omitting the other 2 questions.

---

[14] Respondent's expert witnesses, Principal Miller and Andrea Rutherford, did not testify at the subsequent hearing about the effect of the new evaluations on their expert opinions. Petitioners' expert witness, Judith Endicott also did not testify at the March 4, 2021 hearing.

305. These questions were:

| | |
|---|---|
| Could student benefit from a rudimentary level of print reading skills for short-term functional purposes? | **<u>YES</u>** NO |
| Does student have sufficient visual potential to make such instruction beneficial? | YES NO |
| Would print reading skills have sufficient long-term value to justify instructional time? | YES NO |

Factors to be considered by multidisciplinary team:

[left unanswered]

Stip. Ex. 22, p. 309

306. The 2017 Braille Inventory noted that G.M.'s vision functioning was stable and recommended under the section entitled: "USE OF EXTREMELY LIMITED VISION (for students who read Braille but retain some level of visual functioning)" that G.M. "would benefit from Print Literacy Braille primary." Stip. Ex. 22, p. 309.

307. The 2017 recommendation for Braille instruction is inconsistent with WCPSS' admission that now G.M.'s primary medium is vision and her secondary medium is auditory. It also does not account for the improvement in G.M.'s functional vision since that time.

**The Braille Goal Was Inappropriate**

308. Although G.M.'s IEP teams had decided for years that G.M. did not require instruction in Braille, Respondent included Braille in G.M.'s September 8, 2020, over G.M.'s parents' objections. Stip. 44; Stip. Ex. 20. "[D.M.] asked that it be documented that he and [J.M.] proposed that [G.M.] not be instructed in Braille and receive instruction in print relevant to [G.M.]'s unique circumstances that she can see and her vision is expected to improve." Stip. Ex. 19, p. 243.

309. The school based members of the September 2020 IEP team developed one (1) goal with four (4) objectives to work with G.M. on Braille. The team also intended to remove G.M. from her nondisabled peers for thirty (30) minutes daily to work on this one (1) goal. Stip. Ex. 20, p. 290.

310. The school based IEP team members indicated the reason for making the change was because G.M. was a slow reader and they had concerns about her fluency. *See e.g.* Tr. vol. 4, p. 642:18-20 (T of Rutherford); Tr. vol. 5, 8p. 88:16-18 (T of Wyss). The very same concerns raised by G.M.'s Parents eighteen (18) months previously but ignored by the IEP teams.

311. Without any serious inquiry into the matter, the IEP team was also concerned that G.M.'s functional vision may not continue to improve. A child with an ocular visual impairment would "not have the expectation of improving vision" as such it would be appropriate to teach them Braille as their primary learning medium is tactual. Tr. vol 3, p. 420:19-25 (T of Roman). In contrast, a child with CVI has the expectation with visual supports and interventions his or her vision will improve. Tr. vol 3, pp. 421:7-23; 424:23-425-1 (T of Roman)

312. "To improve vision G. must use her vision." Switching to Braille would decrease her time with print literacy and decrease the amount of time she used her vision for reading. Additionally, G.M. would lose opportunities for repetition in her reading skills. Tr. vol. 2, pp. 286:23-287:3 (T of Endicott).

313. Ms. Rutherford acknowledged that she knew G.M. did not have a degenerative eye condition, yet there is no evidence this was discussed by the IEP team. Tr. vol. 4, 658:9-14; *see* Stip. Ex. 19. To the contrary, Ms. Miller, the LEA Representative who made the determination to include instruction in Braille over the Parents' objection, testified she did not even know if G.M. had a degenerative eye condition. Tr. vol. 6, pp. 1046:24-1047:1.

314. Principal Miller made it clear that she was not interested in the improvement of G.M.'s functional vision. Tr. vol. 6, p. 1036:2-8 (T of Miller).

315. The IEP team did not review G.M.'s most recent report card during that meeting. Tr. vol. 4, pp. 643:13-644:7. Ms. Rutherford further admitted that when the school-based members of the IEP team decided to change G.M.'s educational programming to include Braille, "she wasn't having difficulty accessing grade level material wither her accommodations." Tr. vol. 4, 657:21-24.

316. Ms. Rutherford also admitted the September 2019 DIBELS shows G.M. was reading slightly above the beginning of the year second grade benchmark and that G.M. had passed the goal in nonsense word fluency, correct letter sounds, and whole word read. By the beginning of third grade, even after virtual instruction due to school closures for COVID-19, G.M. was reading at an end of second grade level. Tr. vol. 4, pp. 655:11-656:18 (T of Rutherford); Stip. Ex. 31.

317. Braille instruction is not appropriate for G.M. as vision is her primary learning medium. Tr. vol 3, pp. 435:5-436:10; 438:15-20. In addition, the use of Braille may be harmful to G.M.'s vision and to G.M. emotionally. Tr. vol 3, p. 440:9-18 (T of Roman). Likewise, as Braille is processed through the visual part of the brain, G.M. learning Braille would provide less time for her to access visual opportunities and continue improving her vision. Tr. vol 3, p. 441:5-10 (T of Roman).

318. Dr. Roman's expert opinion was supported by multiple WCPSS' witnesses. Tr. vol. 6, p. 1013:21-23 (Miller testifying G.M. is a "sighted reader."); Tr. vol. 6, pp. 1022:25-1023:10 (Miller testifying G.M. does not struggle with reading decoding or reading comprehension); Tr. vol. 6, p. 1029:10-12 (Miller testifying G.M. can read print and write); Tr. vol 4., p. 635:6-24 (Rutherford testifying G.M.'s functional vision has improved, and she had learned to read on grade level during the time the IEP team offered two hours of VI services daily); Tr. vol 4., p. 635:14-

15 (Rutherford testifying G.M. is a dual media learner – visual and auditory, not tactile); Tr. vol 5., p. 769:13-21(Wyss testifying G.M's functional vision improved a full point on the CVI range, and she was able to read at a smaller font size); Tr. vol. 5, p. 783:1-17 (Wyss testifying about the importance of technology in G.M.'s education).

319. Dr. Roman opined that the September 8, 2020 IEP is inappropriate for introducing Braille instruction and if Braille instruction was necessary, a student would need more than thirty (30) minutes daily to be taught Braille. Tr. vol. 3, p. 524:10-19.

320. Though Dr. Roman clearly testified that the inclusion of Braille was inappropriate and did not meet G.M.'s specific needs, she also opined that the Braille goals themselves were inappropriate as well because:

> [t]hese goals are pre-Braille goals. They're goals that you give to a preschool child or a person who is first learning Braille. And they are – they look to me like the same suggested goals when G. was starting – when she was starting school in the 2017, if I remember correctly.
> So these are – these are very, very – it's clear that they're starting – they want to start Braille instruction at the very, very beginning in a way that you would teach a preschool child how to approach Braille. There's the assumption – the assumption with these goals is that you don't know how to read at all.
>
> Tr. vol. 3, pp. 443:24-444:10.

321. Dr. Roman stated the following concerning G.M.'s potential future need for Braille:

> So I'm not sure if they've conducted an assessment of that [G.M.'s future need for braille], but there would be absolutely no reason to believe that G. would have vision that would begin to deteriorate. There is no evidence of that. That is not what occurs with children with CVI. It is not what occurs with children with optic nerve atrophy. As so she meets the criteria, in my mind, because she does not have a deteriorating vision condition. She is not in Phase I CVI. And she has not expressed the need to learn tactually.
>
> Tr. vol. 7, pp. 1098:21-1099:7.

***Orientation and Mobility Goals and Service Delivery***

322. The September 2020 IEP included two Orientation & Mobility ("O&M goals") goals. Stip. Ex. 20, pp. 287-88.

323. In G.M.'s prior IEP, she received eight (8) sessions per reporting period of orientation and mobility instruction for forty-five (45) minutes per session in the general education environment. The prior IEP contained three (3) goals with six (6) subparts. Stip. Ex. 13, pp. 172-174.

324. In the September 2020 IEP, G.M.'s sessions were cut in half to four (4) sessions per reporting period for forty-five (45) minutes per session and moved into the special education environment. The September 2020 IEP contained only two (2) goals with a total of five (5) subparts. Stip. Ex. 20, pp. 287-288, 291.

325. The two O&M goals were:

> When presented with a street map or building interior map Grace will read and interpret all information to answer given instructor questions with 90% accuracy, in 4 out of 4 opportunities, with fading instructor support.
>
> Grace will listen to audio routes and answer instructor questions with 90% accuracy in 4 out of 4 trials, identifying traffic direction, ambient sounds, traffic flow, sound distance.
>
> Stip. Ex. 20, p. 287.

326. The O&M goals were not grounded in CVI principles nor were any CVI strategies included as accommodations or supplementary aids. *See* Stip. Ex. 20, pp. 291-298.

327. Dr. Roman opined that in September 2020 orientation and mobility goals:

> There is absolutely nothing about CVI even hinted in these goals. These are goals that are – you would teach any child with visual impairment, ocular visual impairment. These are techniques and strategies that are specifically designed with children who have ocular issues in mind.
>
> Tr. vol. 3, p. 446:15-19.

328. Dr. Roman further opined "It's almost like they're teaching orientation and mobility with like vision off. But children with CVI cannot turn their vision off. It's not possible." Tr. vol. 3, 447:17-20. Additionally, "We have to embrace those ten characteristics and insert them into those techniques. What we have are techniques. Those [orientation and mobility] goals have nothing to do with CVI." Tr. vol. 3, 448: 3-6.

329. Ms. Scarborough-Hakin explained that one of the important things she did in her instruction for G.M. was highlighting familiar features, embedding anchors for her in the environment, building on comparative navigational concepts, and building in ways to help G.M. to focus on particular visual details. Tr. vol. 4, pp. 710:19-714:1, 727:7-25. While Ms. Scarborough-Hakin may have been embedding CVI strategies in her instruction, the IEP did not include CVI accommodations for the O&M goals. Stip. Ex. 20, pp. 287-288.

***Assistive Technology Goals***

330. The IEP included three assistive technology goals. Stip. Ex. 20, pp. 288-89. No testimony or evidence was presented regarding any inappropriateness of those goals, and therefore, Petitioners have by definition failed to meet their burden of proof on this issue.

