IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| J.M. and D.M., individually and on behalf of G.M., their minor child, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | NO. 5:21-CV-344-FL |
| WAKE COUNTY BOARD OF EDUCATION, | ) ) ) | |
| Defendant. | ) ) | |

- - - - -

| | | |
|---|---|---|
| WAKE COUNTY BOARD OF EDUCATION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 5:21-CV-409-FL |
| J.M. and D.M., individually and on behalf of G.M., their minor child, | ) ) ) | |
| Defendants. | ) ) | |

**<u>ORDER</u>**

These related cases are before the court upon motion to dismiss by defendant in Case No. 5:21-CV-344-FL (the "'344 case") (DE 24); and by defendants in Case No. 5:21-CV-409-FL (the "'409 case") (DE 14). The issues raised have been briefed fully. For the following reasons, the motion in the '344 case is granted in part and denied in part, and the motion in the '409 case is granted.

## STATEMENT OF THE CASES

J.M. and D.M. filed a complaint in the '344 case August 26, 2021, on behalf of themselves and their minor child G.M., ("G.M. and her parents"),[1] asserting that the Wake County Board of Education ("Board of Education") discriminated against them on the basis of G.M.'s disability and retaliated against them both in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., (the "Rehabilitation Act"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., (the "ADA"), and that it violated G.M.'s equal protection rights under the Fourteenth Amendment to United States Constitution, pursuant to 42 U.S.C. § 1983. They seek compensatory, injunctive, and declaratory relief, and attorneys' fees and costs, generally, in addition to legal fees specifically from the underlying state administrative matter pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., (the "IDEA").

On October 6, 2021, the Board of Education commenced the '409 case against G.M. and her parents, under 20 U.S.C. § 1415(i), seeking to challenge an administrative law judge ("ALJ") decision in an underlying state administrative proceeding and for respite from the decision of the North Carolina Department of Public Instruction (the "Department of Public Instruction") not to review the ALJ's decision. The Board of Education requests relief in the form of remand to the Department of Public Instruction for review of the ALJ's decision on the merits or alternatively this court's review of the ALJ's decision.

---

[1] Although J.M. and D.M. bring suit on behalf of G.M., the pleadings assert that G.M. also is a party plaintiff (see, e.g., J.M., D.M., & G.M.'s Am. Compl. ('344 Case DE 22) ¶ 38). For purposes of the instant analysis, the court treats G.M. as a party plaintiff. Further, the court represents the parties in the caption of this order as depicted in the parties' respective complaints, for ease of reference, but the court does not direct the clerk to make any amendment at this time.

2

In each case, the defending party/parties moved to dismiss complaint.[2]  The Board of Education also filed answer in the '344 case.  The Board of Education seeks dismissal of the complaint in the '344 case on the basis that it fails to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In turn, G.M. and her parents seek dismissal of the complaint in the '409 case on the grounds that the court lacks subject matter jurisdiction over the claims, the court lacks personal jurisdiction over G.M. and her parents due to insufficient process and insufficient service of that process, and the complaint's failure to state a claim upon which relief may be granted, pursuant to Rules 12(b)(1), (2), (4), (5), and (6).

G.M. and her parents attach to their complaint the ALJ's decision and three affidavits of their counsel in support of attorneys' fees and costs.  The Board of Education attaches to its complaints the same ALJ decision and a July 8, 2021, letter from the Department of Public Instruction.  Additionally, in opposition to the motion to dismiss its complaint, the Board of Education relies upon: 1) its notice of appeal of the ALJ's decision filed with the North Carolina Office of Administrative Hearings, 2) prior notices of appeal it has filed in previous cases, 3) affidavit of Sarah Richeda, paralegal employed by the Board of Education's counsel, 4) proof of service of its original complaint, and 5) certified mail receipts dated January 28, 2022.

## STATEMENT OF FACTS

A.    Alleged Facts Common to Both Cases

The following facts common to both cases may be summarized as follows.[3]

---

[2]    Hereinafter, all references to a party's complaint in the text or "Compl." in citations are to the parties' respective amended complaints in each case.  (J.M., D.M. & G.M.'s Am. Compl. ('344 Case DE 22); Board of Education's Am. Compl. ('409 Case DE 14)).

[3]    Where citation is necessary, the court cites to the portion of the Board of Education's answer in the '344 case where it indicates an allegation is admitted.

3

G.M. is a young girl (ten years old at the start of the '344 case) who attends Lacy Elementary School, part of the Wake County Public School System, and has been diagnosed with "Cortical Visual Impairment" ("CVI"), as well as "optic nerve anomaly and myopia." (Answer ('344 Case DE 26) ¶¶ 1, 56). CVI results from damage to "the visual pathways and processing centers in the brain," disrupting "the function of the message being received by the brain." (Id. ¶ 4). Thus, individuals with CVI "can 'see' the world, but their brains cannot process and interpret what they see." (Id.). Unlike children with ocular visual impairment, children with only CVI may improve their functional vision with intervention.

G.M. is undisputedly "a 'child with a disability,'" specifically, visual impairment, and, thus, eligible for certain services under the IDEA. (Id. ¶ 55). G.M. started kindergarten in 2017 and from then up through second grade, when schools in North Carolina stopped in-person instruction due to the COVID-19 pandemic, received two hours of "specially designed instruction from a [teacher of the visually impaired] . . . using CVI strategies as well as CVI modifications and accommodations to access her classroom materials." (Id. ¶¶ 66, 86). This specific teacher, Roxanne Wyss ("Wyss"), had a "CVI Range Endorsement," which is issued by the Perkins School for the Blind "to professionals who have demonstrated their ability to properly conduct the CVI Range,"[4] a means of evaluating functional vision in students with CVI, "passed a test involving knowledge of CVI, and secured letters of recommendation." (Id. ¶¶ 7, 66).

Throughout elementary school, G.M. has had issues with "reading fluency," and her parents have periodically requested that the Board of Education include "a fluency goal" in her IDEA-mandated individualized education program and provide specified auditory reading

---

[4]    The CVI Range runs on a scale from zero to ten, with zero "represent[ing] little or no visual functioning" and ten "represent[ing] near typical visual functioning[.]"  (Answer ('344 Case DE 26) ¶ 61).

accommodations. (Id. ¶¶ 69-70). See generally 20 U.S.C. §§ 1401(14), 1414(d) (defining individualized education program for the purposes of the IDEA). The Board of Education did not implement a specific fluency goal and offered accommodations other than that requested. At some point in 2019, the school staff working with G.M. began to discuss and explore the possibility of implementing braille instruction into G.M.'s individualized education program, a possibility that G.M.'s parents explicitly opposed. In February 2020, braille instruction was officially proposed due to concerns with G.M.'s reading fluency but only in addition to continued use of CVI strategies.

Before the braille instruction plan could be implemented, Wake County public schools switched to virtual instruction, which was not initially modified for G.M. and led to her being frustrated. When G.M.'s parents and G.M.'s teaching team met in June 2020, her parents again requested a fluency goal and pressed for "Extended School Year . . . services"[5] as an option. (Answer ('344 Case DE 26) ¶¶ 82, 90). The Board of Education's determination was that G.M. did not qualify for such services. G.M.'s parents "filed a due process petition"[6] challenging G.M.'s individualized education program on the bases of perceived "absence of fluency goals" and the Board of Education's extended school year services determination. (Id. ¶ 91).

---

[5]     Under the United States Department of Education's regulations, "extended year services mean special education and related services that . . . [a]re provided to a child with a disability . . .[b]eyond the normal school year of the public agency[.]" 34 C.F.R. § 300.106(b); see also State Bd. of Educ., Policies Governing Services for Children with Disabilities NC 1501-2.4 (Mar. 2021) (enumerating factors to be considered), https://www.dpi.nc.gov/media/10976/download?attachment [https://perma.cc/6LKU-SJDR]. See generally N.C. Gen. Stat. § 115C-109.1 (requiring the State Board of Education to "make available to parents a handbook of procedural safeguards" related to the education of children with disabilities and to "place a current copy of the handbook for parents on its Internet Web site").

[6]     North Carolina law, under a statutory section entitled "[i]mpartial due process hearings," allows for "[a]ny party . . . [to] file with the Office of Administrative Hearings a petition to request an impartial hearing with respect to any matter relating to the identification, evaluation, or educational placement of a child, or the provision of a free appropriate public education of a child." N.C. Gen. Stat. §115C-109.6.