331. To the extent any findings are necessary, the Undersigned finds based on the IEPs, meeting minutes, prior written notices, and testimony by school staff regarding the variety of technological supports G.M. was provided, that the assistive technology goals were appropriate.

**Extended School Year ("ESY") Services**

332. Regarding Extended School Year ("ESY") services, the September 2020 IEP team determined that it could not decide at the time of the meeting because new goals had been developed at the meeting and there was therefore no data on those new goals yet. Stip. Ex. 21, p. 304.

333. Previously, Respondent provided G.M. with ESY during the summer of 2018 for sixteen (16) hours, the summer of 2019 for forty-two (42) hours, and the summer of 2020 for thirty-seven (37) hours. Stips. 21, 25&41.

334. G.M.'s parents requested at each of the relevant IEP meetings that G.M. receive ESY services due to G.M.'s need for ongoing, consistent instruction using CVI strategies to continue to make academic and functional progress. Stip. 28.

335. Although consistent instruction using CVI strategies was necessary for G.M.'s progress, at each of the relevant IEP meetings, G.M.'s IEP team either refused to provide ESY or postponed the decision to a later meeting. Stip. 28-9, 35, 38; *see also* Stip. Ex. 14, pp. 189-92 (determining G.M. did not have an emerging skill, did not regress over breaks, and her skills would not be significantly jeopardized without ESY); Stip. Ex. 15, pp. 195-6 (refusing ESY and deciding to reconvene prior to April 20, 2020 to determine G.M.'s need for ESY).

336. Dr. Roman opined the IEP team had enough information at the September 2020 IEP meeting to determine G.M.'s eligibility for ESY based on her fluency issues, writing skills, and need for VI - ECC support. Tr. vol. 3, pp. 449:24-450:17.

337. Based on the Parents prior experiences with WCPSS' delays in making ESY decisions, the Undersigned can understand why they wanted a decision sooner rather than later on the ESY issue.

**Parent Participation & Predetermination**

338. G.M.'s Parents were transparent and collaborative with the IEP team and regularly advocated for goals and services to meet her identified needs. *See, e.g.,* Stip. Ex. 3, p. 35

339. During the May 10, 2019 IEP meeting, the IEP team noted "[G.M.] has issues with fluency . . . but shared that it is more important that [G.M.] is able to read and identify the words and that speed is not a focus for [G.M.]" Stip. Ex. 7, p. 114. Yet, speed was the exact reason the IEP team later gave for why G.M. needed instruction in Braille. *See* Stip. Ex. 19.

340. Likewise, at the February 10, 2020 IEP meeting, the IEP team, over the objection of G.M.'s Parents, determined G.M. did "not qualify for ESY services due to the consistat [sic] progress made on all goals. [G.M.] is currently on grade level." D.M. even argued with the team saying "from what he has heard, fluency is a concern and is not incorporated into the IEP. He feels

that [f]luency is an emerging skill…. [r]eading multi-syllabic words & syllable types are not emerging skills, because they are grade level standards." Stip. Ex. 20, p. 192. Yet, these deficits in G.M.'s fluency levels are exactly the excuse the IEP team later gave for including Braille instruction. Stip. Ex. 20.

341. This "double talk" is bewildering to the Undersigned and must have been truly frustrating to G.M.'s Parents.

342. J.M.'s Parents continually attempted to connect G.M.'s service providers with CVI experts to assist them in developing appropriate programming for G.M. *See, e.g.,* Pet. Ex. 97, p. 745.

343. Yet, Respondent repeatedly refused to accept such support. *Compare, e.g.,* Pet. Ex. 97, p. 745 (Ms. Wyss passing along information to Andrea Rutherford regarding the assistance available from Ms. Endicott) *with* Tr. vol. 2, p. 255:22-25 (Ms. Endicott testifying Ms. Rutherford never contacted her to discuss ideas pertaining to G.M.'s unique needs surrounding CVI and literacy).

344. Ms. Rutherford was aware of Ms. Endicott but has never contacted her directly to get advice, guidance, or information about ways in which Respondent could improve G.M.'s fluency with print literacy. Tr. vol. 4, p. 661:4-10.

345. Respondent admitted "G.M.'s parents have offered to pay for the services of Dr. Roman to support G.M.'s service providers in the CVI instruction" and "D.M. has offered Dr. Roman to assist the IEP team and attend IEP meetings." Pet. Ex. 80, p. 466.

346. Yet, Respondent has *not* contacted Dr. Roman to assist them in providing appropriate instruction to G.M. Tr. vol. 3, pp. 455:22-456:3 (T of Roman).

347. This is deeply troubling that Respondent has had access to an expert in the field of CVI, orientation, and mobility, and the Sensory Balance Learning Media Assessment and has elected over and over again not to reach out to Dr. Roman for any consultation.

348. Respondent's failure to contact an expert in a child's disability when offered by a parent, a member of the very child's IEP team, is illogical especially since G.M's unique circumstances surpass that other VI students for which WCPSS' VI teachers, including the Lead VI teacher, have had experience in teaching.

349. Throughout the 2019-20 school year, the documentary evidence shows the school-based members of the IEP team repeatedly discussed providing G.M. instruction in Braille outside of any IEP meetings and the language that would be used to justify this to her parents. *See, e.g.,* Stip. Ex. 60, pp. 460-1 (notes taken by Ms. Rutherford from the January 23. 2020 meeting that did *not* include G.M.'s Parents, indicating "concern w/fluency and automaticity. When do we consider braille?").

350. The school-based IEP team members then in fact used the same language at later IEP meetings. *Compare* Stip. Ex. 60 at 462 ("We want her to use her vision as much as possible, still use print but supplement w/ braille. Still keep CVI overlay in place.") *and* 463 ("assure that

braille instruction does not take away from classroom work") *with* Stip. Ex. 14 at 188 ("Mrs. Wyss stated instruction in braille would be in addition to what is being addressed now, using CVI strategies").

351. Notably, the school-based members of the IEP team used the exact same language is used to describe Braille for G.M. in these meeting minutes. Stip. Ex. 19, p. 240 ("Mrs. Scarborough-Hakin shared her thoughts regarding Braille…. *Braille is just another tool in [G.M.]'s tool box*.")(emphasis added); Stip. Ex. 14, p. 189 (Ms. Rutherford stating "this could be just another tool in [G.M.]'s tool box…." after Ms. Wyss proposed adding Braille goals to G.M.'s IEP); Stip. Ex. 19, p. 240 (Even Ms. Miller when making the determination as the LEA during the September 8, 2020 IEP meeting noted "Braille would be another tool….").

352. Both Ms. Rutherford and Ms. Wyss testified to the school's CVI consultant. Alisha Waugh, recommended Braille instruction for G.M. *See* Tr. vol. 4, 664:10-13 (T of Rutherford) and Tr. vol. 4, 664:10-22 (T of Wyss). This is inadmissible hearsay. Yet, in Ms. Rutherford's own notes from January 23, 2020, Ms. Rutherford states in her words that Ms. Waugh's *response* to the school team's idea of introducing Braille "Alisha—not opposed, sounds reasonable. 'Seems like she has the skills to learn braille.'" Stip. Ex. 60, pp. 461-462.

353. Most concerning is that despite notes reflecting many school-based IEP team members' conversations with Alisha Waugh about including Braille as part of G.M.'s educational programming, during the meeting with Ms. Waugh where G.M.'s mother ***<u>was</u>*** present, no one mentioned Braille. Tr. vol. 5, p. 895:2-13 (T of Wyss); Stip. Exs. 46-60. This suggests that Ms. Waugh was, in fact, not supportive of Braille instruction for G.M.

354. Even if, for argument's sake, Ms. Waugh had independently advised the school-based members of the September 2020 IEP team that G.M. needed instruction in Braille during the January 23, 2020 call, this would have been inappropriate as Ms. Waugh is not an educator and does not have the skills needed to decide about Braille. Tr. vol. 3, pp. 454:7-455:21 (T of Roman).

355. As noted previously, the September 2020 EP team finally added a fluency goal to G.M.'s IEP. Stip. Ex. 20. G.M.'s Parents had requested this fluency goal since at least March 2019. *See* Stip. Ex. 3. It took the IEP team eighteen months to add a fluency goal. Notably, the same fluency deficit was Respondent's rationale to add Braille instruction.

356. Because of their lack of expertise with CVI students, the September 2020 IEP team did not even know if Braille would help G.M. become more print fluent with Braille. The September 2020 IEP noted that: "[i]nstruction in Braille ***may help increase*** [G.M.]'s ability to ready with more fluency and independence. Providing instruction on pre-readiness Braille skills **may prepare** [G.M.] to read longer passages with automaticity." Stip. Ex. 20, p. 260 (emphasis added).

357. Ms. Wyss testified she had worked with G.M. on fluency and ineffectively used the "bubbling" technique. Yet, Ms. Wyss did not effectively provide fluency instruction to G.M. Tr. vol. 2, p. 259:8-24 (T of Endicott).

358. Ms. Miller's rationale for a fluency goal for G.M. was questionable. She stated: "[s]o this goal is really working on the comprehension of a given text. And remember, that's really the end of – that's the primary purpose of why we do it all." Tr. vol. 6, pp. 979:25-980:3. Yet, Respondent produced no evidence that G.M. needed to work to improve her comprehension. Both Respondent's and Petitioners' witnesses agreed G.M. met grade level expectations regarding her comprehension. The only reason Respondent indicated G.M. needed instruction in Braille was due to her slow reading speed. The Undersigned did not find this single measure of G.M.'s fluency to be a cogent explanation for switching G.M.'s educational programming which had been so successful in the past.

359. Ms. Rutherford's references to the "IEP team" discussing and introducing Braille goals were illustrative of the fact that G.M.'s Parents were not considered part of the team that made this predetermined decision:

> Well, the team had, as you already said, talked about it in February. And we also talked about it again at the June meeting. And so coming into September for the annual after having those conversations and reviewing the data and what next steps there were for G., the team proposed Braille goals.
>
> Tr. vol. 3, p. 605:12-19 (T of Rutherford)

360. While the school based members of the September 2020 IEP team may have discussed Braille at some point before or after the June 2020 IEP meeting, the minutes from the June 2020 IEP meeting do *not* reflect any member of G.M.'s IEP team discussing Braille at that meeting. Stip. Ex. 17. Thus, if there *were* a discussion of Braille for G.M. at a June meeting, it would, again, *not* have included G.M.'s Parents.