In September 2020, an annual review was conducted, and braille instruction was added to G.M.'s individualized education program, over the objection of her parents. A specific fluency goal also was added to her individualized education program. G.M.'s parents filed another due process petition, which was consolidated with the July 2020 petition. (See id. ¶ 102; see also ALJ Decision ('344 Case DE 22-1) at 7). On May 28, 2021, the ALJ presiding over the hearing on the petitions issued a decision in G.M.'s parents' favor. (See Answer ¶ 113; see also ALJ Decision ('344 Case DE 22-1) at 1). The Board "attempted [to] appeal" this decision, but, on July 8, 2021, the Department of Public Instruction deemed the appeal "not timely." (Answer ¶ 53; see also July 8, 2021, Letter ('409 Case DE 12-3) at 1).

B.     Additional Alleged Facts in '344 Case

The following facts derived from G.M. and her parents' complaint are unique to that pleading or in dispute.

G.M. and her parents allege that she performs at or above grade level in all core academic subjects, except reading fluency, and that her functional vision has improved because of her instruction using CVI strategies. Despite such, the Board of Education refused to enact specific fluency goals, abandoned CVI strategies, and never provided any targeted interventions to help with G.M.'s reading fluency as it does for children without CVI. It insisted that G.M. be educated in braille and that CVI strategies be removed from her individualized education program.

Particularly pertinent to G.M. and her parents' claims, they allege that the Board of Education, through its agents, told them that G.M.'s reading speed was not concerning, despite the fact that it acknowledged issues, and that the requested fluency goal and auditory reading program were not needed, although the latter would beneficial. The Board of Education rejected G.M.'s

6

parents' offer to connect G.M.'s education team with an expert in the realm of CVI and to pay for such consultation.

The team is alleged to have predetermined in early 2020 to implement braille into G.M.'s education. Ultimately, the team sought to justify implementation of braille on the basis of G.M.'s slow reading speed, despite alleged prior representations regarding its importance and alleged refusal to consider prior alternative solutions. The individuals alleged to have made these decisions were not versed regarding CVI and failed to conduct requisite evaluations concerning G.M. or implementation of braille into her education (completing them, instead, after the hearing on the due process petitions concluded).

The Board of Education, through G.M.'s educational team, misrepresented that braille would be a supplement to CVI strategies. This allegedly was not the case as implementation of braille removed G.M. from the classroom for extended periods of time for isolated special education and the CVI strategies were removed in large part from her individualized education program. G.M.'s parents challenged this implementation of braille instruction, in part, because the family's preferred method of communication is print media.

As noted, G.M.'s parents prevailed on their due process petitions. In the wake of this ruling, the Board of Education removed Wyss, who had worked with G.M. and was the only teacher of the visually impaired employed by the Board of Education with a CVI Range Endorsement. G.M. and her parents allege that this was purposeful retaliation. Having removed the only CVI Range Endorsed teacher the Board of Education employed, it allegedly then concluded that the individualized educational program would no longer require that G.M. receive instruction from a CVI Range Endorsed teacher. Instead, in Wyss's place, the Board of Education provided teachers for the visually impaired not adequately versed in CVI which has resulted in

G.M.'s schoolwork not being modified appropriately and her being unable to access instruction in various classes. The Board of Education also has not contracted with a mutually agreeable CVI consultant as allegedly ordered by the ALJ.

Thus, G.M. and her parents allege that while the Board of Education did remove braille from G.M.'s individualized education program, as ostensibly ordered by the ALJ, it has, in effect, sabotaged G.M.'s ability to receive a non-braille-based education, as evidenced by the Board of Education's employees' continued insistence that braille instruction is appropriate.

C.    Additional Alleged Facts in '409 Case

The following facts from the Board of Education's complaint are unique to that pleading or otherwise not admitted.

The ALJ entered a decision on G.M. and her parents' due process petitions in their favor on May 28, 2021, which the Board of Education alleges was erroneous. The Board of Education represents that, under state law applicable at the time, appeals of such decisions were made to the Department of Public Instruction. (Compl. ('409 Case DE 12) ¶ 41). "There is no formal filing system at [the Department of Public Instruction] for appeals of due process decisions from the Office of Administrative Hearings," such as "to whom mail must be addressed," which "office . . . to hand deliver a filing and have it file-stamped as received," or "written instruction on what type of delivery . . . is acceptable or unacceptable." (Id. ¶ 44).

"For many years," the Department of Public Instruction "accept[ed] appeals that [were] filed electronically with the . . . Office of Administrative Hearings," and "prior to 2019, [it] had never rejected an appeal that was filed solely through the [Office of Administrative Hearings'] electronic filing system." (Id. ¶ 45). Since 2019, however, it has allegedly "applied a new rule" inconsistently "that it will not recognize appeals filed with [the Office of Administrative

8

Hearings].” (Id. (giving examples of accepted appeals in April 2019 but a rejected appeal in March 2019)). The Department of Public Instruction also had the “practice of accepting appeals that [were] placed in the mail within the . . . appeal window, irrespective of whether they [were] received at [the Department of Public Instruction] within the . . . appeal period.” (Id. ¶ 46). Prior to this case, the Department of Public Instruction had never rejected an appeal as untimely if it was mailed in that appeal window.

On June 25, 2021, 28 days after the ALJ’s decision, the Board of Education electronically filed its notice of appeal with the Office of Administrative Hearings, automatically sending an email to Teresa King (“King”), “the person designated by the State Board of Education to receive appeals.” (Id. ¶ 51). That same day, the Board of Education placed a written version of the notice of appeal in the mail, directed to King’s address at the Department of Public Instruction. The appeal letter was not opened by the staff of the Exceptional Children Division of the Department of Public Instruction, the division in which King works, until July 6, 2021. On July 8, 2021, the Exceptional Children Division’s director, Sherry Thomas, sent a letter to the Board of Education informing that the division considered the appeal received July 6, 2021, outside of the 30-day appeal window, and, thus, that the Department of Public Instruction would not appoint a “State Review Officer” to consider the appeal.

On August 4, 2021, the Board of Education “filed a state complaint” with the Department of Public Instruction challenging the “decision to refuse to appoint a State Review Officer.” (Id. ¶ 56). By decision received October 1, 2021, the Department of Public Instruction determined that it “had not violated the IDEA in refusing to appoint a State Review Officer to review the . . . appeal on the merits.” (Id. ¶ 57).

9

**COURT'S DISCUSSION**

A.    Board of Education's Motion to Dismiss ('344 Case DE 24)

The Board of Education seeks to dismiss G.M. and her parents' complaint on the basis that it fails to state a plausible claim under any of its asserted causes of action and that request for attorneys' fees related to the administrative hearing is premature.

　　1.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the [the non-movant]," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments."  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[7]

　　2.    Analysis

　　　　a.    Rehabilitation Act and ADA Claims

　　　　　　i.    Discrimination Generally

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her . . . disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal

---

[7]    Internal citations and quotation marks are omitted from all citations unless otherwise specified.

financial assistance."[8]  29 U.S.C. § 794(a).  Similarly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," such entities including "any . . . instrumentality of a [s]tate . . . or local government."  42 U.S.C. §§ 12131(1), 12132.  "Because the language of the two statutes is substantially the same, [the court] appl[ies] the same analysis to both."  Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 n.9 (4th Cir. 1995); Baird ex rel. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999) ("The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts.").

To state a claim of discrimination under either, plaintiff must allege "(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the . . . benefit in question; and (3) that [s]he was excluded from the . . . benefit due to discrimination solely on the basis of the disability."  Doe, 50 F.3d at 1264–65; see Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 503 (4th Cir. 2016).  However, in the particular instance of a case also implicating the IDEA, "[t]o prove discrimination in the education context, something more than a mere failure to provide the 'free appropriate education' required by [the IDEA] must be shown."  Sellers by Sellers v. Sch. Bd. of City of Mannassas, 141 F.3d 524, 529 (4th Cir. 1998).  Instead, "either bad faith or gross misjudgment should be shown before a [Rehabilitation Act] violation can be made out, at least in the context of education of handicapped children."  Id.; see Shirey ex rel. Kyger v. City of Alexandria Sch. Bd., No. 99-1127, 2000 WL 1198054, at *4 (4th Cir. Aug. 23, 2000), cited with approval by S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty., 819 F.3d 69, 78 n.6 (4th Cir. 2016).

---

[8]      It is not in dispute that the Board of Education receives federal financial assistance or funds.  (Answer ('344 Case DE 26) ¶ 44).

11

Mere allegations of negligence will not do, where "the educational placement of such children is often necessarily an arguable matter." Sellers, 141 F.3d at 529. For example, in Sellers, the plaintiffs "contend[ed] only that [the student's] test scores from as early as fourth grade 'should have alerted' the defendants of his disability and the need to provide him a free appropriate public education." 141 F.3d at 529. However, this claim "present[ed], at best, a negligence claim," that in effect averred "that the defendants failed to notice signs of disability," which was "virtually indistinguishable from complaints that a student ha[d] been incorrectly evaluated." Id.