361. According to Ms. Rutherford, the September 2020 IEP team did not need additional information from the Sensory Balance Learning Media Assessment because "the team felt that that was enough that it didn't – it didn't need – we didn't need extra data to make those proposals to consider Braille." Tr. vol. 3, p. 610:1-4. Yet, the prior LMA was 3 years old and G.M.'s Parents, two important and seemingly ignored, members of the IEP team asked for additional information specifically for the school to conduct a CVI range and about the amount of time it would take for G.M. to learn Braille. Further, G.M.'s mother, J.M. stated "she would envision auditory supports be used to supplement [G.M.]'s instruction." Stip. Ex. 19, pp. 239-240. A Learning Media Assessment is designed to determine a student's additional means of accessing reading materials: visual, auditory, or Braille. *See e.g.* Tr. vol. 7, pp. 1075:14-1076:5, 1076:15-18.

362. The undisputed evidence shows G.M. is able to read print albeit slower than many of her typically developing, sighted, grade level peers. Respondent presented testimony that G.M. does not like to read, yet Braille instruction is not considered for all students who do not like to read. Tr. vol. 4, pp. 659:22-660:4.

363. Dr. Roman opined that:

> it's almost like this predetermined notion that at some point they're going to teach G. Braille, because there's really no reason for it. She's showing more and more evidence that she's successful. So I'm very, very confused by this return to Braille in the IEP despite – despite her progress."

Tr. vol. 7, pp. 1100:23-1101:3.

364. For the many reasons cited herein, the Respondent's explanations also confuse the Undersigned and are inconsistent with G.M.'s progress in functional vision. Such confusion by its very nature cannot support a cogent and rational explanation for the inclusion of Braille instruction in G.M.'s IEP; therefore, the Undersigned finds that the inclusion of Braille instruction, and the resulting Braille goals, in G. M's September 2020 IEP was inappropriate and predetermined.

## CONCLUSIONS OF LAW

Based on the above Findings of Fact and relevant laws and legal precedent, the Undersigned concludes as follows:

### General Legal Framework

1. To the extent the Findings of Fact contain conclusions of law, or that the Conclusions of Law are findings of fact, they should be considered without regard to their given labels. *Charlotte v. Heath*, 226 N.C. 750, 755, 40 S.E.2d 600, 604 (1946); *Peters v. Pennington*, 210 N.C. App. 1, 15, 707 S.E.2d 724, 735 (2011). *Warren v. Dep't of Crime Control*, 221 N.C.App. 376, 377, 726 S.E.2d 920, 923, disc. rev. den., 366 N.C. 408, 735 S.E.2d 175 (2012); *Watlington v Rockingham Co. Department of Social Services*, COA17-1176 (2 October 2018).

2. This Order incorporates and reaffirms the conclusions of law contained in the previous Orders entered in this litigation.

### Jurisdictional, Party, and Legal Stipulations

3. The Parties, Petitioners, G.M., by and through her parents, D.M. and J.M. ("Petitioners", "G.M." or "Parents"), and Respondent, Wake County Board of Education ("WCPSS" or "Respondent"), are properly before this Tribunal, and this Tribunal has personal jurisdiction over them. Stip. 1.

4. The Office of Administrative Hearings ("OAH") has jurisdiction over claims relating to the identification, evaluation, educational placement, or provision of a free appropriate public education ("FAPE") pursuant to Chapters 115C and 150B of the North Carolina General Statutes and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 et seq. and implementing regulations, 34 C.F.R. Part 300. 20 U.S.C. §1415 and N.C. Gen. Stat. § 115C-109.6(a) control the issues to be reviewed. Stip. 2.

5. The IDEA is the federal statute governing education of students with disabilities. The federal regulations promulgated under IDEA are codified at 34 C.F.R. Part 300. Stip. 3.

6. Respondent, Wake County Board of Education, is a local education agency receiving monies pursuant to the IDEA. Stip. 4.

7. The controlling State law for students with disabilities is N.C. Gen. Stat. Chapter 115C, Article 9. Stip. 5.

8. G.M. and her parents were residents of Wake County, North Carolina during the period relevant to this controversy. Stip. 10; Stip. 11. G.M. is a "child with a disability" for the purposes of 20 U.S.C. § 1400 *et seq.* and N.C. Gen. Stat. § 115C-106 *et seq.* Stip. 9. The WCPSS thus had an obligation under the IDEA to provide G.M. a free appropriate public education ("FAPE").

9. As the party requesting the hearing, the burden of proof lies with Petitioners and the standard of proof is by a preponderance of the evidence. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); N.C. Gen. Stat. § 150B-25.1(a). Actions of local boards of education are presumed to be correct; for Petitioners to prevail, their evidence must outweigh the evidence in favor of the Board's decisions. *See* N.C. Gen. Stat. 115C-44(b).

**G.M. as a Visually Impaired Student is Eligible as a "Child With a Disability"**

10. In 2014, WCPSS deemed G.M. eligible for services under the IDEA in the category of Visual Impairment ("VI"). Stip. 13. The category of Visual impairment means an impairment in vision that, even with correction, adversely affects a child's educational performance. The term includes both partial sight and blindness. 34 C.F.R. § 300.8(13).

11. A "child with a disability" includes a child with a visual impairment and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3)(A).

12. A school district must offer every student with a disability a free appropriate public education ("FAPE") through an Individualized Education Plan ("IEP") that meets the requirements of the IDEA and state standards. 20 U.S.C. § 1412(a)(1)(A). 20 U.S.C. § 1401(9).

13. The appropriateness of a student's educational program is decided on a case-by-case basis, in light of the individualized consideration of the unique circumstances of the child. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017); see *Hendrick Hudson Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982).

**Braille Instruction as Mandated by the IDEA**

14. The primary issue in this case is the appropriateness of Braille Instruction for G.M., a visually impaired student diagnosed with CVI.

15. In 1997, Congress amended the IDEA and included instruction in Braille as one of the special factors that IEP teams must consider for students who are blind or visually impaired. 20 U.S.C. § 1414(d)(3)(b)(iii); 34 CFR § 300.324(a)(2)(iii).

16. With respect to Braille instruction the IDEA states:

> The IEP Team **shall**…in the case of a child who is blind or visually impaired, **provide for instruction in Braille** and the use of Braille **unless** the IEP Team determines, **after an evaluation** of the child's **reading and writing skills**, needs, and appropriate **reading and writing media** (including an **evaluation of the child's future needs for instruction in Braille or the use of Braille**), that instruction in Braille or the use of Braille is **not appropriate** for the child.

20 U.S.C. § 1414(d)(3)(B)(iii) (emphasis added).

17. First, the statutory command is that Braille "shall" be taught "unless" the team determines it is "not appropriate." Some hearing officers have interpreted this to mean that for a visually impaired student, the default position is to teach Braille or that there is a presumption in favor of Braille instruction. *Oceanport Board of Education*, 115 LRP 39646 (N.J. SEA 2012) (concluding the IDEA "contains a presumption in favor of Braille instruction for students disabled by a visual impairment"); Las *Vegas City Schools*, 61 IDELR 238 (N.M. SEA 2013) ("Braille is, by specific Congressional mandate, presumed to be an essential part of a FAPE for a blind or visually impaired child."). Unfortunately, no binding precedent exists to guide this Tribunal. There may be a presumption when the parties agree that Braille instruction is needed, but when a parent objects, then the IEP team must determine the appropriateness of Braille instruction for that particular VI student.

18. To determine the appropriateness of Braille instruction for a VI student, certain assessments must be conducted, especially in a case such as this where the Parents contest the appropriateness of Braille instruction.

19. Based on the IDEA's mandate that every child with special needs be provided a free and appropriate public education unique to that child's individualized needs, the Undersigned declines to conclude that there is a "presumption" in favor of Braille instruction for a visually impaired student like G.M. diagnosed with CVI.

20. Respondent knew that G.M.'s Parents had objected to the inclusion of Braille instruction in G.M.'s kindergarten IEP. The Parents again objected in March 2020 to the inclusion of Braille instruction and, at that time, the IEP team agreed to conduct a CVI Range to determine G.M.'s current functional vision. Prior to the September 2020 IEP decision to include Braille instruction, the Parents also asked that a Learning Media Assessment ("LMA") be conducted as the last LMA was outdated having been completed in 2017. Inexplicably, the IEP team agreed to the LMA but only *after* the Braille decision. Stip. 49.

21. Before making their Braille decision, WCPSS also failed to conduct a functional vision assessment ("CVI Range"). After promising to conduct the CVI Range as a reevaluation at

the February 2020 IEP and as a progress monitoring tool twice a year at the June 2020 IEP, WCPSS failed to complete any CVI Range before the September 2020 IEP. Stip. 46, 47 & 48.

22. In a 2013 *Dear Colleague* letter[15], the Office of Special Education and Rehabilitation Services provides guidance on what evaluations a school district must conduct in order to determine whether it was appropriate to instruct a visually impaired student in Braille.

> The evaluation of vision status and the need (or future need) for Braille instruction should be thorough and rigorous, ***include a data-based media assessment, be based on a range of learning modalities, including auditory, tactile, and visual, and include a functional visual assessment***. An assessment of a child's vision status generally would include the nature and extent of the child's visual impairment, and its effect, for example, on the child's ability to learn to read, write, do mathematical calculations, and use computers and other assistive technology, as well as the child's ability to be involved in and make progress in the general curriculum offered to non-disabled students. Such an evaluation generally would be closely linked to the assessment of the child's present and future reading and writing objectives, needs, and appropriate reading and writing media. The information obtained through the evaluation generally should be used by the IEP Team in determining ***whether it would be appropriate to provide a blind or visually impaired child with instruction in Braille or the use of Braille as required by the IDEA***.
> 61 IDELR 172 (June 19, 2013) (emphasis added)

23. Consideration of Braille instruction is a special factor which the IEP team must consider when developing each visually impaired child's IEP along with all of the child's other academic, developmental, and functional needs. *See* 34 C.F.R. § 300.324. The impact of Braille instruction on G.M.'s functional vision should have must be taken into account by the IEP team before adding Braille instruction. However, improvement of G.M.'s vision was not addressed by the September 2020 IEP team. No functional vision goals were proposed in the September 2020 IEP because WCPSS's goal was not to improve G.M.'s vision" but "to improve G.M.'s ability to read." Tr. vol. 6, p. 1036:2-8 (T of Miller).