In contrast, the United States Court of Appeals for the Eighth Circuit has described an example of bad faith or gross misjudgment in this context as: "fail[ure] to return [plaintiff-student's] mother's repeated phone calls regarding the safety of her son, the school administrators' proposals to either drastically alter [the student's] school day or send him to an alternative school for behaviorally troubled students, and the [educator's] assurance that it could cover the costs of [the student's] transportation to [another school], and rescission of that offer once [the student] had enrolled in [the other school]." M.P. ex rel. K. v. Indep. Sch. Dist. No. 721, 326 F.3d 975, 982 (8th Cir. 2003); see, e.g., D.N. v. Louisa Cty. Pub. Sch., 156 F. Supp. 3d 767, 776-77 (W.D. Va. 2016) (holding plaintiff had pleaded a plausible claim of bad faith or gross misjudgment where, among other things, defendant-school misrepresented facts regarding the student's education and relied on those misrepresentations to make educational decisions for the student); N.T. v. Baltimore City Bd. of Sch. Comm'rs, No. CIV. 11–356, 2011 WL 3747751, at *8 (D. Md. Aug. 23, 2011) (holding plaintiff had pleaded a plausible claim of bad faith or gross misjudgment where defendant-school made "abrupt decisions to discontinue significant parts of [the student's] educational program, without proper assessments and evaluations").

Here, the Board of Education is alleged not merely to have negligently missed signs of G.M.'s disability or incorrectly evaluated her due to its negligence. Construing the facts in G.M. and her parents' complaint in the light most favorable to them and drawing all reasonable inferences therefrom, the Board of Education is alleged to have grossly misjudged what G.M.'s disability warranted or ignored, in bad faith, evidence that its predetermined conclusion that braille instruction was warranted was, in fact, egregiously inappropriate. And, accepting the factual allegations of that complaint, the Board of Education, through its agents, did so intentionally discriminating against G.M. on the basis of her CVI.

As alleged, G.M.'s educational plan was working for her in large part, helping her functional vision improve, and allowing her to communicate with her family in their preferred medium. (Compl. ('344 Case DE 22) ¶¶ 8, 61, 95, 115). Without substantiated justification, the Board of Education started the process of changing that plan to its end goal of braille instruction, which it preordained to be appropriate, ignoring G.M.'s parents' suggestions and request for alternative solutions. (Id. ¶¶ 74, 76).

On the facts alleged, the Board of Education did not engage in requisite evaluations to make the decision regarding braille instruction, instead, engaging in such only after the decision was made. (Id. ¶¶ 98, 106-07). And those belated evaluations allegedly revealed that braille instruction was inappropriate for G.M. (Id. ¶¶ 108-09). Even then, although the decision had been taken out of their hands by the ALJ, the Board of Education's agents still insisted that braille was appropriate and that, but for the ALJ's decision, G.M. would be educated in braille. (Id. ¶ 121). This abrupt course change plausibly indicates, in part, bad faith or gross misjudgment by the Board of Education.

G.M. and her parents' complaint describes, particularly, the relevant decisionmaker's ignorance as to CVI and its impact on the Board of Education's course of conduct. (See, e.g., ¶¶ 82, 98). Despite this alleged ignorance, that decisionmaker insisted that it was "G.M.'s vision [that was] preventing her from reading" and that braille instruction would make G.M. a faster reader. (Id. ¶ 93). This claim was made without any training regarding CVI or evaluating G.M. using appropriate measures.

The Board of Education's ignorance is alleged to be the result of obstinance. G.M.'s parents offered to connect G.M.'s educational team with Christine Roman, a doctor who developed the CVI Range and is an expert in that field, as well as another expert. (Id. ¶¶ 61 n.3, 73, 79). See generally 20 U.S.C. § 1414(d)(1)(B)(vi) (enumerating that a student's "individualized education program team" may include, "at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child"). The Board of Education not only failed to talk to these individuals but allegedly did so intentionally, with G.M.'s teacher Wyss being "directed not to reach out to Dr. Roman." (Compl. ('344 Case DE 22) ¶ 74). While it may not have been legally obligated to consult with or include the proffered experts, in this instance, that decision supports a plausible claim of bad faith or gross judgment, specifically, a bad faith effort to remain ignorant as to the particulars of the disability of a student that results in grossly misjudging her educational needs.

The Board of Education's sudden and ostensibly uninformed decision was joined by alleged misrepresentations to G.M.'s parents in order to implement the plan to instruct G.M. in braille. Although the Board of Education represented to G.M.'s parents that G.M.'s reading speed was not a concern, it later used such to justify the implementation of braille instruction.[9] (Id. ¶¶

---

[9]    The Board of Education contends that the "substantial time gap between these two positions," from first grade to third grade, explains any discrepancy in the two positions given that G.M. had "g[otten] older and [her]

71, 79, 93).  The Board of Education relayed that "it would consult with a CVI Range Endorsed professional to discuss G.M.'s fluency" at a meeting during which the topic of braille was "tabled" but never consulted with such a professional prior to deciding braille instruction was appropriate. (Id. ¶ 85).  Ultimately, the Board of Education promised that it was implementing the objected-to braille instruction as a supplement to G.M.'s CVI strategy-based instruction but instead replaced that instruction nearly entirely with braille.  (Id. ¶¶ 84, 99).

G.M. and her parents aver that this inequitable treatment was administered not just on account of G.M. being disabled generally but on account of her CVI specifically.  Other IDEA-covered students struggling with reading fluency and speed received classroom interventions to help them improve.  (Id. ¶¶ 9-10, 81; see id. ¶ 94 (explaining that other "slow readers" were "provided individualized education program goals")).  G.M. did not, implicitly, because of her having CVI, as opposed to another more well-known disability that the relevant decisionmakers better understood.  (See id. ¶¶ 2-3, 98).  The factual allegations of G.M. and her parents' complaint support that the Board of Education plausibly treated G.M. in a discriminatory fashion because of her CVI.

In sum, G.M. and her parents allege facts supporting an inference that the decisions made here were not based on professional judgment and expertise.  Rather, G.M. and her parents' complaint plausibly alleges that, due to either bad faith or gross misjudgment, the Board of Education discriminated against G.M. on the basis of her disability.  Thus, G.M. and her parents have sufficiently pleaded claims under Title II of the ADA and the Rehabilitation Act for intentional discrimination.

---

reading expectations [had] become more advanced."  (Board's Mem. ('344 Case DE 25) at 8-9).  This very well may true, but the court is required at this stage to take the facts of the non-movants' complaint as true and construe them in the light most favorable to plaintiff, which the Board of Education's proffered rationale does not do.

The Board of Education raises a number of arguments against this conclusion: 1) that predetermining the result of an individualized education program meeting is nothing more than a harmless, procedural violation of IDEA; 2) that it was required to provide braille instruction by federal law; 3) and that the ALJ's findings undercut G.M. and her parents' complaint's allegations. None change the outcome here.

The Board of Education cites E.S. by B.S. v. Smith, 767 F. App'x 538 (4th Cir. 2019) (per curiam), for the proposition that "predetermination can be and is often found be a harmless procedural violation." (Board of Education's Mem. ('344 Case DE 25) at 6). In that case, the plaintiffs alleged that the defendant "predetermined the [individualized education program] in violation of IDEA." E.S., 767 F. App'x at 538. The United States Court of Appeals for the Fourth Circuit affirmed the district court's holding that the educator "had not complied with the IDEA," but that "the noncompliance . . . [was] procedural and harmless" because it "did not deprive [the student] of a [free and appropriate public education]." Id. at 539. Meaningfully, G.M. and her parents' complaint does not raise an IDEA merits question and instead relies on the ALJ's decision that the Board of Education, in fact, did deprive G.M. of a free and appropriate public education in violation of the IDEA, although the Board of Education contests that conclusion in its complaint in '409 case, discussed below. E.S. provides no basis to conclude that the instant complaint fails to allege a bad faith and/or grossly misjudged decision that resulted in discrimination against G.M. based on her CVI.

The Board of Education's contention that federal law, in the form of 20 U.S.C. § 1414(d)(3)(B)(iii), in some way makes G.M. and her parents' claims fail as a matter of law similarly is unavailing. That section of the IDEA provides that individualized education program team

16

shall . . . , in the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the . . . [t]eam determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media, . . . that [such] . . . is not appropriate for the child.