24. CVI literacy instruction was replaced with Braille instruction as another way to enable G.M. to access print. Tr. vol. 6, p. 1037:15-24 (T of Miller). IDEA mandates that the IEP team consider both a child's academic and functional needs. 20 U.S.C. § 1414(d)(3)(A)(iv). The school based IEP team members did not equate that improving G.M.'s functional ability to see has improved her academic ability to read as well as enabled her to have access to print and the general curriculum as the IDEA mandates. At the September 2020 IEP meeting, the school based IEP team members did not consider G.M.'s functional vision at all.

25. Nor, in changing G.M.'s placement did the school based IEP team members consider the "harm" which this change may have on G.M.'s existing functional vision. In selecting the LRE consideration must be given to any potential harmful effects 34 C.F.R. § 300.116(d).

---

[15] The Undersigned recognizes that this is simply guidance not binding authority, however, it does repeat the evaluations listed in the IDEA.

26. Based on G.M.'s unique circumstances and, for other reasons stated below, the Undersigned concludes that Braille instruction is not appropriate for G.M.

**Professional Judgment and Deference to Educators**

27. The professional judgment of teachers and other school staff is a critical factor in the evaluation of an IEP. "Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." *Hartmann by Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997); *see also, Rowley*, 458 U.S. at 207 (stating that "courts must be careful to avoid imposing their view of preferable educational methods upon the States."). The IDEA "requires great deference to the views of the school system rather than those of even the most well-meaning parents." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004)

28. "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra v. Pawling Central Sch. Dist.*, 427 F.3d 186, 194 (2d Cir. 2005); *see, e.g., Genn v. New Haven Bd. of Educ.*, 219 F.Supp.3d 296, 329 (D. Conn. 2016)

29. When deciding an administrative case, "due regard" must be given "to the demonstrated knowledge and expertise of the agency with respect to facts and inferences within the specialized knowledge of the agency." N.C. Gen. Stat. § 150B-34(a).

30. As long as educators "offer a cogent and responsive" explanation for their decisions at some point during the administrative process, deference is due to their professional judgment. *See Endrew F.*, 137 S. Ct. at 1002.

31. The "cogent and responsive" language from *Endrew F.* does not shift the burden of proof to the school district. The burden of proof remains entirely on the Petitioners. Rather, the substantial deference afforded to school decisions is supported when there is a "cogent and responsive" explanation for those decisions. While school decisions may appear "convincing" on the surface, if the educators making those decision do not have the requisite knowledge about the subject matter, then their professional judgment is not due any deference.

32. In this case, deference was not due to the educators because they had no "special expertise" and demonstrated no "specialized knowledge" about the appropriateness of Braille instruction for G.M., a student diagnosed with CVI.

33. The school-based members of the IEP team decided that Braille was necessary because of G.M.'s slow fluency rate. No one from WCPSS had any expertise about fluency rates for students with CVI. The final decision-maker, Principal Miller admitted that she never even heard of CVI before she met G.M.

34. Principal Miller also admitted to her lack of knowledge. Prior to the September 2020 IEP meeting, as the LEA Representative Principal Miller, admitted that WCPSS could not

develop a fluency goal for G.M. because they had no "normed data to indicate what a reasonable rate of growth would be" for a student with CVI. Tr. vol. 6, p. 1013:24-1014:14.

35. It was undisputed that G.M. was the only visually impaired student with CVI in Wake County Schools who was on grade level and the only VI student being assessed by the CVI Range. Before G.M. arrived, it appears that G.M.'s kindergarten VI teacher was CVI Range Endorsed. But otherwise, Ms. Wyss is the only VI teacher at WCPSS that is CVI Range Endorsed.

36. The IDEA requires that an IEP team member attend the IEP "who can interpret the instructional implications of evaluation results." 34 C.F.R. § 300. 321(a)(5). Although the VI teacher Ms. Wyss was CVI Range Endorsed, evidently her knowledge was so limited that WCPSS had to contract with an outside CVI consultant. Yet, Ms. Wyss was the individual at the September 2020 IEP meeting purportedly with the qualifications to interpret the evaluation results with respect to G.M.'s fluency and her need for Braille instruction. 34 C.F.R. § 300. 321(a)(5); Stip. Ex. 20, p. 301 (listing Ms. Wyss as "Interpreter of Instructional Implications of Evaluation Results").

37. With respect to the Braille instruction, Respondent's experts and educators admitted that they did not know the answers to the following questions: 1. whether a student with CVI could learn Braille; 2. what harm Braille instruction might do to G.M.'s functional vision; 3. how long it would take for G.M. to learn Braille; and 4. what progress to anticipate she might make. All important matters that the IEP team with the Parents should have "considered" during a meaningful Braille deliberation.

38. Despite, their demonstrated lack of knowledge, some of these questions might have been answered if they had conducted a new Learning Media Assessment rather than relying on the outdated 2017 assessment. Or perhaps if an undated CVI Range been completed before the Braille decision, the IEP team could have compared the future impact of Braille instruction on G.M.'s functional vision growth. As explained further, IDEA requires certain assessments if the appropriateness of Braille instruction is at issue. The school-based IEP team chose not to conduct further assessments and used inadequate information in their decision-making process.

39. Based on their flawed decision-making process and their admitted lack of expertise and specialized knowledge particular to this case, no deference is due to these educators with respect to G.M.'s fluency and Braille needs.

**PROCEDURAL VIOLATIONS**

40. WCPSS committed both procedural and substantive violations in its development of the contested IEPs.

41. The Supreme Court held in *Rowley* that "a court's inquiry" first requires the determination of whether the "[LEA] complied with the procedures set forth in the [IDEA], [a]nd second," whether the "[IEP] developed through the [IDEA's] procedures [is] reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 206–207.

42. A hearing officer may find a denial of FAPE where the public agency's procedural

inadequacies: (1) impeded the child's right to a free appropriate public education; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); N.C. Gen. Stat. § 115C-109.8(a).

43. A substantive procedural violation is one that "seriously infringe[s] the parents' opportunity to participate in the IEP formulation process," *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) (citations omitted), "the enforcement of the IEP," *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1198 (9th Cir. 2017), or causes the child to lose any educational opportunity, *Burke Cnty. Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990). *But see R.F. by & through E.F. v. Cecil Cty. Pub. Sch.*, 919 F.3d 237, 248 (4th Cir.), *cert. denied*, 140 S. Ct. 156, 205 L. Ed. 2d 46 (2019) (internal citations and alterations omitted)(finding no denial of parental participation because the child received more services than what was outlined in her IEP was not denied a FAPE).

44. The failure to conduct an evaluation integral to understanding the student's needs "is a serious procedural violation because it may prevent the IEP team from obtaining necessary information about the student's [identified needs], leading to their being addressed in the IEP inadequately or not at all." *S.S. v. Bd. of Educ. of Hartford Cnty.*, 2020 WL 6290664 (Oct. b27, 2020)(quoting *R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012)); *accord Z.B. v. D.C.*, 888 F.3d 515, 524 (D.C. Cir. 2018).

45. To determine if Braille is appropriate for a visually impaired student certain evaluations must be conducted. 20 U.S.C. § 1414(d)(3)(B)(iii). Failure to conduct these evaluations would prevent the IEP team from obtaining critical information and prevent full parental participation.

46. IDEA requires certain members to attend the IEP meeting. One such member is one that "can interpret the instructional implications of evaluation results." 34 C.F.R. § 300. 321(a)(5). In addition, an LEA Representative knowledgeable about the availability of resources of the LEA must attend and has the final decision-making authority in matters disputed by the IEP team members. 34 C.F.R. § 300.321(a)(4)(iii). Ms. Sherrill Miller is the Principal of Lacy Elementary School who is responsible for the school's budget and the overall supervision of the school. *See* N.C.G.S. § 115C-288.

47. No one at the September 2020 IEP meeting, including Ms. Wyss and the Lead VI teacher, were qualified to interpret the instructional implications of Braille instruction for a student like G.M. Principal Miller, who acted as the LEA representative at the IEP meeting and cast the deciding vote, was admittedly not qualified to make the final decision about Braille instruction for G.M.

**Parent Participation**

48. "When Congress passed the IDEA, it placed great importance in the role of parents in crafting an adequate and individualized education for each disabled student. *Rowley,* 458 U.S. 205–06.

49. "The grammatical structure of IDEA's purpose of protecting 'the rights of children

with disabilities and parents of such children,' § 1400(d)(1)(B), would make no sense unless 'rights' refers to the parents' rights as well as the child's. Other provisions confirm this view. *See, e.g.*, § 1415(a)." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 517 (2007).

50. "IDEA grants parents independent, enforceable rights. These rights, which are not limited to certain procedural and reimbursement-related matters, encompass the entitlement to a free appropriate public education for the parents' child." *Id.* at 533.

51. The IDEA's procedural requirements are purposefully designed to ensure that parents can meaningfully participate in the process of developing an IEP for their child. *See Rowley,* 458 U.S. 205–06 ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard."); *see also* 34 C.F.R. § 300.322(a); N.C. Gen. Stat. § 115C-109.3(a) (guaranteeing the parent the right "to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to that child.").

52. Parents are denied their right to meaningfully participate in the development of their child's IEP when a school district predetermines the child's placement prior to an IEP meeting. *See, e.g.*, *Spielberg ex rel. Spielberg v. Henrico Cnty. Public Sch.*, 853 F.3d 256 (4th Cir. 1988) (finding the school district's decision to change a student's placement before the IEP meeting violated the Education for All Handicapped Children Act, the predecessor to the IDEA); *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1188 (11th Cir. 2014) ("Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team.").

53. "To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child." *R.L.*, 757 F.3d at 1188 (citing *Deal*, 392 F.3d at 858. When the school district "presents one placement option at the meeting and is unwilling to consider other alternatives," its actions violate the IDEA. *H.B. v. Las Virgenes Unified Sch. Dist.*, 239 F. App'x 342 (9th Cir. 2007); *see also R.L.*, 757 F.3d at 1188–90 (finding the school board predetermined the student's placement where it was "clear that 'there was no way that anything [the student's parents] said, or any data [they] produced, could have changed the [Board's] determination of the appropriate placement").