20 U.S.C. § 1414(d)(3)(B)(iii). G.M. and her parents in their complaint allege, and the ALJ found, that braille instruction was not appropriate for G.M. Moreover, the Board of Education, at least at the beginning of G.M.'s education, concluded that instruction in braille and the use of braille were not appropriate, given that it did not implement braille into her individualized education program until three or so years after her education had begun. Section 1414(d)(3)(B)(iii) does not obviate G.M. and her parents' claim, supported by well-pleaded facts, that throughout the decisionmaking process that braille instruction was appropriate for G.M., the Board of Education acted in bad faith and/or made a gross misjudgment.

The Board of Education further argues that G.M. and her parents' complaint contradicts the ALJ's decision that is appended to it, and, thus, that the appended exhibit prevails. Rule 10 does provide generally that "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes," Fed. R. Civ. P. 10(c), and Fourth Circuit law holds that "in the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). However, as the Fourth Circuit has also explained, "[p]laintiffs attach exhibits to their complaints for all sorts of reasons, . . . and it is not always appropriate to conclude that the plaintiff has adopted the contents of an attached document." Id. In this particular instance, the court does not treat G.M. and her parents as wholesale accepting the ALJ's decision as true.[10]

---

[10]    The Board of Education does not argue that G.M. and her parents are in some way estopped from alleging facts contrary to the ALJ's decision and finding of facts; thus, the court does not address such a possibility.

17

Moreover, the cited portions of the ALJ's decision are not necessarily at odds with G.M. and her parents' factual allegations. The ALJ's reference to the Board of Education's employees' representations regarding reading strategies during the school year for G.M. does not vitiate her and her parents' assertion that reading interventions, of the kind provided to other students, were not provided to her. (Compare ALJ Decision ('344 Case DE 22-1) at 23, 25, 37, with Compl. ('344 Case DE 22) ¶¶ 81, 94, 132). Similarly, the ALJ's finding that the Board of Education's individualized education program document for G.M., after the braille decision, "still contained CVI accommodations based in the supplemental aids and accommodation section as well as VI teacher support with CVI strategies for the regular education teachers and CVI training if necessary," (ALJ Decision ('344 Case DE 22-1) at 42), does not sufficiently undercut the allegation that the Board of Education, in reality, "replaced G.M.'s specially designed instruction using CVI strategies with braille" and that "it significantly decreased G.M.'s specially designed instruction using CVI strategies," (Compl. ('344 Case DE 22) ¶¶ 84, 99); especially where the ALJ also found that "[n]one of the academic or functional goals in the [individualized education program] included in the goal 'with CVI modifications.'" (ALJ Decision ('344 Case DE 22-1) at 42).

Accordingly, that part of the Board of Education's motion seeking dismissal of claims under Title II of the ADA and the Rehabilitation Act for intentional discrimination is denied.

ii.     Effective Communication Regulation

G.M. and her parents cite United States Department of Justice's regulations implementing Title II of the ADA, see 42 U.S.C. § 12134, as supporting their complaint's claim of discrimination based on disability. (Compl. ('344 Case DE 22) ¶¶ 143-49). Specifically, they allege that the Board of Education violated the regulatory prohibition on

> a public entity, in providing any aid, benefit, or service, . . . on the basis of disability[,] . . . [p]rovid[ing] a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[,]

28 C.F.R. § 35.130(b)(1)(iii), by failing to "furnish appropriate auxiliary aids and services . . . necessary to afford [G.M.] . . . an equal opportunity to participate in, and enjoy the benefits of" the Board of Education's services, programs, and activities. Id. § 35.160(b)(1). They contend that the Board of Education failed to give "primary consideration" to G.M. and her parents' request "[i]n determining what type[] of auxiliary aid[] and service[] [was] necessary." Id. § 35.160(b)(2).

Auxiliary aids and services include "taped text; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; [and] . . . large print materials." Id. § 35.104(2); see also 42 U.S.C. § 12103(1)(B) (defining "auxiliary aids and services" to include "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments"). Failure to furnish appropriate auxiliary aids may constitute Title II ADA discrimination. See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 337, 340 (4th Cir. 2012). For example, interpretive guidance by the United States Departments of Justice and Education explains that, in the public education context, Title II of the ADA would require that, "[i]f homework assignments are available on-line," "the on-line program used by the school . . . be accessible to students who are blind." U.S. Dep't of Just. & U.S. Dep't of Educ., Frequently Asked Questions on Effective Communication for Students with Hearing, Vision, or Speech Disabilities in Public Elementary and Secondary Schools 11 (Nov. 2014), https://sites.ed.gov/idea/files/idea/policy/speced/guid/idea/memosdcltrs/doe-doj-eff-comm-faqs.pdf [https://perma.cc/8DGN-GLPH]. Other guidance by the Department of Justice expounds on the "primary consideration" requirement, explaining that "[t]he public entity shall honor the choice [of the individual with a disability] unless it can

19

demonstrate that another effective means of communication exists or that use of the means chosen would," 28 C.F.R. § Pt. 35, App. A, "result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164.

Here, G.M. and her parents allege the Board of Education "failed to provide appropriately modified materials to enable G.M. to access the general education curriculum during virtual learning." (Compl. ('344 Case DE 22) ¶¶ 86, 147). Their complaint further describes the Board of Education's refusal to provide "modified" versions of the books on the reading list for the summer leading up to third grade and that it, instead, provided only the same modified versions of books G.M. was given to read during the school year. (Id. ¶ 90). Finally, they allege that the Board of Education refused to provide a "systematic auditory support system." (Id. ¶¶ 83, 96). In this procedural posture, G.M. and her parents' complaint sufficiently ties this string of decisions to the allegations of bad faith and gross misjudgment described above in relation to the decision to teach G.M. braille and remove the majority, if not all, of her CVI-focused learning.

The Board of Education directs its attention regarding this claim on whether the decision to teach G.M. to read braille falls within the province of educational decisions under the IDEA and its requirement for a free appropriate public education or, as it denies, within the province of Title II of the ADA's requirements on furnishing appropriate auxiliary aids. It contends that, on G.M. and her parents' complaint, the Board of Education never communicated with G.M. through braille or offered materials in braille and that, accordingly, this regulatory provision on communication is not implicated, as purportedly evidenced by the United States Departments of Justice and Education's joint interpretative guidance that "[s]ome services related to communication, like teaching a child to read Braille or understand sign language, are not required by Title II[] [of the ADA's] effective communication requirement but may be required by" the IDEA. U.S. Dep't of

Just. & U.S. Dep't of Educ., <u>Meeting the Communication Needs of Students with Hearing, Vision, or Speech Disabilities</u> 1 (Nov. 2014), <u>https://sites.ed.gov/idea/files/idea/policy/speced/guid/idea/memosdcltrs/doe-doj-eff-comm-fct-sht.pdf</u> [<u>https://perma.cc/WMC6-UDXZ</u>].

As already noted, G.M. and her parents allege denial of auxiliary aids separate and apart from the ultimate decision to teach braille to G.M. -- not just that the Board of Education decided to teach G.M. braille but that it refused to provide print media to be accessed in conjunction with CVI strategies. (<u>See</u> Compl. ('344 Case DE 22) ¶¶ 95, 99). If, as G.M. and her parents allege, this auxiliary aid and service, 28 C.F.R. § 35.104(2) (exampling "large print materials"), was necessary to afford G.M. an equal opportunity to participate and enjoy the benefits of the Board of Education's provision of educational services, the Board of Education violated the regulation's commands. Thus, accepting the factual allegations of G.M. and her parents' complaint as true, they state a claim under that provision.

The Board of Education argues, again, that by attaching the ALJ's decision to their complaint, G.M. and her parents have defeated their claim under 28 C.F.R. § 35.160(b)(1). For the reasons noted above, the court does not treat G.M. and her parents as adopting wholesale the ALJ's findings of facts. The ALJ's finding that G.M.'s individualized education program, at various points, included a variety of "assistive technolog[ies]," (ALJ Decision ('344 Case DE 22-1) at 24), does not contradict G.M. and her parents' allegation that the Board of Education refused to provide a "systematic auditory support system" to G.M., (<u>Id.</u> ¶¶ 83, 96), taken here to mean a combination of auxiliary auditory aids and services necessary to afford G.M. an equal opportunity to participate in, and enjoy the benefits of the Board of Education's services, programs, and activities.

The Board of Education's motion to dismiss is also denied in this part pertaining to claims regarding effective communications standards under Title II of the ADA.

### iii.    Retaliation

G.M. and her parents allege that after their successful due process petitions, the Board of Education retaliated against G.M.