54. G.M.'s Parents were denied the opportunity to meaningfully participate in G.M.'s Braille decision-making process. Ms. Roxanne Wyss, Ms. Kathy Kalmbach, Ms. Andrea Rutherford, Ms. Selda Falih, and Ms. Claire Scarborough-Hakin all attended the January 23, 2020 meeting *without* G.M.'s Parents and determined at that meeting to introduce Braille. The school based members of the IEP team did not attend IEP meetings with an "open mind" subsequent to their January 23, 2020 meeting without G.M.'s Parents. Specifically, they had predetermined to change G.M.'s educational programming by January 23, 2020, and were not willing to consider any alternatives to Braille after that meeting. Principal Miller, as the LEA Representative predetermined upon meeting G.M. for the first time in February 2020 that G.M. needed Braille instruction.

55. The school-based members of the IEP Team had predetermined they were changing G.M.'s VI educational programming at the September 2020 IEP meeting. This predetermination denied G.M.'s Parents meaningful participation in the decision of the IEP team and substantively harmed G.M. by denying her a FAPE.

**Evaluations**

56. "Because an IEP must be tailored to the student's reasonably known needs at the time it is offered, the underlying evaluation of the student is fundamental to creating an appropriate educational program" especially in a case such as this when the student's diagnosis is relatively unknown. *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018).

57. The IEP team must complete the re-evaluation process at least every three years, or more often if a parent requests a reevaluation. 20 U.S.C. § 1415(a)(2).

58. When a Parent requests a reevaluation "to determine the child's educational needs . . . the public agency must either conduct the reevaluation or provide notice to the parents as to why the public agency believes a reevaluation is unnecessary." 71 Fed. Reg. 46,644 (2006).

59. Since March 2019, G.M.'s Parents repeatedly asked for a fluency goal and if sufficient information was available to draft such a goal. WCPSS, however, did not conduct a fluency evaluation until August 2020.

60. At the February 2020 IEP meeting, Respondent agreed to conduct another CVI Range but did not. Also at that meeting, Respondent failed to advise the Parents that an LMA would not be conducted before the Braille decision and that the IEP team would rely on an outdated 2017 LMA.

61. When a district conducts a reevaluation, it must review the existing evaluation information on the child and gather information about the child's disability from the child's parent(s). 34 C.F.R. 305(a)(1).

62. The evaluation must be sufficiently comprehensive to identify all of the child's special education needs, whether or not commonly linked to the disability category in which the child has been identified. 20 U.S.C. 1414(b)(1)-(3), 1412(a)(6)(B); 34 CFR 300.304.

63. The evaluation must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information." 20 U.S.C. § 1414(b); 34 CFR § 300.304. A team may "not use any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(B). Evaluations must be conducted in the "form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally." 20 U.S.C. § 1414(b)(3)(A)(ii) The district is required to select and administer assessments that "accurately reflect the child's aptitude or achievement . . . rather than reflecting the child's impaired ***sensory***, manual, or speaking skills." 34 C.F.R. § 300.304(c)(3) (emphasis added).

64. The IDEA mandates the use of "assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided." 20 U.S.C. § 1414(b)(3)(C).

65. A district must also examine "[w]hether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general education curriculum." 34 CFR § 300.305 (a)(2)(iii)(iv).

66. "The evaluation requirement 'serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child.'" *Z.B.*, 888 F.3d at 523 (quoting *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016)).

67. Applying *Endrew F.*, this Tribunal must ask whether the school district "adequately evaluated [the student's] particular needs and offered her an IEP tailored to what it knew or reasonably should have known of her disabilities at the time." *Z.B.*, 888 F.3d at 524 (citing *Endrew F.*, 137 S.Ct. at 999). The answer to that inquiry in this case is clearly no.

68. Each member of G.M.'s IEP Team who testified indicated the reason for making the change was because G.M. was a slow reader and they had concerns about her fluency. Yet, the law is clear: an IEP team may "not use any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(B). The Undersigned finds Respondent improperly changed the educational programming for G.M. as it only considered the "single measure" of reading fluency as its basis for the change to Braille.

69. The single measure school based members of the September 2020 IEP team could point to in shifting G.M.'s educational programming to Braille was her fluency or "slow reading." Yet, the Undersigned finds it is inappropriate under the IDEA to change G.M.'s VI educational programming based on a single measure.

70. Furthermore, the Undersigned notes Respondent conducted *both* the CVI Range and the Sensory Balance Learning Media Assessment on G.M. after all evidence had been heard in this matter. Thus, the Undersigned reopened the matter to hear the additional evidence on the two (2) evaluations Respondent should have conducted and which were relevant to the question of whether instruction in Braille was an appropriate instruction for G.M. Stip. Exs. 66-69.

71. The Undersigned finds predetermination in WCPSS' failure to assess G.M. with the CVI Range or a Learning Media Assessment prior to the consideration of the decision to change G.M.'s educational programming to include Braille. The failures of Respondent to conduct the CVI Range and Learning Media Assessment are procedural violations as those evaluations are necessary to create an appropriate educational program for G.M. This failure is also evidence of Respondent's predetermination of Braille instruction. Once the IEP team agreed to conduct evaluations, Respondent delayed in providing the evaluations to the Parents. Although

Respondent's own evaluations do not support Respondent's contention that G.M. requires instruction in Braille, Respondent nevertheless continues to argue she needs it. That is the essence of closed mindedness and predetermination by Respondent.

72. Respondent committed numerous procedural violations that caused substantive harm to G.M. These violations significantly impeded G.M.'s Parents' meaningful participation in the IEP process, caused educational harm to G.M., and resulted in a denial of FAPE to G.M.

**SUBSTANTIVE VIOLATIONS OF FAPE**

73. In addition, based on its inadequate and untimely evaluation of G.M., Respondent committed numerous substantive violations of the IDEA.

74. The IDEA was enacted to "ensure that all children with disabilities have available to them a Free Appropriate Public Education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

75. A school district is required to offer each student with a disability the opportunity for a FAPE through an Individualized Education Program (IEP) that conforms to the requirements of the IDEA and state standards. 20 U.S.C. § 1412(a)(1)(A); 20 U.S.C. § 1401(9).

76. An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" the IDEA. 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a).

77. The IEP is the "centerpiece" of delivering FAPE for disabled students; it must set out relevant information about the child's present educational performance and needs, establish annual and short-term objectives for improvements in that performance, and describe the specially designed instruction and services to meet the unique needs of the child. *Honig v. Doe,* 484 U.S. 305, 311 (1988) (quoting 20 U.S.C. §§ 1401, 1414(d)).

78. Specifically, the IEP Team must consider "the strengths of the child; the concerns of the parent[] for enhancing the education of [her] child; the results of the . . . most recent evaluation of the child; and the academic developmental, and functional needs of the child." 20 U.S.C. 1414(d)(3)(A).

79. In *Endrew F.*, the Supreme Court held that while the students protected under the IDEA may have a broad range of disabilities affecting each child's ability to access the general curriculum, the "substantive obligation" of the school district is the same for all students: "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S.Ct. at 999; *see also M.C. v. Antelope Valley*, 858 F.3d 1189, 1200 (9th Cir. 2017) (finding in *Endrew F.,* the Supreme Court "provided a more precise standard for evaluating whether a school district has complied substantively with the IDEA").

80. The IDEA requires an IEP is "likely to produce progress, *not regression*." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)(emphasis added)(internal citation omitted).

81. "Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis;* rather, an IEP must be 'likely to produce progress, not regression or trivial educational advancement.' In short, the educational benefit that an IEP is designed to achieve must be 'meaningful.'" *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 248 (5th Cir. 1997).

82. The "snapshot" rule requires "the adequacy of an IEP [] be assessed as of the time the IEP was developed, rather than in hindsight," *S.S. ex. Rel. Shank v. Howard Rd. Academy*, 585 F.Supp.2d 56, 66 (D.D.C. 2008), but that does not preclude the admission of evidence that post-dates its development. Rather, such evidence may be properly admitted if it sheds light on whether the IEP was objectively reasonable at the time it was promulgated." *Z.B. v. Dist. of Columbia*, 202 F.Supp.3d 64, 76, fn. 23 (D.D.C. 2016); *Z.B.*, 888 F.3d at 526.

83. The IEPs developed in September 2019 to September 2020 failed to address G.M.'s unique circumstances and denied G.M. a FAPE.

**G.M.'s "Unique Needs and Circumstances" Govern the IEP Development**

84. G.M.'s "unique needs and circumstances" govern the IEP development process. "In determining what it means to 'meet the unique needs' of a child with a disability, the provisions of the IDEA governing the IEP development process provide guidance. These provisions reflect what the Court said in *Rowley* by focusing on "progress in the general education curriculum." *Endrew F.*, 137 S. Ct. at 992; see *also* 34 CFR §§ 1414(d)(1)(A)(i)(I)(aa), (II)(aa), (IV)(bb). Unlike most of the VI students in WCPSS, G.M. is on grade level and, with the CVI modification and assistive technology, G.M. is able to access the general education curriculum.

85. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S.Ct. at 1001. The IEP must give the child "the chance to meet challenging objectives" and "[a child's] educational program must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *See id.* at 1000.

86. School districts must use methods that have proven to be effective with the student based on the student's unique needs, not necessarily the method with the greatest body of research. 71 Fed. Reg. 46,665 (2006). While research shows that Braille is appropriate for many visually impaired students, for a "sighted" student like G.M., it is not appropriate.

**IEP Requirements**

87. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

88. For a reviewing court, "the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F.*, 137 S.C. at 999.

89. The plain language of the IDEA requires the IEP team to consider the following when developing an IEP: "(i) [t]he strengths of the child; (ii) [t]he concerns of the parents for enhancing the education of their child; (iii) [t]he results of the initial or most recent evaluation of the child; and (iv) [t]he academic, developmental, and *functional* needs of the child." 34 C.F.R. § 320.324 (emphasis added).