Both Title II of the ADA and the Rehabilitation Act prohibit retaliation against certain individuals for engaging in protected activity and rely on similar standards to prove such. S.B., 819 F.3d at 78 n.6; see also 42 U.S.C. § 12203(a). Such a claim requires showing 1) that the claimant "engaged in conduct protected by the" relevant statute, 2) that she "suffered an adverse action subsequent to engaging in the protected conduct," and 3) "that there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002). The Board of Education asserts that the last two elements are not plausibly alleged in G.M. and her parents' complaint. The court does not agree.

### a)    Adverse Action

As to the second element, the action must be sufficiently "materially adverse" to "give rise to a retaliation claim." S.B., 819 F.3d at 78; Feminist Majority Found. v. Hurley, 911 F.3d 674, 695 (4th Cir. 2018). An action is "materially adverse" where it "'well might' be enough to 'dissuade[] a reasonable [individual] from making or supporting a charge of discrimination.'" S.B., 819 F.3d at 78 (first alteration in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 54 (2006)); see also Burlington, 548 U.S. at 68. For example, in the employment context, courts have explained that "a minor change in working conditions[] is typically not a materially adverse action." Forgus v. Mattis, 753 F. App'x 150, 153 (4th Cir. 2018). A claim for retaliation may stem from a similar factual foundation as a claim based on a "school's

22

failure to provide a [free appropriate public education]." Cf. Z.G. v. Pamlico Cty. Pub. Sch. Bd. of Educ., 744 F. App'x 769, 779 (4th Cir. 2018).

Here, G.M. and her parents' complaint alleges a sufficiently materially adverse action: the hamstringing of G.M.'s ability to obtain what that complaint alleges is a sufficient education and the Board of Education's refusal to provide accessible educational materials to G.M. Their complaint alleges that "provi[sion] [of] services using CVI strategies by [the only] CVI-Range Endorsed teacher," Wyss, had allowed G.M. to learn, in certain areas, "at or above grade level" and helped "her functional vision improve[]" and that the Board of Education removed Wyss because of the successful due process petitions. (Compl. ('344 Case DE 22) ¶¶ 66, 115, 136). The reasonable inference from the facts alleged in G.M. and her parents' complaint, when viewed in light most favorable to them, is that the CVI-Range Endorsement or other CVI-specialized training was necessary or key to G.M.'s teacher providing that instruction. (See, e.g., id. ¶¶ 79 n.4, 85, 115). That deprivation, if as severe as alleged, constitutes an action of sufficient adversity that it might well dissuade a reasonable student or her parents from making or supporting a charge of disability discrimination. G.M. and her parents additionally allege that the Board of Education has also "not appropriately modified" G.M.'s schoolwork and prevented her from being "[]able to access instruction in various classes" since the successful due process petitions. (Id. ¶¶ 119). This only further bolster the materiality of the adverse action against G.M. alleged.[11]

The Board of Education contends that G.M. and her parents' complaint only alleges that Wyss left "for 'personal and professional reasons'" rather than because of direction by the Board of Education. (Id. ¶ 114). However, this ignores the other allegations that the Board of Education

---

[11]   Because the court concludes that G.M. and her parents state sufficiently a claim of retaliation on these described facts, it does not consider whether the alleged failure by the Board of Education to "contract[] with a mutually-agreeable CVI consultant," as ostensibly ordered by the ALJ, constitutes retaliation. (Compl. ('344 Case DE 22) ¶ 120, 138).

"intentionally removed" Wyss, (see, e.g., id. ¶¶ 115, 119, 136-37), and binding law directing that the court accept complainants' well-pleaded facts as true. See, e.g., Houck v. Substitute Tr. Servs., Inc., 791 F.3d 473, 484 (4th Cir. 2015). Read fairly, the complaint's description of Wyss's comment, in light of its allegation of direction by the Board of Education, leads to the reasonable inference that Wyss was being untruthful or polite in describing her transition as based on personal and professional reasons.

b)      Causal Link

In the context of a claim of retaliation generally, significantly close "temporal proximity" between the protected activity and adverse action "is sufficient to establish a causal connection at the prima facie stage." Strothers v. City of Laurel, 895 F.3d 317, 336-37 (4th Cir. 2018); see Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 654 (4th Cir. 2021); see, e.g., Coursey v. Univ. of Md. E. Shore, 577 F. App'x 167, 175 (4th Cir. 2014) ("[D]ischarge of an employee soon after he engages in a protected activity is strongly suggestive of retaliatory motive and gives rise to a sufficient inference of causation to satisfy the prima facie requirement.").

Here, G.M. and her parents allege that the Board of Education learned May 28, 2021, that it had lost the initial stage of the proceedings before the ALJ and that July 8, 2021, the Board of Education was informed it could not appeal. (Compl. ('344 Case DE 22) ¶ 139). One month and twenty days later it informed G.M. and her parents that Wyss would no longer work with G.M. (Id.). This is closer to the time that courts have found sufficiently temporally proximate than not. See, e.g., Sempowich, 19 F.4th at 654 (considering a time period of "about a month"); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015) (recognizing that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of a prima facie case solely on the basis of temporal proximity).

Further, other comments by the Board of Education's agents reflect what reasonably could be inferred as resentment of the ALJ's decision. (See Compl. ('344 Case DE 22) ¶¶ 16 (alleging that the relevant decisionmaker asserted she "was only removing braille from th[e] [individualized education program] due to the ALJ's Order"), 121). Finally, a causal connection between the protected activity here and the adverse action is inferable due to the related subject matter of the two: in simplest terms, G.M. and her parents allege they complained, successfully, that G.M. was not being provided education suitable to her CVI and that, in retaliation, the Board of Education made a CVI savvy teacher unavailable.

The Board of Education's motion is denied in that part seeking dismissal of G.M. and her parents' retaliation claim, and their claims under the ADA and Rehabilitation Act are allowed to proceed.

b.  Fourteenth Amendment Claim

G.M. through her parents brings a claim for violation of her Fourteenth Amendment right to equal protection, pursuant to 42 U.S.C. § 1983, by the Board of Education through its failure to provide certain assistance that other slow readers received because of her CVI.

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. This "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "[T]o state a claim for violation of the [Equal Protection] Clause, a plaintiff must plausibly allege first that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Fauconier v. Clarke, 966

F.3d 265, 277 (4th Cir. 2020).  Further, the plaintiff must demonstrate that "the disparity was not justified under the appropriate level of scrutiny."  Id.

The Board of Education contends that G.M.'s claim fails at each step.  The court, after considering each in turn, agrees in relevant part.[12]

First, the court considers whether G.M. has plausibly alleged that she was similarly situated with those whom she claims were treated differently than her and others with CVI.  To do so, she "must show that" those with CVI like her and those whom she claims are similarly situated "are 'in all relevant respects alike.'"  Doe v. Settle, 24 F.4th 932, 939 (4th Cir. 2022) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).

Although the parties disagree as to the relevant group to which G.M. and/or those with CVI should be compared, (G.M. and her parents focus on other slower readers, including those with disabilities, and the Board of Education focuses on slow readers without disabilities), under either side's formulation, G.M. and her parents' complaint fails to allege plausibly that the two groups were in all relevant respects alike.  On the complaint's allegation, those with CVI including G.M. are not like other slower readers, including those with their own individualized educational performance plan, in all relevant aspects because CVI impacts individuals' vision in such a way to sometimes hamper reading fluency.  (See Compl. ('344 Case DE 22) ¶¶ 8, 12, 81).  G.M. and her parents do not allege that her treatment, the ostensible refusal by the Board of Education to provide certain reading interventions to G.M. because of her CVI and the Board of Education seeking to teach her braille, was dissimilar to those with disabilities similarly impacting reading

---

[12]    Because the court concludes that G.M. and her parents fail to allege sufficiently that G.M. was similarly situated to those treated differently or that the differential treatment lacked a rational basis, it finds no occasion to consider whether their complaint sufficiently alleges the type of intentional discrimination required for an equal protection claim and whether similar allegations of intentional discrimination under the ADA and the Rehabilitation Act would suffice.

fluency through visual impairment, even among slow readers. Rather, they allege that the Board of Education's treatment of G.M. was different generally than that of other slow readers, which fails to allege that they are similar in all relevant aspects to G.M.

Moreover, even assuming she had sufficiently demonstrated she was similarly situated to other slow readers, the disparate treatment was justified under the deferential rational basis review required. "[U]nless a suspect class is involved, disparate treatment is presumed to be valid and will be sustained if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." King v. Rubenstein, 825 F.3d 206, 220 (4th Cir. 2016). The Supreme Court has concluded that classifications based on disability are not suspect, Cleburne, 473 U.S. at 439-41, and thus "classifications based on disability are subject to minimal scrutiny." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 486 (4th Cir. 2005); Sellers, 141 F.3d at 531 ("[E]ven if a plaintiff can prove a school board intended to treat children differently because of their disabilities, . . . . a plaintiff in this context would have to prove that a school board's decision was without any rational basis.").[13] "[T]he Fourteenth Amendment does not require States to 'make special accommodations for the disabled, so long as their actions toward such individuals are rational,' . . . even in the context of public education." Constantine, 411 F.3d at 486 (quoting Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001)).