90. An appropriate IEP must do the following: 1. indicate the student's current level of academic achievement and functional performance; 2. describe how the child's disability affects his involvement and progress in the general education curriculum; 3. state annual goals; 4. provide a method for progress monitoring; and 5. identify special education and related services for the student. *Endrew F.*, 137 S.Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(A)); *M.M. ex rel. D.M. v. Sch. District of Greenville Cnty.*, 303 F.3d 523, 527 (4th Cir. 2002).

91. With respect to IEP goals, the IDEA requires that the IEP include:

> (II) a statement of measurable annual goals, including academic and functional goals, designed to—
> (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and
> (bb) meet each of the child's other educational needs that result from the child's disability.
> 20 U.S.C. § 144(d)(1)(a).

92. Where an IEP team does not incorporate the evaluative materials and evidence of the student's needs when drafting an IEP, the IEP is not designed to enable a student to make progress in light of her unique educational needs. *S.B. v. New York City Dept. of Education*, 70 IDELR 221, 117 LRP 41951 (E.D.N.Y. 2017)(ignoring the student's deficiencies relevant to her education needs outlined in a psychoeducational report when drafting the IEP). For whatever reason, despite documented need and the Parents' five (5) requests, the school based members of the IEP team did not evaluate G.M.'s fluency needed when drafting the September 2019, and February 2020 IEPs.

**No Fluency Goal in the September 2019 and February 2020 IEPs**

93. Despite, repeated requests and known fluency deficits since March 2019, the school-based IEP teams failed to include a fluency goal in G.M.'s March 2019 IEP,[16] September 2019 IEP, and February 2020 IEP. The failure to address known deficiencies results in an absence of goals in areas of need and unattainable goals. *Id.; see also A.D. v. Creative Minds International Public Charter School*, 120 LRP 30541 (D.C., August 14, 2020)(*citing Endrew F. v. Douglas Cty. Sch. Dist*., 290 F. Supp. 3d 1175, 1183-84 (D. Colo. 2018) and concluding the IEP was inappropriate given the students' needs in math and the absence of math goals in the student's IEP).

94. When a school "completely ignor[es] the evidence" of a student's deficit, "and ignor[es] the parent's request" for the needed support to address the deficit, "the IEP created by

---

[16] The appropriateness of the March 2019 IEP is not at issue in this case. Reference to that IEP is to highlight when the fluency goal matter first arose.

[the school district] cannot 'have reasonably been calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *Capistrano Unified School District v. S.W*, 77 IDELR 137, 120 LRP 28361, (C.D. Cal., 2020)(*quoting Endrew F*., 137 S.Ct. at 1001).

95. The September 2019 IEP and February 2020 IEP contained four reading goals, none of which appropriately addressed G.M.'s reading fluency. In fact, one "reading" goal was actually a "writing" goal and while it may have been appropriate to address G.M.'s writing needs, it was not appropriately labeled as a reading or fluency goal. Respondent's witnesses claimed that these reading goals "supported" G.M.'s fluency remediation. To the extent that Respondent admitted G.M. needed fluency "support", then she also needed a fluency goal. Respondent also could not explain why they could not have drafted a fluency goal for the prior IEPs, but later at the September 2020 IEP had no difficulty evaluating G.M.'s fluency and drafting a fluency goal. The evidence is suggestive that Respondent deliberately did not address G.M.'s fluency deficit because G.M.'s slow reading rate was the sole reason used to justify the inclusion of Braille instruction in the September 2020 IEP.

96. Because the September 2019 IEP and February 2020 IEP failed to address G.M.'s fluency deficit, they were inappropriate and denied G.M. a FAPE.

**The IEP Must Contain Appropriately Ambitious Goals**

97. "The goals may differ, but every child should have the chance to meet challenging objectives." *Enter. City Bd. of Educ. v. S.S.,* No. 1:19-CV-748-ALB, 2020 WL 3129575, at *5 (M.D. Ala. June 12, 2020)(citing Endrew F., 137 S.Ct. at 1000; *Endrew F. ex rel. Joseph F. v. Douglas Cty Sch. Dist. RE 1*, 290 F. Supp. 3d 1175, 1184 (D. Colo. 2018) (mere "updates" or "minor or slight increases" in goals are insufficient)).

98. Based on the expert opinions of Petitioners' witnesses, the reading goals were not appropriately ambitious and the mere increase in proficiency levels was inadequate to make the reading goals appropriate.

**Least Restrictive Environment ("LRE")**

99. Because of the inclusion of Braille instruction, the CVI modifications in the IEP goals and the 2 hours of VI services were removed from G.M.'s IEP. With these CVI modifications and VI services, G.M. had been able to successfully access the regular education curriculum and her functional vision improved. The school based IEP team members removed these VI services and modifications from G.M.'s goals and changed her placement from regular to a resource placement.

100. The IDEA clearly articulates a presumption that disabled children will not be segregated from their non-disabled peers and will be educated in the least restrictive environment ("LRE"):

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of

> children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

U.S.C. § 1412(5)(A); 34 C.F.R. § 300.114(a)

101. "In sharp contrast to the vagueness provided in the statute as to the meaning of FAPE, the IDEA has a very specific prescription for the educational environment for a child with a disability. Particularly, the IDEA requires a balancing of the need for the provision of a free and appropriate public education with the need for providing such an education in the least restrictive environment." *TexArkana Sch. Dist.,* 115 LRP 46616 (Arkansas SEA 2015) (citing *Sacramento City Unified Sch. Dist. v. Rachael H.,* 14 F.3d 1398 (9th Cir. 1994); *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1044-45 (5th Cir. 1989); *Lachman v. Illinois Bd. of Educ.,* 852 F.2d 290, 295 (7th Cir. 1985), *cert. denied,* 488 U.S. 925; *A.M. v. Northwest R1 Sch. Dist.,* 8113 F.2d 158, 162 (8th Cir. 1987), *cert denied,* 484 U. S. 847 (1987)).

102. The IDEA prefers full integration in the regular classroom, *Endrew F.*, 137 S.Ct. at 999, and emphasizes the integral role of supplemental aids and services to allow disabled students to access the regular classroom, 34 CFR § 300.114(a)(2)(ii).

103. Before denying a child access to a general education classroom, the IDEA requires the LEA to meaningfully consider the provision of appropriate supplementary aids and services needed for a disabled child to participate. 34 C.F.R. § 300.117. "[A] student with disabilities must be placed 'in the least restrictive environment that will provide the child with a meaningful educational benefit.'" *H.L. v. Downington Area Sch. Dist.* 624 F. App'x 64, 68 (3d Cir. 2015) (citing *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556-57 (3d Cir. 2010)).

104. While the IDEA does not define "supplementary aids and services," some examples include "modifications to the regular class curriculum, assistance of an itinerant teacher with special education training, special education training for the regular teacher, use of computer-assisted devices, provision of note takers, and use of a resource room." *OSEP Memorandum 95-9* (Nov. 23, 1994); *see also P. ex rel. Mr. P. v. Newington Bd. of Educ.*, 512 F. Supp. 2d 89, 104 (D. Conn. 2007) (identifying the following supplementary aids and services considered by the IEP Team: assistance of two (2) paraprofessionals on a routine basis; co-teaching; program modifications and adaptions to accommodate the student's needs; modification of the regular curriculum).

105. A child may not be "removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum." 34 C.F.R. § 300.116(e).

106. In deciding the LRE for a child, the IEP team must also consider any harmful effect on the child or the quality of services. 34 C.F.R. § 300.116(d). The September 2020 IEP team did not consider how this change in placement might harm G.M.'s functional vision trajectory. Instead, Principal Miller made it clear that G.M.'s functional vision was of no concern to the IEP team

when she stated that no vision goals were proposed in the September 2020 IEP because WCPSS's goal was to "not to improve G.M.'s vision" but "to improve G.M.'s ability to read." Tr. vol. 6, p. 1036:2-8 (T of Miller).

107. Implementation of G.M.'s prior IEPs required extensive services from the VI teacher at Lacy Elementary School. Ms. Wyss was the only VI teacher in Wake County Schools providing this level of instruction. And while the use of such resources may have been a drain on that school's budget over which Principal Miller presides, even that justification for removal of G.M.'s VI services is not recognized by the IDEA.

108. The September 8, 2020 IEP does not provide G.M. a FAPE within the LRE. The IEP team determined, without a cogent explanation, to remove G.M. from her nondisabled peers for additional time to allow for the inappropriate Braille instruction. *Compare* Stip. Ex.13 *with* Stip. Ex. 20. It was unnecessary to remove her to a resource setting as the Respondent could, as it had successfully done in the past, provide supplementary aids and services in the general education setting.

109. The Undersigned found no persuasive testimony or evidence which indicated a need for G.M. to receive additional time spent in the special education environment. Therefore, the change in the service delivery in the September 8, 2020 IEP violated G.M.'s right to a FAPE in the LRE.

**Extended School Year Services ("ESY")**

110. Every year prior to the September 2020 IEP meeting, G.M.'s IEPs included ESY services of varying amounts. Usually, the school based IEP team members chose to defer the ESY decision until later in the school year to allow for regression data collection or other reasons. The North Carolina Department of Public Instruction Policy ("Policy") 1501-2.4(b)(2)[17] encourages this practice in North Carolina school districts. However, the language in this Policy[18] appears nowhere in the IDEA or its supporting regulations.

111. "[I]ndividualized determinations about each disabled child's need for ESY services

---

[17] The IEP Team must determine that extended school year services are necessary for the provision of FAPE to an individual child by considering:

(i) Whether the student regresses or may regress during extended breaks from instruction and cannot relearn the lost skills within a reasonable time; or
(ii) Whether the benefits a student gains during the regular school year will be significantly jeopardized if he or she is not provided with an educational program during extended breaks from instruction; or
(iii) Whether the student is demonstrating emerging critical skill acquisition ("window of opportunity") that will be lost without the provision of an educational program during extended breaks from instruction. NCDPI Policy 1501-2.4(b)(2)

[18] The State Board of Education has been ordered by the North Carolina Supreme Court to promulgate rules through the proper rule making procedures. *North Carolina State Board of Education v. State*, 814 S.E.2d 54 (2018). To date, none of the NCDPI "Policies Governing Services for Students with Disabilities" have gone through the rule making process.

are made through the IEP process." 71 Fed. Reg. 46,582 (2006).

112. According to federal law, Extended School Year services "must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§300.320 through 300.324, that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106(a)(2).