In considering the rationality of the government actors' conduct through the lens of a Rule 12(b)(6) motion, a plaintiff "must plead sufficient facts to overcome the presumption of rationality that applies to government classifications." Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir.

---

[13] Treating G.M.'s equal protection claim as a "class of one" claim under the Equal Protection Clause, as alternatively urged by G.M. and her parents' response brief, would not alter the court's analysis where such a claim would require sufficient "alleg[ations] that [the claimant] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," without consideration of the government actor's "subjective motivation." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000) (per curiam).

2008); Veney v. Wyche, 293 F.3d 726, 731 (4th Cir. 2002) (inquiring "whether [the plaintiff] has alleged facts that, if found to be true, would demonstrate that the disparate treatment lacks justification under the requisite level of scrutiny").  And in considering the justification for the government's disparate treatment, "any conceivable reason will do" if it is rational, and "[i]t does not matter what motivated the" treatment.  Doe, 24 F.4th at 943; Siena Corp. v. Mayor & City Council of Rockville Maryland, 873 F.3d 456, 465 (4th Cir. 2017) ("This analysis looks not to the subjective motivations of the local officials."); Kirby v. City of Elizabeth City, 388 F.3d 440, 447 (4th Cir. 2004) ("[I]t is not sufficient for a plaintiff simply to show that the defendants' actual motive for their disparate treatment was irrational; rather he must negate any reasonably conceivable state of facts that could provide a rational basis for the classification."). But see also Cleburne, 473 U.S. at 446-47 (explaining that "a bare desire to harm a politically unpopular group [is] not [a] legitimate state interest[]").

Here there is a conceivable rational relationship between the disparity of the Board of Education's treatment of G.M. and others with C.V. and a legitimate governmental purpose, even accepting her and her parents' factual allegations as true.  See, e.g., McWaters v. Cosby, 54 F. App'x 379, 383 (4th Cir. 2002) ("[N]umerous rational bases for the defendants' actions suggest themselves even from the[] facts [as alleged in plaintiff's complaint]. . . . Since [her] complaint does not negative the facts that support the rational bases noted . . . , it follows that she has failed in her burden of asserting irrationality.").  "Assisting disabled children is a legitimate governmental purpose," Calloway v. District of Columbia, 216 F.3d 1, 9 (D.C. Cir. 2000), and the Board of Education's treatment of G.M. was at least rationally connected to that purpose.

CVI, like that which G.M. is diagnosed with, causes visual impairment impacting, inter alia, "reading fluency."  (See, e.g., Compl. ¶ ('344 Case DE 22) ¶¶ 2, 4, 8, 67, 69-70, 79 n.4).  The

complaint alleges that "students without CVI who are struggling with reading fluency" are routinely "provided classroom interventions, a literary specialist . . . , or evaluat[ions] [of their] reading skills." (Id. ¶ 81). Such a decision has a conceivable rational basis, however. The complaint does not allege that such "targeted interventions," (id. ¶ 10), were as effective for students with CVI or that it was irrational for the Board of Education's employees to possibly conclude such. See also McWaters, 54 F. App'x at 383 ("[T]he defendants are not required to show that they actually were acting on those rational bases."). Although G.M. and her parents allege that the Board of Education did not provide modified versions of the books on the summer reading list that students without CVI were assigned to read, "[t]he Fourteenth Amendment does not require States to make special accommodations" for those with disabilities. Constantine, 411 F.3d at 486.

Although plausibly related to violations of her and her parents' statutory rights described above, the decision to instruct G.M. in braille but not "other students who are slow readers," (Compl. ('344 Case DE 22) ¶ 94), was rationally based in providing an educational aid effective for those with visual impairments generally, see, e.g., 42 U.S.C. § 12103(1)(B) (enumerating braille as an auxiliary aid to "mak[e] visually delivered materials available to individuals with visual impairments"), as opposed to providing that educational aid to those for which that aid is less effective, generally. See, e.g., Q.C. v. Winston-Salem/Forsyth Cnty. Sch. Bd. of Educ., No. 1:19-CV-1152, 2022 WL 1686905, at *12 (M.D.N.C. May 26, 2022) ("Such a scheme may not have been in Q.C.'s best interest and may have violated Section 504, the ADA, or IDEA, but it was not irrational."); O.V. v. Durham Pub. Sch. Bd. of Educ., No. 1:17-CV-691, 2018 WL 2725467, at *30 (M.D.N.C. June 6, 2018) ("Those considerations—even if grossly misapplied in violation of the IDEA, the ADA, and/or Section 504—all qualify as rational bases (in the context

of the Equal Protection Clause) for educating O.V. via a separate curriculum[.]"). G.M. and her parents do not allege that she would be unable to read braille or that it would hurt her reading fluency, merely that it "was not their preferred method of communication" and that G.M. did not "require[] instruction in braille." (See, e.g., Compl. ('344 Case DE 22) ¶¶ 95, 109).

There is no disharmony between the court's conclusion above that G.M. and her parents plead plausible claims of statutory violations related to disability but not of violations of the Constitution's commands. The Fourth Circuit has explained that "Title II [of the ADA] imposes a greater burden on the States than does the Fourteenth Amendment," Constantine, 411 F.3d at 489, and observed that "[n]aturally school boards will be subject to liability for statutory IDEA violations much more frequently than for similarly pled constitutional claims." Sellers, 141 F.3d at 531.

The court accordingly grants the Board of Education's motion in this part, dismissing G.M. and her parents' § 1983 claim due to its failure to state a plausible claim for relief.

c.    Attorneys' Fees

The IDEA allows for recovery of "reasonable attorneys' fees" by "a prevailing party who is the parent of a child with a disability" "[i]n any action or proceeding brought under [§ 1415]," 20 U.S.C. § 1415(i)(3), within the discretion of the court. See J.D. ex rel. Davis v. Kanawha Cnty. Bd. of Educ., 571 F.3d 381, 387 (4th Cir. 2009). To be considered the "prevailing party" in the underlying proceeding, the party must have "obtain[ed] judicially sanctioned and enforceable final relief on some claims." J.D., 571 F.3d at 387. "The IDEA allows parties to bring an independent action in federal court solely to recover fees incurred in an administrative proceeding." Combs v. Sch. Bd. of Rockingham Cnty., 15 F.3d 357, 359 n.10 (4th Cir. 1994).

30

The Board of Education's only argument in support of dismissing G.M. and her parents' claim for attorneys' fees is that it is premature where the '409 case challenging the ALJ's decision is still pending. However, where the court below grants G.M. and her parents' motion to dismiss the Board of Education's complaint in the '409 case, the Board of Education proffers no viable reason to grant its motion in that part. That portion is therefore denied.

B.    G.M. and Her Parents' Motion to Dismiss ('409 Case DE 14)

G.M. and her parents seek to dismiss the Board of Education's complaint on the bases that this court lacks both subject matter jurisdiction over the Board of Education's claim, due to its failure to exhaust its administrative remedies, and personal jurisdiction over them, due to improper service of insufficient process, and that the Board of Education fails to state a claim under the IDEA.

1.    Standard of Review

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Such motion may either 1) assert the complaint fails to state facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Where a defendant raises a "facial challenge[] to [subject matter jurisdiction] that do[es] not dispute the jurisdictional facts alleged in the complaint," the court accepts "the facts of the complaint as true as [the court] would in context of a Rule 12(b)(6) challenge." Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018).

A motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(4) challenges the sufficiency of process, while Rule 12(b)(5) motions challenge the sufficiency of service of process. Fed. R. Civ. P. 12(b)(4), (5). Further, "a failure to obtain proper service on the defendant deprives

31

the court of personal jurisdiction over the defendant," Koehler v. Dodwell, 152 F.3d 304, 306 (4th Cir. 1998); see also Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."), implicating Rule 12(b)(2)'s enumeration of "lack of personal jurisdiction" as a basis for dismissal. Fed. R. Civ. P. 12(b)(2). Plaintiff bears the burden both of showing personal jurisdiction and establishing that effective process has been served properly. See Mylan Lab'ys, Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).

Finally, the court relies on the same standard of review for Rule 12(b)(6) motions set forth above.