113. Section 300.320 requires the school team develop provide ESY services that fulfill the requirements of the IEP including:

a. The child's present level of academic achievement and functional performance;
b. A statement of measurable annual goals;
c. A description of how progress will be measured;
d. A statement of related services and supplementary aids and services that will be provided to the child;
e. A statement of appropriate individual accommodations; and
the date of the beginning of services.

114. If ESY decisions are made in accordance with §§300.320 through 300.324, these decisions must be made at the beginning of the school year. Section 300.323 states that IEPs must be in effect "at the *beginning* of each school year", not in the middle, not in the end, not when convenient, but at the beginning.[19]

115. "[A]n ESY determination is necessarily fact and case specific and that a showing of actual regression is not required in order to find a child eligible for ESY. *Letter to Given*, 39 IDELR 129 (citing MM *ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 537–38 (4th Cir. 2002))

116. Over the objection of G.M.'s Parents, the school based members of the September 2020 IEP team refused to consider ESY services at the September 2020 IEP meeting and deferred that decision to a later date. The school based IEP team members did not refuse ESY service outright though.

117. ESY services have been necessary for G.M.'s VI educational programming. Both of Petitioners' expert witnesses opined that ESY was necessary for G.M. to receive a FAPE. Tr. vol. 2, 296:20-24 (T of Endicott); Tr. vol. 3, pp. 449:24-450:17 (T of Miller).

118. The implementing regulations of the IDEA state that the IEP must be in effect "at the beginning of the school year" and ESY services as part of the IEP, must too be in effect at the beginning of the school year. By not considering whether ESY services were necessary for G.M. at the beginning of the 2020-2021 school year at the September 2020 IEP meeting, the school based IEP team members were essentially saying "no" to ESY. This is a procedural and substantive

[19] *See also* NCDPI Policy 1503-4.4(a).

violation of G.M.'s right to a FAPE.

**Failure to Implement the IEP**

119. Under the IDEA, a school district is required to implement all components of a student's IEP. 34 CFR 300.323 (c).

120. The Fourth Circuit held in *Sumter County Sch. Dist. 17 v. Heffernan*, 642 F.3d 478, 484 (4th Cir. 2011), "a material failure to implement an IEP, or, put another way, a failure to implement a material portion of an IEP, violates the IDEA." *See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) ("[A] material failure to implement an IEP violates the IDEA."); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) ("[W]e cannot conclude that an IEP is reasonably calculated to provide a free appropriate public education if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit."); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) ("[A] party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP.").

121. "The Supreme Court has described the IEP as "[t]he primary vehicle for implementing the[ ] congressional goals" identified in IDEA. It follows that a school district's adherence to the prescribed IEP is essential to a child's educational development under IDEA." *Holman v. D.C.*, 153 F. Supp. 3d 386, 393 (D.D.C. 2016)(citing *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 (1988)).

122. However, "the materiality standard does not require that the child suffer demonstrable educational harm in order to prevail on a failure-to-implement claim." *Wilson v. D.C.*, 770 F.Supp.2d 270, 275 (D.D.C.2011)(internal citations omitted)(*citing Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811,822(9th Cir. 2007)).

123. "In deciding if [a] failure [to implement the IEP] was material, '[c]ourts ... have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld.'" *Turner v. D.C.*, 952 F. Supp. 2d 31, 40 (D.D.C. 2013) (*citing Wilson v. D.C.*, 770 F.Supp.2d 270,275(D.D.C. 2011)).

124. "Since proof of harm is not required under these circumstances, it follows that a material deviation from the prescribed IEP is *per se* harmful under IDEA. (*See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007)). The "crucial measure" under the materiality standard is the "proportion of services mandated to those provided" and not the type of harm suffered by the student…." *Holman v. D.C.*, 153 F. Supp. 3d 386, 393–94 (D.D.C. 2016).

125. "Courts should therefore view deviations from the IEP 'with a critical eye to ensure that motivations other than those compatible with the statute, such as bureaucratic inertia, are not driving the decision.'" *L.J. by N.N.J. v. Sch. Bd. of Broward Cty.*, 927 F.3d 1203, 1215 (11th Cir.

2019)(*quoting John M. v. Bd. of Ed. of Evanston Township High Sch. Dist.*, 502 F.3d 708, 715(7th Cir. 2007)). WCPSS failed to implement G.M.'s IEP for administrative convenience. And, while the COVID-19 pandemic was unprecedented, IDEA remained in full force and effect.

**IDEA Remained in Full Force and Effect During the COVID-19 Pandemic**

126. The IDEA and its implementing regulations have remained in full effect during the COVID-19 pandemic. *See, e.g., Supplemental Fact Sheet Addressing the Risk of COVID-19 in Preschool, Elementary, and Secondary Schools While Serving Children with Disabilities,* 76 IDELR 104 at 2 (Office for Civil Rights (March 21, 2020) ("School districts must provide a free and appropriate public education (FAPE) consistent with the need to protect the health and safety of students with disabilities and those individuals providing education, specialized instruction, and related services to these students.").

127. In fact, the federal government has repeatedly emphasized, "the IDEA includes no exceptions to implementation for physical school closures caused by pandemics or governmental directives to close schools. [School districts] remain[] responsible under the IDEA for materially implementing IEPs despite the school closure, even if by alternate methods of delivery"). 76 IDELR 104 at 3.

128. When a school district provides "educational opportunities to the general student population during a school closure, the school must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE." *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak*, 76 IDELR 77 at 3, U.S. Department of Education (March 12, 2020). *see also In re: Student with a Disability*, 77 IDELR 173 at 2 (Wisconsin State Educational Agency, September 30, 2020) ("School districts must provide equal access to educational opportunities to students with disabilities during extended school closures if those opportunities are provided to the general student population during that time, including the provision of a free appropriate public education (FAPE)").

129. Consistently, the courts and the federal government have reiterated the IDEA remains in full force and effect during the COVID-19 pandemic, and all decisions regarding the provision of FAPE through the supports and services in a student's IEP must be individualized to that particular student. *See, e.g.*, 76 IDELR 104 at 3 (explaining the district has options for meeting its legal obligations to children with disabilities when "technology itself imposes a barrier to access or where educational materials simply are not available in an accessible format"); *Norris School District*, 120 LRP 30203 at 25 (California State Educational Agency, September 2, 2020) (clarifying the school district "could also consider alternative service delivery options such as in-home service delivery, meeting with individual students at school sites, or other appropriate locations to deliver services"). If it is not possible for a school district to implement the student's IEP and related services remotely then the district must offer compensatory education. *Porter Township School Corporation*, 120 LRP 29261 at 1, 4 (Indiana State Educational Agency, August 30, 2020).

130. "The facility closures due to COVID-19 do not relieve [the Board of Education] of the obligation to provide Student with FAPE." *East Windsor Bd. of Ed.,* 121 LRP 2530 at 38

(Connecticut State Educational Agency, November 18, 2020). A school must "significantly or materially implement[] [the IEP] during distance learning." *East Windsor Bd. of Ed.,* 121 LRP 2530 at 39 (Connecticut State Educational Agency, November 18, 2020).

131. Although her IEP called for G.M. to receive two (2) hours of specially designed instruction per day, she did not receive it because the instruction provided was asynchronous and the same given to all children in the class. Pet. Ex. 47; Tr. vol. 3, 611:17-25. It was not "specially designed" to address G.M.'s "unique needs." Further, the lessons that were provided were "inappropriate and not visually accessible for [G.M.]." Tr. vol. 1, p. 123:20-24.

132. Between March 14 and June 11, 202, G.M. was entitled to two (2) hours per day of VI services. As such, G.M. was entitled to one-hundred and twenty-eight (128) hours of specially designed instruction of which she only received twenty-two hours. Stip. Ex. 36 (Ms. Wyss's service delivery log), Stip. Ex. 13 (February 10, 2020 IEP), and Stip. Ex. 18 (June 15, 2020 PWN correcting clerical error omitting service delivery time from Stip. Ex. 13). Respondent's failure to implement G.M.'s IEP and denial of 106 hours of specialized instruction violated the IDEA and G.M.'s right to a FAPE.

**Remedies: Compensatory Education**

133. The IDEA confers "'broad discretion' on the court in fashioning an appropriate remedy." *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 325 (4th Cir. 2009) (quoting *Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1996)).

134. "Courts fashioning discretionary equitable relief under [the] IDEA must consider all relevant factors . . . ." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993).

135. "The relief granted by courts under section 1415(i)(2)(C)(iii) is primarily compensatory education. Compensatory education, however, is not defined within the IDEA and is a judicially created remedy. It is intended as 'a remedy to compensate [the student] for rights the district already denied ... because the School District violated [the] statutory rights while [the student] was still entitled to them.'" *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 717 (3d Cir. 2010)(citing *Lester H. v. Gilhool*, 916 F.2d 865, 872 (3d Cir. 1990)).

136. G.M. is entitled to specially designed instruction in the area of fluency, appropriate services for O&M, and the development of an IEP with appropriately ambitious reading goals with CVI overlay. To accomplish this, G.M. is entitled to 101.5 hours of VI compensatory education with a CVI Range Endorsed VI teacher and 3.5 hours of O&M compensatory services.

## ISSUES FOR DECISION

**September 12, 2019 IEP Issue:**

**Issue 1: Did the September 12, 2019 IEP fail to offer FAPE for lack of appropriate reading goals?**

1. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that the reading goals contained in the September 12, 2019 IEP denied G.M. a FAPE.

2. The evidence establishes that the reading goals were not appropriately ambitious, based on G.M.'s documented and individualized needs, and did not appropriately target G.M.'s documented fluency deficits.

**February 10, 2020 IEP Issues:**

**Issue 2: Did the February 10, 2020 IEP fail to offer FAPE for lack of appropriate reading goals?**

3. For the same reasons applicable to Issue 1 and based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish by a preponderance of the evidence that the reading goals contained in the February 10, 2020 IEP denied G.M. a FAPE.

**Issue 3: Whether Respondent failed to implement G.M.'s IEP during school closures from March 16, 2020 through June 15, 2020?**

4. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that Respondent failed to implement G.M.'s IEP during the period of school closures.