    2.    Analysis

        a.    IDEA Claim

The IDEA requires that state educational agencies that receive federal assistance "to provide special education . . . to children with disabilities" offer procedural safeguards to those children and their parents with respect to the provision of the state education agencies' statutorily mandated "free appropriate public education." 20 U.S.C. § 1415(a). For example, as alluded to above, the state agency must provide a mechanism for parents to file a "due process complaint" regarding the "provision of a free appropriate public education to" a child with disabilities. Id. § 1415(b)(6), (8). Filing of such a complaint entitles the filing parent to "an opportunity for an impartial due process hearing, . . . conducted by the [s]tate educational agency or by the local educational agency, as determined by [s]tate law or the [s]tate educational agency." Id. § 1415(f)(1)(A). "Any party aggrieved by the findings and decision" made as part of the hearing on the complaint may "bring a civil action with respect to the complaint . . . , which action may be

brought in any [s]tate court of competent jurisdiction or in a district court of the United States." Id. § 1415(i)(2)(A).

North Carolina law, as operative at the time of the Board of Education's appeal,[14] implements the IDEA, N.C. Gen. Stat. § 115C-106.2(b), in part, by providing for "[i]mpartial due process hearings" before an ALJ "with the Office of Administrative Hearings . . . with respect to any matter relating to . . . the provision of a free appropriate public education of a child." Id. § 115C-109.6(a). The decision of the ALJ following that hearing is "final and is not subject to further review unless appealed to the Review Officer under [N.C. Gen. Stat. § 115C-109.9]." Id. § 115C-109.6(f). Under § 115C-109.9, "[a]ny party aggrieved by the findings and decision of [an ALJ] under [N.C. Gen. Stat. §115C-109.6] . . . may appeal the findings and decision within 30 days after receipt of notice of the decision by filing a written notice of appeal with the person designated by the State Board [of Education] under [N.C. Gen. Stat. § 107.2(b)(9)] to receive notices." Id. § 115C-109.9(a).

Under the rules promulgated by the State Board of Education, see N.C. Gen. Stat. § 115C-107.2(a)(1), (b)(9), appeal may be made "to the North Carolina Department of Public Instruction, Exceptional Children Division within 30 days of receipt of the written decision" of the Office of Administrative Hearings. State Bd. of Educ., Policies Governing Service for Children with Disabilities NC 1504-1.15(b)(1) (Mar. 2021), https://www.dpi.nc.gov/media/10976/download?attachment [https://perma.cc/6LKU-SJDR]; E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 515 (4th Cir. 2014) ("North Carolina law provides that any party aggrieved by the findings and decision of a hearing officer in an IDEA case may seek review by filing a

_____

[14] Section 115C-109.9 was repealed November 18, 2021, and surrounding, related statutory sections were amended. 2021 Appropriations Act, SL 2021-189, § 7.25, 2021 N.C. Sess. Laws ___, ___. All citations to the North Carolina General Statutes are to that version effective prior to November 18, 2021.

33

written notice of appeal with the North Carolina Department of Public Instruction, Exceptional Children Division.").

The State Board of Education, "through the Exceptional Children Division," then "appoint[s] a Review Officer," who "conduct[s] an impartial review of the findings and decision appealed." N.C. Gen. § 115C-109.9(a). After review, he or she "make[s] an independent decision," which "becomes final unless an aggrieved party brings a civil action under subsection (d) of" § 115C-109.9. Id. Section 115C-109.9(d) provides that "[a]ny party that does not have the right to appeal under [§§ 115C-109.1 to 115C-109.9] and any party who is aggrieved by the decision of the Review Officer under [§ 115C-109.9] may institute a civil action in [s]tate court within 30 days after receipt of the notice of the decision or in federal court as provided in 20 U.S.C. § 1415." Id. § 115C-109.9(d).

Under federal law, a "district court's jurisdiction under the IDEA is limited to review of the final 'findings and decision' of the administrative proceedings." M.E. ex rel. C.E. v. Buncombe Cnty. Bd. of Educ., 72 F. App'x 940, 941 (4th Cir. 2003) (per curiam) (quoting 20 U.S.C. § 1415(i)(2)(a)). "Thus, where administrative remedies have not been exhausted, parties cannot maintain an action in federal court under § 1415(i)(2)," id., because that "failure . . . to exhaust . . . deprives [the court] of subject matter jurisdiction over" the IDEA claim. MM ex rel. DM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 536 (4th Cir. 2002); E.L., 773 F.3d at 513-14; see also Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 526 (2007) ("Once the state educational agency has reached its decision, an aggrieved party may commence suit in federal court."). It is only "when [a plaintiff] receives a finding or a decision from the Review Officer" that a "plaintiff has exhausted administrative remedies" and can "proceed to file a civil action in state or federal court."

Z.G. by & through C.G. v. Pamlico Cnty. Pub. Sch. Bd. of Educ., 744 F. App'x 769, 776-77 (4th Cir. 2018).

The Fourth Circuit has explained that where a party "fail[s] to properly take an appeal, there [is] nothing for the review officer to consider as to [their IDEA] claims" and, thus, the party failed to exhaust their administrative remedies. E.L., 773 F.3d at 516. Further even where an "ALJ incorrectly dismisse[s] [a party's] claim as untimely" and therefore "d[oes] not consider the merits of her claim," "there [are] no administrative 'findings or decision' regarding the merits of [that] claim for the district court to review and the district court d[oes] not have jurisdiction under § 1415(i)(2) to consider the merits of [the party's] claim." M.E., 72 F. App'x at 942.

Here, although the Board of Education alleges it properly took an appeal of the ALJ's unfavorable decision, "[w]hether a plaintiff has properly exhausted all administrative remedies is a pure question of law." E.L., 773 F.3d at 514. The Department of Public Instruction's past practices and/or forgiveness of other procedural missteps does not alter the plain statutory language requiring a party aggrieved by an ALJ's IDEA decision to "appeal the findings and decision within 30 days after receipt of notice of the decision by filing a written notice of appeal." N.C. Gen. § 115C-109.9(a). "[T]he general rule in civil appeals" is "that a notice of appeal is [not] 'filed' at the moment it is placed in the mail addressed to the [recipient]," "on the ground that receipt by the [addressee] is required." See Houston v. Lack, 487 U.S. 266, 274 (1988); Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 534 (4th Cir. 1996) ("[T]he unincarcerated litigant who decides to rely on the vagaries of the mail must suffer the consequences if the notice of appeal fails to arrive within the applicable time period.").

The Board of Education's complaint does not allege what date the notice of appeal was received by the Department of Public Instruction beyond that it was "opened by the staff in the

Exceptional Children[] Division office . . . July 6, 2021." (Compl. ('409 Case DE 12) ¶ 53; July 8, 2021, Letter ('409 Case DE 12-1) at 1 ("The North Carolina Department of Public Instruction is in receipt of the appeal filed by you on behalf of your client on July 6, 2021.")). The Board of Education's bare speculation that perhaps the notice was received in a timely manner on an undescribed date is insufficient. See Lemon v. Myers Bigel, P.A., 985 F.3d 392, 400 (4th Cir. 2021) ("Speculation, of course, falls short of what Twombly and Iqbal require."). Nor does "electronic filing with the Office of Administrative Hearings," (Compl. ('409 Case DE 12) ¶ 51), satisfy the statutory scheme's plain requirement to "fil[e] a written notice of appeal with the North Carolina Department of Public Instruction, Exceptional Children Division." E.L., 773 F.3d at 515; see, e.g., K.I. v. Durham Pub. Sch. Bd. of Educ., No. 1:19-CV-857, 2020 WL 3512213, at *5 (M.D.N.C. June 29, 2020) ("[S]trict adherence, rather than substantial compliance, to the statute's requirements is necessary to exhaust a would-be appellant's administrative remedies."), appeal docketed, No. 20-1834 (4th Cir. July 31, 2020).[15] In resolving the legal question of whether the Board of Education exhausted its administrative remedies, the court is unable to credit its bald claim that it timely filed notice of appeal, where its factual allegations demonstrate that it failed to adhere to the statutory scheme's explicit requirements.

Further, the decision by the Department of Public Instruction not to review the Board of Education's untimely appeal does not result in an "independent decision" conducted after the Review Officer's "impartial review of the findings and decision appealed," such that the Board of Education's administrative remedies have been exhausted. See N.C. Gen. Stat. § 115C-109.9; see

---

[15]     While the North Carolina Administrative Procedure Act ("NCAPA") allows particularly for "electronic filing," N.C. Gen. Stat. § 150B-23.3, the act specifically states that "[n]otwithstanding any other provisions of [the NCAPA], timelines and other procedural safeguards . . . under IDEA and Article 9 of Chapter 115C of the General Statutes must be followed . . . when a [due process] petition is filed." N.C. Gen. Stat. § 150B-22.1.

also 20 U.S.C. § 1415(i)(2)(A) (requiring an IDEA plaintiff to be "aggrieved by . . . findings and decision").[16] "Because [the Board of Education] failed to properly take an appeal, there was nothing for the review officer to consider as to [its] claims." E.L., 773 F.3d at 516.