5. While there is no doubt that the COVID-19 pandemic created unprecedented challenges for schools, families, students, and others, the mandates of the IDEA remained in place and Respondent was required to implement G.M.'s IEP as written.

6. Respondent failed to implement G.M.'s IEP and O&M services during the pandemic and denied her a FAPE.

**September 8, 2020 IEP Issues:**

**Issue 4: Did the September 8, 2020 IEP fail to offer FAPE for lack of appropriate goals?**

7. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that the reading fluency and O&M goals contained in the September 8, 2020 IEP were not appropriate and denied G.M. a FAPE.

8. Because the inclusion of Braille instruction in the September 2020 IEP was inappropriate, it was also inappropriate to include Braille goals in the IEP and the inclusion of these goals denied G.M. a FAPE.

9. The removal of the CVI overlay in the IEP goals was inappropriate and denied G.M. a FAPE.

10. No evidence was put forth challenging the appropriateness of the assistive technology goals or any other goals in the IEP.

**Issue 5: Did the September 8, 2020 IEP fail to offer FAPE for lack of appropriate service delivery?**

11. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that the service delivery in the September 8, 2020 denied G.M. a FAPE.

12. The school staff's explanation for G.M.'s removal from the general education environment for inappropriate Braille instruction was not cogent and responsive to her individualized needs as a student on grade level with functional vision successfully accessing the general education curriculum and classroom with CVI modifications and VI services. The benefits of mainstreaming G.M. were not marginal to her or her nondisabled peers. G.M. was an excellent, well-liked student who eagerly participated in the regular classroom. She was "an inspiration" to her teacher with 30 years of teaching experience and her classmates.

13. As the service delivery was developed to provide special education and O&M services for the inappropriate Braille, fluency, and O&M goals and not based on G.M.'s individualized needs, the service delivery was not appropriate and denied G.M. a FAPE.

**Issue 6: Did the September 8, 2020 IEP fail to offer FAPE because the team added specially designed instruction in Braille?**

14. This is the primary issue in this case and for the reasons set forth above and based on the findings above and evidence in the record, by a preponderance of the evidence, Petitioners met their burden to prove that Braille instruction denied G.M. a FAPE.

15. Because Braille instruction was inappropriate for G.M., the addition of a Braille goal and the change in the service delivery for specially designed instruction in that Braille goal and objectives was also inappropriate.

**Issue 7: Did the September 8, 2020 IEP fail to offer FAPE because the IEP team deferred a decision on Extended School Year services?**

16. As mandated by the IDEA, the meeting took place at the "beginning of the school year" and the IEP was developed at the meeting which included new goals in several areas and the IEP should have also included a determination on Extended School Year services rather than deferring that decision to a later point in time.

17. This was a procedural violation and if ESY and substantive violation because the ESY deferment is essentially a refusal to complete a necessary component of G.M.'s IEP at the beginning of the 2020-2021 school year.

**Issue 8: Did Respondent deny the Parents' meaningful participation in the IEP process during the statutory period?**

18. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that Respondent denied G.M.'s Parents meaningful participation in the IEP process.

19. The school-based IEP team members predetermined the inclusion of Braille instruction without the Parents being part of that decision making process.

20. Moreover, Respondent failed to conduct mandatory evaluations to determine G.M.'s learning media and current functional vision and instead relied on an outdated 2017 Learning Media Assessment and CVI Range.

21. Moreover, Respondent intentionally failed to timely conduct a fluency evaluation, LMA, and CVI range prior to the September 2020 IEP meeting which denied G.M.'s Parents meaningful participation in prior IEP meetings.

22. Respondent's failure to conduct reevaluations which were integral to the Braille determination denied both G.M.'s Parents and the other IEP team meaningful participation in the IEP process.

23. Respondent's failure to allow G.M.'s Parents to participate in the decision about Braille instruction, an inappropriate learning media, resulted in a denial of FAPE to G.M.

**Issue 9: Did Respondent appropriately evaluate G.M. during the statutory period?**

24. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that Respondent failed to appropriately evaluate G.M. before adding Braille in the September 2020 IEP.

25. Based on the findings and conclusions set forth above, as well as other evidence presented at the hearing, Petitioners did establish, by a preponderance of the evidence, that Respondent failed to appropriately evaluate G.M.'s reading fluency despite multiple requests from G.M.'s Parents and the acknowledgment by the school-based member of the IEP teams that G.M.'s fluency deficits significant to the extent that Braille was later recommended.

26. Even without the new CVI Range or Sensory Balance Assessment which do not support Braille instruction for G.M., the IEP team's failure to consider and inability to answer important questions about how the introduction of Braille would impact G.M.'s functional vision

and the potential harm caused by the reduction of VI services also evidenced their failure to thoroughly evaluate the addition of Braille instruction.

**Issue 10: If there were any violations of G.M.'s right to a FAPE, what compensatory education and related services should be awarded?**

27. As with all the special education assigned to the Undersigned, at the prehearing conference, and before the hearing, both parties are instructed to propose remedies in the eventuality of an award of compensatory education. Before issuance of this Final Decision, both Parties were asked to submit proposals for an award of compensatory services for the period of the COVI-19 pandemic. Respondent was given the opportunity to submit alternative remedies but chose not to.

28. Therefore, based on the Petitioners' submission and evidence, G.M. is entitled to 200 hours of compensatory education for the violations of her right to a FAPE. In addition, Petitioners are awarded compensatory education for the period during the COVID-19 pandemic in the amount of 101.5 hours of specialized instruction and 3.5 hours of O&M compensatory services.

29. The configuration of the compensatory special education and O&M service shall be determined by a mutually agreeable independent CVI consultant at public expense.

**Other Issues**

30. To the extent that this Final Decision does not expressly rule on any other claims raised in the Petition, the Undersigned concludes that Petitioners have abandoned any additional issues not included in the original and Amended Pre-Trial Orders and therefore did not meet their evidentiary burden to establish any right to relief on those claims, if any.

## FINAL DECISION

**BASED** upon the foregoing **FINDINGS OF FACT** and **CONCLUSIONS OF LAW**, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Petitioners met their burden of proof, by a preponderance of the evidence on all issues, and the Undersigned hereby **ORDERS** that:

1. G.M. is entitled to Compensatory Education for the time Respondent failed to provide G.M. a FAPE by failing to implement her IEP during school closures from March 16, 2020, through June 15, 2020, in the amount of 101.5 hours of compensatory VI special education and 3.5 hours of O&M compensatory services. In addition, unless otherwise agreed to by the Parties, for 200 additional hours of compensatory special education services for her fluency deficits and O&M services. The configuration of the compensatory special education and O&M service shall be decided with the assistance of a mutually agreeable CVI specialist at public expense.

2. The inclusion of Braille instruction in G.M.'s IEP is inappropriate and does not meet her unique needs and circumstances. Therefore, the Undersigned hereby orders Respondent to

remove Braille from G.M.'s IEP and to reinstate G.M.'s VI services and supports until an IEP meeting can be reconvened after all evaluations, observations, and progress monitoring has been completed as directed and supervised by the CVI consultant detailed in the next paragraph.

3. Respondent shall contract with a mutually agreeable CVI specialist at public expense to review G.M.'s records, observe G.M. in the classroom, conduct teacher/staff/service provider/parents' interviews, conduct evaluations, and/or request evaluations/assessments that the CVI specialist deems necessary for G.M.'s educational program. The CVI specialist shall make recommendations for IEP goals, supplemental aids/services, service delivery, and ESY services. Once observation/evaluation period is completed, the CVI specialist shall make recommendations for IEP goals, supplemental aids/services, service delivery, and ESY services. In addition, the CVI specialist shall draft the IEP goals with CVI overlay and attend an IEP meeting to develop the IEP with WCPSS staff and G.M.'s Parents. For a period of one (1) year after the development of the new IEP for G.M., the CVI specialist shall monitor the implementation of the IEP, review progress monitoring with data collection, and train staff as needed. G.M.'s Parents and Respondent shall have equal access to the CVI specialist, and the CVI specialist shall communicate openly with the Respondent and Parents as equal participants.

4. Petitioners are the prevailing party on all issues and are entitled to attorneys' fees.

## NOTICE OF APPEAL RIGHTS

In accordance with the Individuals with Disabilities Education Act and North Carolina's Education of Children with Disabilities laws, the parties have appeal rights regarding this Final Decision.

Under North Carolina's Education of Children with Disabilities laws (N.C.G.S. §§ 115C-106.1 et seq.) and particularly N.C.G.S. §§ 115C-109.9, "any party aggrieved by the findings and decision of a hearing officer under G.S. 115C-109.6 or G.S. 115C-109.8 may **appeal the findings and decision within 30 days after receipt of notice of the decision by filing a written notice of appeal with the person designated by the State Board** under G.S. 115C-107.2(b)(9) to receive notices. The State Board, through the Exceptional Children Division, shall appoint a Review Officer from a pool of review officers approved by the State Board of Education. The Review Officer shall conduct an impartial review of the findings and decision appealed under this section."

Inquiries regarding further notices, timelines, and other particulars should be directed to the Exceptional Children Division of the North Carolina Department of Public Instruction, Raleigh, North Carolina prior to the required close of the appeal filing period.

**IT IS SO ORDERED.**

This the 28th day of May, 2021.

Stacey Bice Bawtinhimer
Administrative Law Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that, on the date shown below, the Office of Administrative Hearings sent the foregoing document to the persons named below at the addresses shown below, by electronic service as defined in 26 NCAC 03 .0501(4), or by placing a copy thereof, enclosed in a wrapper addressed to the person to be served, into the custody of the North Carolina Mail Service Center who subsequently will place the foregoing document into an official depository of the United States Postal Service.

Stacey M Gahagan
Gahagan Paradis, PLLC
sgahagan@ncgplaw.com
K. Alice Tolin
atolin@ncgplaw.com
Attorneys for Petitioner

David B. Noland
Tharrington Smith, LLP
dnoland@tharringtonsmith.com
Stephen Rawson
srawson@tharringtonsmith.com
Attorneys for Respondent

Teresa Silver King
NC Department of Public Instruction
due_process@dpi.nc.gov
Affiliated Agency

This the 28th day of May, 2021.

Anita M. Wright

Anita M Wright
Paralegal
N. C. Office of Administrative Hearings
1711 New Hope Church Road
Raleigh, NC 27609-6285