Here, because the Department of Public Instruction dismissed the Board of Education's notice of appeal "as untimely," it "did not consider the merits of [the appellant's] claim," meaning there was there were no findings or decision on appeal regarding the merits of the Board of Education's claim. See M.E., 72 F. App'x at 942; see, e.g., Charlotte-Mecklenburg Bd. of Educ. v. Brady, No. 3:18-CV-463-RJC-DSC, 2022 WL 989231, at *8 (W.D.N.C. Mar. 31, 2022) (explaining that the "argument, that IDEA claims are exhausted after [claimants] go through the administrative process prior to filing in federal court regardless of whether the state administrative agency has ruled on the merits of the claims, is unavailing in light of Fourth Circuit caselaw."). Thus, it did not properly exhaust its administrative remedies before bringing suit under 20 U.S.C. § 1415(i)(2), a prerequisite "before bringing such an action." E.L., 773 F.3d at 513-14.

The Board of Education argues in the alternative that, even if it failed to exhaust properly its administrative remedies, an exception to that requirement applies here. Namely, it contends that its failure "should be excused on the basis of futility in that the state agency has arbitrarily and capriciously rejected a timely appeal; or on the basis that the state agency has arbitrarily and capriciously changed its prior practice without notice and to the detriment of the Board [of Education], which reasonably relied upon that prior practice." (Compl. ('409 Case DE 12) ¶ 59).

---

[16] This fact further means that the Board of Education's complaint in federal court was untimely because the "findings and decision" by which the Board of Education was "aggrieved" is the ALJ's May 28, 2021, decision. 20 U.S.C. § 1415(i)(2). It had to "institute a civil action . . . in federal court" "within 30 days [of] receipt of the notice of th[at] decision," N.C. Gen. Stat. § 115C-109.9(d); see also 20 U.S.C. § 1415(i)(2)(B) (explaining that, in this context, "[t]he party bringing the action shall have . . . such time as . . . [s]tate law allows" "to bring such an action"), meaning the Board of Education's October 6, 2021, complaint in federal court is untimely.

The Fourth Circuit has recognized "three narrow exceptions to th[e] exhaustion requirement" under the IDEA: "(1) when the administrative process would have been futile; (2) when a school board failed to give parents proper notification of their administrative rights; or (3) when administrative exhaustion would have worked severe harm upon a disabled child." MM, 303 F.3d at 536. The Board of Education's first basis for an exception falls under the first exception identified by the court in MM. However, "[a]ppeal here would not have been futile because the review officer clearly could have granted [the Board of Education] relief, had [it] availed [it]self of the opportunity of appeal" in a timely fashion. See E.L., 773 F.3d at 516. The Board of Education fails to cite any case where failure to exhaust IDEA administrative remedies has been excused due to the administrative process being futile because the underlying state educational agency allegedly acted arbitrarily and capriciously during the administrative process.

The Board of Education's second basis for excusing its failure, the Department of Public Instruction's alleged arbitrary and capricious change from prior practice, independent from the futility exception, has not been recognized by the Fourth Circuit. Those narrow exceptions that have been adopted "aris[e] largely out of the legislative history of the IDEA," specifically, MM, 303 F.3d at 536, to which the Board of Education does not cite any portion of in support of its previously unrecognized exception.

Moreover, the cases the Board of Education relies on in support of its arguments arose in distinct contexts. Encino Motorcars, LLC v. Navarro, 579 U.S. 211 (2016), considered whether a Department of Labor regulation was arbitrary and capricious, and therefore not due deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), as an interpretation of the relevant statute, because the "regulation was issued without the reasoned explanation that was required in light of the Department's change in position and the significant

38

reliance interests involved." <u>Encino Motorcars</u>, 579 U.S. at 222, 224. <u>MW Clearing & Grading,</u>

<u>Inc. v. North Carolina Department of Environment & Natural Resources, Division of Air Quality</u>,

360 N.C. 392 (2006) (per curiam), <u>rev'g in part</u> 171 N.C. App. 170 (2005), adopted in limited part,

without substantive analysis, a dissenting North Carolina Court of Appeals opinion that an

"agency's longstanding prior history of interpreting violations" of a statute and related regulation

"is the proper interpretation which should receive deference, not an interpretation in which [an

agency employee] essentially throws out the rule book in order to assess a civil penalty inconsistent

with the agency's previous actions." <u>MW Clearing & Grading</u>, 171 N.C. App. at 186 (Jackson, J.,

dissenting). Notably, <u>MW Clearing & Grading</u> arose through the specific procedural vehicle of

the private plaintiff's initiation of a NCAPA suit against the offending agency, which allowed the

agency to affirm its interpretation of the statute and defend it (unsuccessfully).

Neither case discusses an administrative exhaustion requirement, exceptions to that

requirement, or even the IDEA. Further, each case considered the propriety of an official, declared

interpretation of law rather than the ad hoc determination described in the Board of Education's

complaint. (<u>See</u> Compl ('409 Case DE 12) ¶ 49). And in fact, the Board of Education corrects its

complaint in its response to the motion to dismiss, clarifying that it "cannot assert that [the

Department of Public Instruction] has accepted an appeal filed solely electronically [with the

Office of Administrative Hearings] after April 2019," approximately two years prior to its own

electronic filing with the Office of Administrative Hearings, rejection of which was allegedly

arbitrary. (Board of Education's Resp. ('409 Case DE 16) at 5 n.1; Compl. ('409 Case DE 12) ¶

53; <u>see also</u> ALJ Decision ('344 Case DE 22-1) at 79 (explaining under subsection entitled notice

of appeal rights that "[i]nquiries regarding further notices, timelines, and other particulars should

be directed to the Exceptional Children Division of the North Carolina Department of Public Instruction, Raleigh, North Carolina prior to the required close of the appeal filing period")).

As a final matter, in addition and in the alternative, the principal form of relief the Board of Education seeks, remand to the Department of Public Instruction, is not available statutorily, as recently elucidated by the Fourth Circuit. Johnson v. Charlotte-Mecklenburg Sch. Bd. of Educ., 20 F.4th 835, 846 (4th Cir. 2021) ("[D]istrict courts cannot 'remand' an IDEA case to a state agency."); see also Kirkpatrick v. Lenoir Cnty. Bd. of Educ., 216 F.3d 380, 386 (4th Cir. 2000) ("[C]ross-system appeals from state courts to federal courts are not contemplated by our system of federalism."). Its alternative form of relief, direct review of and relief from the ALJ's decision, would circumvent "[t]he IDEA's exhaustion requirement['s] . . . important purpose of allowing states to use their special expertise to resolve educational disputes," E.L., 773 F.3d at 514, such as through appellate review by "an educator or other professional who is knowledgeable about special education" and not employed by an interested party. N.C. Gen. Stat. § 115C-109.9(b).

In sum, the cases cited by the Board of Education and the arguments it proffers fail to provide reason to excuse it from the IDEA's exhaustion requirement. Accepting the Board of Education's factual allegations but not its legal conclusions as true, its appeal was untimely, meaning it failed to exhaust properly its remedies and that its current action may not be brought in this court. Accordingly, the court, under Rules 12(b)(1) and (6), grants G.M. and her parents' motion and dismisses the Board of Education's complaint.[17]

## CONCLUSION

Based on the foregoing, the Board of Education's motion to dismiss in the '344 case (DE 24) is GRANTED IN PART and DENIED IN PART. G.M. and her parents' claims of

---

[17]    Because the court grants their motion on the bases of Rules 12(b)(1) and (6), it does not address G.M. and her parents' arguments under Rules 12(b)(2), (4), and (5).

discrimination and retaliation under the ADA and the Rehabilitation Act and for attorneys' fees under the IDEA may proceed. Their § 1983 claims for violations of G.M.'s equal protection rights are DISMISSED. Further, G.M. and her parents' motion to dismiss in the '409 case (DE 14) is GRANTED. The Board of Education's complaint in that case is DISMISSED.

The clerk is DIRECTED to close the '409 case. In the '344 case, stay ordered November 8, 2021, is LIFTED. An initial order on planning and scheduling will follow in that case.

SO ORDERED, this the 26th day of August, 2022.

LOUISE W. FLANAGAN
United States District Judge